**UNITED STATES COURT OF INTERNATIONAL TRADE**

| |
|---|
| QUANTIFIED OPERATIONS LIMITED, WOBBLEWORKS (HK) LIMITED, |
| Consolidated Plaintiffs, |
| v. |
| UNITED STATES, |
| Defendant. |

Before: Hon. Richard K. Eaton, Judge

Consol. Court No. 22-00178

## <u>ORDER</u>

Having considered Plaintiffs' motion for summary judgment pursuant to Rule 56 of the Rules of this Court concerning the classification of certain 3D Pen Sets, Defendant's response, and all other papers and proceedings in this action, and after due deliberation, it is hereby –

**ORDERED** that Plaintiffs' motion for summary judgment is granted; it is further

**ORDERED** that the responsible United States Customs and Border Protection officials shall re-liquidate the entries subject to this action, classifying Consolidated Plaintiffs 3D Pen Sets in subheading 9503.00.00 of the Harmonized Tariff Schedule of the United States, and refunding the excess duties collected on the merchandise, with interest as provided by law.

_____
Richard K. Eaton, Judge

DATED: _____
      New York, New York

### UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| QUANTIFIED OPERATIONS LIMITED, WOBBLEWORKS (HK) LIMITED,<br><br>        Consolidated Plaintiffs,<br>  v.<br><br>UNITED STATES,<br><br>           Defendant. | Before: Hon. Richard K. Eaton, Judge<br><br>Consol. Court No. 22-00178 |

### PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Pursuant to U.S. Court of International Trade Rules 7(g) and 56(a), Consolidated Plaintiffs, Quantified Operations Limited ("Quantified") and WobbleWorks (HK) Limited ("WobbleWorks") ("Plaintiffs"), move for summary judgment in their favor. A judicial decision on the motion would dispose of this case on its merits.

This case involves the tariff classification of several models of small, hand-held 3Doodler® and similar 3D doodling pens and their sets ("3D Pen Sets" or "imported merchandise") imported by Plaintiffs. The United States Customs and Border Protection ("Customs" or "CBP") liquidated the subject entries under subheading 8477.80.00 (or 8477.80.01, depending on the year of entry) of the Harmonized Tariff Schedule of the United States ("HTSUS"), which covers industrial "machinery for working rubber or plastics" or "for the manufacture of products from these materials." Plaintiffs challenge Customs' classification on the grounds that when a General Rules of Interpretation ("GRI") GRI 1 analysis is applied, the 3D Pen Sets are properly classified under subheading 9503.00.00, HTSUS, duty free, because their principal use is as toys, not as industrial machinery.

Plaintiffs contend that this Motion for Summary Judgment can be decided as a matter of law in their favor, based on Memorandum of Law, Declarations and Exhibits thereto, Separate Statement of Undisputed Material Facts, Request for Judicial Notice, and other

pleadings filed concurrently herewith and upon the entire record, including the other documents and records filed in this action.

WHEREFORE, Plaintiff asks this Court to grant their Motion for Summary Judgment and order that the appropriate official of Customs be directed to reliquidate the entries subject to this action, classifying the 3D Pen Sets under subheading 9503.00.00, HTSUS, and to refund to Plaintiff the excess duties deposited, with interest properly payable to Plaintiffs from the date of deposit thereof, as provided by law.

Respectfully submitted,

*/s/ Alena A. Eckhardt*
Alena A. Eckhardt
Matt Nakachi

NAKACHI ECKHARDT & JACOBSON, P.C.
50 California Street, Suite 1500
San Francisco, CA 94111
(415) 498-0070
alena@tradelawcounsel.com
matt@tradelawcounsel.com
*Counsel for Plaintiffs*

# TABLE OF EXHIBITS

| EXHIBIT | DESCRIPTION |
|---|---|
|  | **DECLARATION OF MAXWELL BOGUE** |
| **A** | A1-8: Physical Samples of the 3D Pen Sets [MANUALLY SUBMTTED] |
| **B** | Marketing Materials |
| **C** | Retail Placement: Online Listings and In-Store Displays |
| **D** | Representative Toy Industry Publications and Insights |
| **E** | Toy Industry Trade Shows Images |
| **F** | Customer Reviews |
|  | **DECLARATION OF ALENA A. ECKHARDT** |
| **G** | Excerpts from the Deposition of Daniel Cowen (Jan. 6, 2025) |
| **H** | U.S. Customs Ruling NY N248177 (Dec. 18, 2013) |
| **I** | U.S. Customs Headquarters Ruling HQ H293445 (Oct. 7, 2019) |
| **J** | Defendant's Responses to Plaintiffs' Interrogatories, Set One |
| **K** | Excerpts from *Oxford English Dictionary Online*, Oxford Univ. Press, https://www.oed.com. |
| **L** | Google Image Search for "Machinery for Working Plastics or the Manufacture of Products from Plastics" Screenshot (Aug. 8, 2025) |
|  | **DECLARATION OF MR. BERT REINER, PLAINTIFFS' TOY INDUSTRY EXPERT W/ATTACHMENTS** |
|  | Attachment 1: CV |

| | |
|---|---|
| | Attachment 2: Article Re: "Kidults" |
| | Attachment 3: Sample Packaging and Doodles |
| | Attachment 4: Google Image Search |
| | Attachment 5: Hobby Lobby Store Placement Photo |
| | **DECLARATION OF DR. DAVID KAZMER, PLAINTIFFS' PLASTICS INDUSTRY EXPERT W/ATTACHMENTS** |
| | Attachment 1: CV |
| | Attachment 2: Test data |
| | Attachment 3: Patent |
| | Attachment 4: Excerpts from websites |
| | Attachment 5: Highlights of Plastic Industry Association Video **[MANUALLY SUBMITTED]** |

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| QUANTIFIED OPERATIONS LIMITED, WOBBLEWORKS (HK) LIMITED, <br><br>                               Consolidated Plaintiffs, <br>     v. <br><br> UNITED STATES, <br><br>                                   Defendant. | Before: Hon. Richard K. Eaton, Judge <br><br> Consol. Court No. 22-00178 |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Dated:      August 25, 2025

                                     */s/ Alena A. Eckhardt*
                                     Alena A. Eckhardt
                                     Matt Nakachi

                                     NAKACHI ECKHARDT & JACOBSON, P.C.
                                     50 California Street, Suite 1500
                                     San Francisco, CA 94111
                                     (415) 498-0070
                                     alena@tradelawcounsel.com
                                     matt@tradelawcounsel.com
                                     *Counsel for Consolidated Plaintiffs*

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................1

SUBJECT MERCHANDISE................................................................................................3

RELEVANT PORTIONS OF THE TARIFF SCHEDULE ..................................................6

I.    Tariff Provision Claimed by the Government ...........................................................6

II.   Tariff Provisions Claimed by Plaintiffs ...................................................................7

STATEMENT OF FACTS ...................................................................................................8

QUESTION PRESENTED FOR DECISION .....................................................................8

SUMMARY OF THE ARGUMENT ...................................................................................8

JURISDICTION ..................................................................................................................9

STANDARD OF REVIEW ................................................................................................10

I.    The 3D-Pens Are Properly Classified in HTSUS 9503, as Toys, and Not in
      HTSUS 8477, as Machinery for Working Plastics or for the Manufacture of
      Products from Plastics.................................................................................................11

      A.    Governing Rules of Interpretation .................................................................12

      B.    The 3D-Pen Sets are Prima Facie Classifiable in HTSUS 9503 Because
            They are Invented, Designed and Used for Amusement, Diversion or
            Play of Children and Adults, Rather than Practicality..................................15

            1.    HTSUS 9503 Provides for the Class or Kind of Merchandise That
                  are "Toys" ...........................................................................................15

            2.    The Class or Kind to Which The 3D-Pen Sets Belong is "Toys"..........17

            3.    The 3D-Pen SETS Are Classified as Toys in HTSUS 9503.00.00
                  Under GRI 3(b) ...................................................................................26

            4.    Exclusionary Note Forecloses Classification of the 3D-Pen Sets in
                  Chapter 84 ...........................................................................................27

      C.    3D-Pen Sets Are Not Properly Classified in Heading 8477, HTSUS, as
            Machinery for Working Plastics or the Manufacture of Products from
            Plastics ...........................................................................................................28

            1.    HTSUS 8477 Provides for the Class or Kind of Merchandise That
                  are Machinery for Working Plastics or the Manufacture of
                  Products from Plastics .........................................................................28

        2.   The Carborundum Factors Demonstrate that the 3D-Pens are Not of a Class or Kind Principally Used for Working Plastics or the Manufacture of Products from Plastics ...................................................34

III.    Alternatively, the 3D-Pens Are Classifiable in Heading 8516, HTSUS, as Domestic Appliances ...........................................................................................41

IV.    Alternatively, the 3D-Pens Are Classifiable in Heading 8467, HTSUS, as Handheld Tools..........................................................................................................43

     A.      Heading 8467, HTSUS, Covers Portable Hand Tools...................................43

     B.      Customs Analysis in HQ H293445 Was Unreasonable................................44

     C.      Heading 8477 Could Never Have Applied ...................................................45

CONCLUSION ...........................................................................................................46

## TABLE OF AUTHORITIES

**Statutes**

19 U.S.C. § 1202 .................................................................................................................3

19 U.S.C. § 1515 .................................................................................................................9

19 U.S.C. § 1515(b) ............................................................................................................9

28 U.S.C. § 1581(a) ........................................................................................................9, 10

28 U.S.C. § 2637(a) ..........................................................................................................10

28 U.S.C. § 2640(a)(1) ......................................................................................................10

**Rules**

USCIT Rule 56(a) ..............................................................................................................10

USCIT Rule 56.3(a) .............................................................................................................8

**Cases**

*Anderson v. Liberty Lobby, Inc.,*

477 U.S. 242 (1986) ...........................................................................................................10

*Aromont USA, Inc. v. United States,*

671 F.3d 1310 (Fed.Cir.2012) ................................................................................10, 17, 24

*Automatic Plastic Molding, Inc. v. United States*,

26 C.I.T. 1201 (Ct. Int'l Trade 2002) ................................................................................14

*Bausch & Lomb, Inc. v. United States,*

148 F.3d 1363 (Fed.Cir.1998) ............................................................................................10

*BenQ Am. Corp. v. United States*,

646 F.3d 1371 (Fed. Cir. 2011) .....................................................................................12, 14

*Carl Zeiss, Inc. v. United States,*

195 F.3d 1375 (Fed.Cir.1999) ........................................................................................12, 13

*Clarendon Mktg., Inc. v. United States,*

144 F.3d 1464 (Fed. Cir. 1998) ..........................................................................................43

*Consolidated Int'l Equip. & Supply Co. v. United States*,

280 F. Supp. 886 (Cust. Ct. 1968) ......................................................................31

*Cummins Inc. v. United States*,

454 F.3d 1361 (Fed. Cir. 2006)...........................................................................10

*ENI Tech. Inc. v. United States*,

641 F.Supp.2d 1337 (Ct. Int'l Trade 2009) ........................................................10

*EOS of North America, Inc. v. United States*,

911 F. Supp.2d 1311 (Ct. Int'l Trade 2013) ...........................................13, 33, 39

*Ero Indus., Inc. v. United States*,

118 F. Supp. 2d 1356 (Ct. Int'l Trade 2000) .....................................................16

*Goodman Mfg., L.P. v. United States*,

69 F.3d 505 (Fed.Cir.1995)..................................................................................10

*Hartz Mountain Corp. v. United States*,

903 F. Supp. 57 (Ct. Int'l Trade 1995) ...............................................................41

*Ideal Toy Corp. v. United States*,

78 Cust. Ct. 28 (1977)..........................................................................................16

*Infantino v. United States*,

2014 WL 7331753, 36 ITRD 1534 (Ct. Int'l Trade 2014) ...........................15, 16

*Janex Corp. v. United States*,

80 Cust. Ct. 146, C.D. 4748 (1978) ....................................................................18

*Kahrs Int'l., Inc. v. United States*,

791 F.Supp.2d 1228 (Ct. Int'l Trade 2011) ..................................................13, 30

*Len-Ron Mfg. Co. v. United States*,

334 F.3d 1304 (Fed. Cir. 2003).....................................................................24, 43

*Minnetonka Brands v. United States*,

110 F. Supp. 2d 1020 (Ct. Int'l Trade 2000) ......................................13, 15, 17, 27

iv

*Orlando Food Corp. v. United States*,

140 F.3d 1437 (Fed. Cir. 1998)........................................................................12

*Primal Lite, Inc. v. United States*,

182 F.3d 1362 (Fed.Cir.1999).....................................................................13, 43

*Processed Plastic Co. v. United States*,

473 F.3d 1164 (Fed. Cir. 2006)........................................................................15

*Rollerblade, Inc. v. United States*,

282 F.3d 1349 (Fed. Cir. 2002)........................................................................46

*Skidmore v. Swift & Co.*,

323 U.S. 134 (1944)........................................................................................11

*Sony Electronics, Inc.*,

37 C.I.T. 1748 (Ct. Int'l Trade 2013) ..............................................................11

*Springs Creative Products Group v. United States*,

37 C.I.T. 1222 (Ct. Int'l Trade 2013) ...................................................15, 16, 18

*United States v. Carborundum Co.*,

63 CCPA 98, 536 F.2d 373 (1976) .............................................................14, 17

*United States v. Kurt Orban Co.*, Inc.,

47 CCPA 28, C.A.D. 724 (1959)......................................................................31

*United States v. Mead Corp.*,

533 U.S. 218 (2001)........................................................................................11

*Warner-Lambert Co. v. U.S.*,

407 F.3d 1207 (Fed. Cir. 2005)........................................................................11

**Other Authorities**

Harmonized Tariff Schedule of the United States

Additional Rule of Interpretation 1(a) .............................................13, 14, 17, 40

Chapter Note 4 to Chapter 95 ..........................................................................26

Explanatory Note to Heading 3924.................................................................................41

Explanatory Note to Heading 8467.................................................................................43

Explanatory Note to Heading 8477.................................................................................29

Explanatory Note to Heading 8516.............................................................................41, 42

Explanatory Note to Heading 9503.........................................................................15, 16, 20

Explanatory Note X to General Rule of Interpretation 3(b) ...............................................26

General Rule of Interpretation 1 ........................................................................12, 28, 40

General Rule of Interpretation 3(b).........................................................................26, 27

Heading 8467 ...........................................................................................i, 7, 43

Heading 8477 .................................................................................................passim

Heading 8516 .................................................................................................passim

Heading 9503 .................................................................................................passim

Section Note 1(p) to Section XVI...................................................................14, 27, 41, 46

Section Note 5 to Section XVI........................................................................................28

Subheading 8467.29.00...........................................................................................1, 7, 8

Subheading 8467.29.0090.......................................................................................7, 45, 46

Subheading 8477.80.00.......................................................................................passim

Subheading 8477.80.01.......................................................................................passim

Subheading 8516.79.00.......................................................................................passim

Subheading 9503.00.00.......................................................................................passim

U.S. Customs and Border Protection Rulings

Headquarters Ruling Letter 950627 (Mar. 30, 1992) ..........................................................42

Headquarters Ruling Letter 960374 (Aug. 8, 1997) ......................................................31, 39

Headquarters Ruling Letter H293445 (Oct. 7, 2019) .........................................i, 11, 43, 44

Headquarters Ruling Letter H293457 (Jan. 7, 2025)............................................................38

New York Ruling Letter D84411 (Nov. 24, 1998)..............................................................38

New York Ruling Letter N248177 (Dec. 18, 2013) ............................................................42

New York Ruling Letter N289201 (Sept. 12, 2017)............................................................43

<u>Other Administrative Authorities</u>

Treasury Directive 89-80, 54 Fed. Reg. 35127 (August 23, 1989) .....................................13

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| QUANTIFIED OPERATIONS LIMITED, WOBBLEWORKS (HK) LIMITED, <br><br><br> Consolidated Plaintiffs, <br>     v. <br><br> UNITED STATES, <br><br> Defendant. | Before: Hon. Richard K. Eaton, Judge <br><br> Consol. Court No. 22-00178 |

## MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

This memorandum is submitted in support of Plaintiffs' Motion. Plaintiffs move for judgment in their favor because, as a matter of law, the proper tariff classification of the imported merchandise is under subheading 9503.00.00, HTSUS (as toys), and not under subheading 8477.80.00, or 8477.80.01, HTSUS (as industrial-grade machinery), as claimed by the Government. Alternatively, Plaintiffs plead classification under subheading 8467.29.00, HTSUS (as tools for working in the hand with a self-contained electrical motor), or 8516.79.00, HTSUS (electrothermic appliances of a kind used for domestic purposes).

## INTRODUCTION

This case centers on the proper classification of various models of 3D doodling pens ("3D-Pens"), imported in retail sets ("3D-Pen Sets"). Plaintiffs' Statement of Undisputed Material Facts ("SUMF") ¶¶1–2. 3D-Pens are compact, handheld, electrically powered devices, sold in sets designed to appeal to both children and adults. SUMF ¶¶39, 40, 51. With an ergonomic shape and brightly colored or aesthetically styled design, the 3D-Pens are presented in playful packaging with colorful filament packs, project stencils, and activity guides that encourage fun and imaginative play. SUMF ¶¶47, 52, 54, 61, 82. Measuring 7 inches or less long and weighing just a few ounces, all 3D-Pens feature a lightweight housing,

ergonomic design, intuitive controls, and a low-voltage heating element paired with a small motor. SUMF ¶¶40, 47, 49-50, 56. This user-friendly design softens and dispenses colorful plastic filament, enabling users to "doodle" freeform, whimsical lines, shapes, and objects in mid-air or on surfaces, sparking imagination and bringing creative ideas to life in playful form (SUMF ¶¶44-45; *see*, e.g.:



SUMF ¶3; **Comp. Ex. A6**, **Comp. Ex. B**.

The subject 3D-Pens were designed and developed for creative amusement by children and adults, not for practical utility or any industrial-grade plastic processing or manufacture. SUMF ¶¶69-71. From the beginning, Plaintiffs' business group centered on licensing innovative toy concepts to toy companies; and the idea for a 3D-Pen arose while its inventors worked on a toy for a well-known toy company. SUMF ¶¶26-28. The first prototype was a basic, hand-assembled and user-friendly, able to "doodle" lines and shapes in mid-air, and was pitched to and optioned by major toy companies, confirming its recognition as a toy. SUMF ¶¶29-32. From its invention, the original 3Doodler® 3D pen was conceived and marketed as a novel, playful device for creating whimsical three-dimensional objects purely for enjoyment,

2

which was immediately validated by overwhelming consumer enthusiasm and recognition from the toy industry.  SUMF ¶35.  Since then, 3D-Pens have consistently been designed, marketed, and sold as products for amusement and play, appealing to both children and adults, and they continue to be overwhelmingly used for these purposes today.

The entire line of 3D-Pen products is made by factories specializing in toys and sold by leading retailers in the toys, games, and crafts departments, featured at prestigious international toy fairs, and recognized with toy industry awards.  SUMF ¶¶38, 79-81, 96-100.  From their origin and design, through their channels of trade, packaging, and consumer perception, the record consistently demonstrates that their principal use is, and always has been, as toys.  To the extent the Pens could be used for incidental utilitarian purposes, such uses are secondary and do not outweigh their predominant amusement value. SUMF ¶¶70-71.

The subject entries liquidated under subheading 8477.80.00 or 8477.80.01, HTSUS, depending on year of entry, as industrial "machinery for working rubber or plastics or for the manufacture of products from these materials."  SUMF ¶13; 19 U.S.C. § 1202.  Plaintiffs maintain the 3D-Pen Sets are properly classifiable under HTSUS subheading 9503.00.00, HTSUS, as toys.

No genuine dispute over the nature or function of 3D-Pens or this Court's jurisdiction exists.  The only issue is their proper tariff classification – a question of law suitable for summary judgment.  Undisputed evidence and every *Carborundum* factor show their principal use is as toys under heading 9503, HTSUS, not as industrial machinery under heading 8477, HTSUS.  Plaintiffs are entitled to summary judgment.

## SUBJECT MERCHANDISE

The imported merchandise includes eight 3D-Pen Sets: 3Doodler® Create+ Pen Set, 3Doodler® PRO+ Pen Set, Scrib3D P1, Scrib3D Advanced, Pika3D PRO Pen Set, Pika3D Super Pen Set, and 3Doodler® Create+ Learning Pack Sets (6 Pens and 12 Pens).    Physical

samples of each of model has been submitted to the Court.  SUMF ¶2, Composite ("Comp.")

Exhibit ("Ex.") A1-8, Physical Samples.  These 3D-Pens in their retail sets share the following

characteristics:

- A 3D-Pen is a small, electrically-operated, handheld device, roughly the size of a marker, that functions through a simplified internal mechanism: a low-voltage heating element heats a thin plastic filament inserted into the back of the pen, while a small electric motor and gear assembly feed the filament through a nozzle at the tip of the pen.  SUMF ¶40.

 

SUMF ¶¶39, 41-44, **Comp. Ex. B**.

- Once the device is plugged in and powered on, and the user inserts a plastic filament into the back of the pen, the pen heats up to a preset temperature suited to the chosen filament type (e.g., PLA or ABS).  By pressing a button, the user activates an internal motor that feeds the filament into a heated chamber where the filament is made pliable. As the user continues to press the button, the softened filament is pushed out of the pen's nozzle. As the softened filament is dispensed, it quickly cools and solidifies, enabling users to build up forms upward and outward, creating whimsical lines and shapes in mid-air or on surfaces.  SUMF ¶¶41-44.

- The design of all 3D-Pens is intentionally user-friendly: 3D-Pens do not require software, design files, digital models, or programming.  Instead, they are operated entirely by hand, allowing for intuitive, freeform creativity.  SUMF ¶¶45-46.

- Their bodies are lightweight (only a few ounces), aesthetically styled, and ergonomically shaped for small and large hands alike. SUMF ¶47.

- Most models include a simple on/off switch or a start button, along with adjustable for feed/reverse and temperature/speed settings for greater control.  SUMF ¶48.

4

- The pens use low-voltage heaters (typically powered by USB or small AC-adapters operating at only 5V, 2A) with limited and safe temperature ranges adjustable for filament types.  SUMF ¶¶49, 56.

- All pens feature manual, intuitive controls: all models operate via simple controls – buttons or sliders for feed/reverse and temperature/speed.  Some PRO+ models add an OLED with multi-speed settings, but remains manually driven, confirming their design for creative hands-on use.  SUMF ¶50.

- 3D-Pen Sets are typically packaged in brightly-colored, visually-engaging boxes to appeal to a wide age range, from children and teens to adults.  The packaging is compact, often featuring imagery of the pen in use as a toy and sample whimsical creations to emphasize creativity and hands-on fun.  SUMF ¶51.

- Predominantly shown on the package are typically "LIFT YOUR IMAGINATION OFF THE PAGE," "DOODLE IN OVER 65 COLORS," DRAW ANYTHING IN 3D," "ACQUIRE NEW SKILLS," "CREATE A NEW DIMENSION," "EXPRESS YOURSELF IN 3D."  SUMF ¶52.

- Each Set typically includes a 3D-Pen, a starter assortment of plastic filaments (typically PLA, ABS, or specialty filaments, 1.75 or 3mm, depending on the model), and a power adapter or USB charging cable. SUMF ¶55.

- The filaments are brightly colored strands to support playful and creative projects. SUMF ¶60. The entry-level and mid-range pen sets at issue mainly use PLA (polylactic acid) and ABS (acrylonitrile butadiene styrene) plastic filaments.  SUMF ¶57.

- "Pro" models (3Doodler® PRO+) expand the creative possibilities by offering a wider range of filament material for advanced users of all ages (including specialty filaments such as wood-filled composites, nylon, FLEXY (flexible TPU), or infused filament (*e.g.,* copper and bronze within the plastic filament), which enhance the fun and expressive possibilities of "doodling" in 3D.  SUMF ¶64.

- Additional set contents commonly include colorfully illustrated activity guides or project booklets, which are playfully illustrated and designed to encourage creative experimentation – offering easy, step-by-step instructions with stencils for making whimsical doodles and objects, while inviting users to invent their own designs.  SUMF ¶61.

- Other accessories such as nozzle-cleaning tools or unblocking-rods, or silicone work-mats may also be included to assist with maintenance and promote safety and ease of use.  SUMF ¶62.

- Educational or multi-pen Learning Pack sets are packaged with organized compartments for each item and extra materials, such as lesson plans, challenge cards, filaments, maintenance tools and organized storage, to ensure an "open-and-go" educational experience to support immediate play and ongoing creative discovery. SUMF ¶63.

- Each set is marketed for users 14 and up.  SUMF ¶68.

- Although the six 3D pen models at issue differ in certain technical and cosmetic respects, those distinctions are immaterial to tariff classification. All share the same core characteristics – integral architecture, plastic construction, handheld design, consumer-oriented marketing, and principal use for amusement or play of children and adults. To the extent individual models include additional features (such as variable speed or temperature settings), those features do not alter the pens' fundamental nature or their principal use as toys.

- Plaintiffs submit the declarations of Mr. Maxwell Bogue (inventor and founder), Mr. Bert Reiner (toy industry expert), and Dr. David Kazmer (plastics industry expert), all of which are incorporated herein by reference. These declarations demonstrate that the products are principally used for the amusement and play of both children and adults, not for practical applications, and certainly not for industrial plastics processing or manufacturing.

### RELEVANT PORTIONS OF THE TARIFF SCHEDULE

### I.    Tariff Provision Claimed by the Government

Customs liquidated the 3D-Pen Sets under HTSUS subheading 8477.80.00 (2020, 2021) or 8477.80.01 (2022, 2023),[1] which provides for:

**Heading 8477**      Machinery for working rubber or plastics or for the manufacture of products from these materials, *not specified or included elsewhere in this chapter*; parts thereof:

    . . .

  **8477.80.01**          Other machinery

(Emphasis added.)

This subheading had an applicable *ad valorem* duty rate of 3.1%.    Additionally, Customs liquidated the imported merchandise under secondary HTSUS subheading 9903.88.01, which had an additional applicable 25% Section 301 tariff.

---

[1] SUMF ¶12, fn. 1.

## II.    <u>Tariff Provisions Claimed by Plaintiffs</u>

Plaintiffs contend that the classification of the imported merchandise as industrial machinery in HTSUS subheading 8477.80.00 (or 8477.80.01) is incorrect, and the 3D-Pen Sets should enter duty and tariff free under HTSUS subheading 9503.00.00, which provides for:

**Heading 9503**[2]

| | |
|---|---|
| **9503.00.00** | Tricycles, scooters, pedal cars and similar wheeled toys; dolls' carriages; dolls, *other toys*; reduced-scale ("scale") models and similar recreational models, working or not; puzzles of all kinds; parts and accessories thereof: |

. . .

| | |
|---|---|
| **9503.00.0090** | Other |

(Emphasis added.)

In the alternative, Plaintiffs contend that the 3D-Pen Sets should be classified under subheading 8467.29.0090, HTSUS, which provides for:

| | |
|---|---|
| **Heading 8467** | *Tools for working in the hand*, pneumatic, hydraulic or *with self-contained electric* or nonelectric *motor*, and parts thereof: |

. . .

| | |
|---|---|
| **8467.29.00** | Other |

. . .

| | |
|---|---|
| **8467.29.0090** | Other |

(Emphasis added.)

In the alternative, Plaintiffs contend that the 3D-Pen Sets should be classified under subheading 8516.79.00, HTSUS, which provides for:

---

[2] HTSUS subheading 9503.00.00 encompasses the full scope of articles typically described as "toys." Unlike many other tariff provisions, Chapter 95 does not feature a separate four-digit heading 9503 standing alone; instead, the relevant provision for classification is the six-digit subheading 9503.00.00, HTSUS. As a result, when classifying merchandise that may fall within this category, the Court must analyze and apply the language and scope of subheading 9503.00.00 directly, since there is no discrete heading 9503 to consult separately.  This structure requires the Court to construe and apply the terms of subheading 9503.00.00 as the primary and operative tariff provision for toys and related articles under the HTSUS.

| | |
|---|---|
| **Heading 8516** | Electric instantaneous or storage water heaters and immersion heaters; electric space heating apparatus and soil heating apparatus; electrothermic hairdressing apparatus (for example, hair dryers, hair curlers, curling tong heaters) and hand dryers; electric flatirons; *other electrothermic appliances of a kind used for domestic purposes*; electric heating resistors, other than those of heading 8545; parts thereof: |
| | . . . |
| **8516.79.00** | Other |

(Emphasis added.)

## STATEMENT OF FACTS

Pursuant to USCIT Rule 56.3(a), Plaintiffs incorporate their Statement of Material Undisputed Facts as if fully set forth herein.

## QUESTION PRESENTED FOR DISCUSSION

Whether the 3D-Pen Sets are classified as "toys" in subheading 9503.00.00, HTSUS, (or, alternatively, under subheadings 8516.70.00 or 8467.29.00, HTSUS), as claimed by Plaintiffs; or as "machinery for working plastics or for the manufacture of products from plastics" under subheading 8477.80.00 (or 8477.80.01), HTSUS, as claimed by the Government?

## SUMMARY OF THE ARGUMENT

Summary judgment for Plaintiffs is appropriate. The issue in this case is whether the merchandise at issue is classified as "toys" of a kind used for amusement under heading 9503, HTSUS, or machinery of a kind used for industrial working of plastics or for the manufacture of products from plastics under heading 8477, HTSUS.

Both headings at issue in this action are "principal use" provisions, and therefore, the ordinary use of the class or kind to which the imported merchandise belongs is controlling. The record and uncontroverted expert testimony establish that the 3D-Pens are within the class/kind known in commerce as "toys." They are designed, packaged, and marketed for creative amusement, widely sold through toy and craft channels, and recognized within the toy

industry and used by consumers of all ages as playthings. The plain language of the HTSUS, legal notes, the Explanatory Notes, and all *Carborundum* factors, confirm 3D-Pens are principally used as toys, and are "toys" under heading 9503, HTSUS.  Moreover, 3D-Pens are not of the class or kind of machinery used for industrial or commercial processing of plastics or manufacturing of plastic products contemplated by heading 8477, HTSUS, as commonly and commercially understood.  Unlike the stationary, heavy-duty equipment classified within HTSUS 8477, HTSUS, which is designed to reliably and consistently process large volumes of plastics and manufacture plastic goods on a commercial scale, these 3D-Pens are small, lightweight, handheld devices intended for individual use.  They lack the capacity for high-volume, continuous production and cannot perform the automated, large-scale processing or manufacturing that defines machinery under heading 8477, HTSUS.  Instead, the 3D-Pens are designed to create whimsical objects that lack practical utility; their value lies in the act of play and amusement, not in the outputs themselves.  Accordingly, the 3D-Pen Sets fall within heading 9503, HTSUS, and Plaintiffs' motion for summary judgment should be granted.

## JURISDICTION

Plaintiffs bring this action pursuant to 19 U.S.C. § 1515. The Court has exclusive jurisdiction over any civil action commenced to contest the denial of a protest, in whole or in part, under Section 515 of the Tariff Act of 1930 pursuant to 28 U.S.C. § 1581(a).  Plaintiffs timely protested Customs' liquidations of entries between June 2020 and August 2023.  SUMF ¶¶14-17.  Customs denied the protests on January 19, 2022, February 16, 2022, and March 1, 2024, or they were deemed denied by operation of law under 19 U.S.C. § 1515(b) on January 17, 2022.  *Id*.  Plaintiffs then filed summonses within 180 days of each denial, resulting in court numbers 22-00178, 22-00179, 24-00015, and 24-00058.  *Id*.  The Court subsequently consolidated the actions under lead Court No. 22-00178.  *Id*. ¶18.  Plaintiffs paid all liquidated

duties, taxes, and fees prior to filing, consistent with 28 U.S.C. § 2637(a).  *Id*. ¶19.  Therefore, this Court has jurisdiction pursuant to 28 U.S.C. § 1581(a).  SUMF ¶20.

## **STANDARD OF REVIEW**

Summary judgment is appropriate where "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  USCIT R. 56(a); *see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986).*

This Court may resolve a classification issue by means of summary judgment.  *Bausch & Lomb, Inc. v. United States,* 148 F.3d 1363, 1365 (Fed.Cir.1998).  Determining the correct classification of merchandise requires the Court to first construe the relevant classification headings, which is a purely legal question, and then to determine under which of the properly construed tariff terms the merchandise at issue falls, which is a question of fact.  *Id*. (Citations omitted.) Where, as here, the nature of the merchandise is undisputed, the classification issue collapses entirely into a question of law, and court reviews Customs' classification decision *de novo* on the record made before the court.  *Cummins Inc. v. United States*, 454 F.3d 1361, 1363 (Fed. Cir. 2006) (citations omitted); 28 U.S.C. § 2640(a)(1).  When the only factual dispute between the parties is the "principal use" of merchandise, this is not a material dispute preventing summary judgment. *Aromont USA, Inc. v. United States,* 671 F.3d 1310 (Fed.Cir.2012) (making a principal use determination at summary judgment); *ENI Tech. Inc. v. United States,* 641 F.Supp.2d 1337 (Ct. Int'l Trade 2009) (granting summary judgment on the issue of principal use).

Where no genuine dispute as to any material fact on motion for summary judgment exists, Customs does not receive the benefit of any presumption of correctness.  *Goodman Mfg., L.P. v. United States,* 69 F.3d 505, 508 (Fed.Cir.1995).  Moreover, this Court need not defer to Customs' final classification determination; rulings are only afforded deference proportional to their power to persuade,  *United States v. Mead Corp*., 533 U.S. 218, 234-35

(2001) (citing to *Skidmore v. Swift & Co. (Skidmore)*, 323 U.S. 134, 140 (1944)), and "the degree of deference depends on the thoroughness evident in the classification ruling; the validity of the reasoning that led to the classification; consistency of the classification with earlier and later pronouncements; the formality with which the particular ruling was established; and other factors that supply a 'power to persuade.'" *Warner-Lambert Co. v. U.S.*, 407 F.3d 1207, 1209 (Fed. Cir. 2005) (citing to *Skidmore*, 323 U.S. at 140). "A lack of consistency indicates that Customs has not thoroughly considered a particular classification and undermines the persuasive power of its conclusions." *Sony Electronics, Inc.*, 37 C.I.T. 1748, 1754-1755 (Ct. Int'l Trade 2013).

Customs' ruling HQ H293445 (Oct. 7, 2019) (SUMF ¶22), which misclassifies 3D-Pen as industrial machinery, fails on every measure. It is inconsistent with its prior ruling that classified a 3D-Pen under heading 8516, HTSUS, fails to even address heading 9503, HTSUS, and ignores legal standards by omitting the proper GRI, ARI and *Carborundum* analysis, undermining any claim to consistency or expertise. Most critically, the ruling lacks reasoned analysis, ignores the common and commercial meaning of the terms in heading 8477, HTSUS, and arbitrarily treats small handheld 3D-Pens as industrial equipment. The ruling is entitled to no deference under *Skidmore*.

## ARGUMENT

### I.    The 3D-Pens Are Properly Classified in HTSUS 9503, as Toys, and Not in HTSUS 8477, as Machinery for Working Plastics or for the Manufacture of Products from Plastics

The issue before the Court is whether Plaintiffs' 3D-Pen Sets are properly classified under heading 9503, HTSUS, as "other toys," as Plaintiffs contend, or under heading 8477, HTSUS, as "machinery for working rubber or plastics, or for the manufacture of products from these materials," as the Government asserts. As discussed herein, the 3D-Pens' value lies principally in their capacity to provide amusement for children and adults, which far outweighs

any functional utility. Accordingly, their classification as toys under heading 9503 is proper, precluding classification in heading 8477. Moreover, the 3D-Pens are not machinery principally used for the industrial or commercial processing or manufacture of plastic products.

### A. *Governing Rules of Interpretation*

The General Rules of Interpretation ("GRIs") and, if applicable, the Additional U.S. Rules of Interpretation ("ARIs"), which are both applied in numerical order, govern the classification of merchandise under the HTSUS. *BenQ Am. Corp. v. United States*, 646 F.3d 1371, 1376 (Fed. Cir. 2011).

The Court's analysis begins with GRI 1, which instructs that, "classification shall be determined according to the terms of the headings and any relative section or chapter notes." HTSUS, GRI 1. The HTSUS chapter and section notes are considered binding statutory law. *BenQ Am. Corp.*, 646 F.3d at 1376 (citation omitted). In other words, the Court must first examine the language of the tariff headings to determine whether the merchandise is described by those terms and not excluded by any applicable notes – so that the article is *prima facie* classifiable under a particular heading. *Orlando Food Corp. v. United States*, 140 F.3d 1437, 1440 (Fed. Cir. 1998). Only where goods are *prima facie* classifiable under multiple headings do GRIs 2–6 apply. If the proper heading can be determined under GRI 1, the Court need not look to subsequent GRIs. This is the case here: the 3D-Pens, by their terms, design, and principal use, fall squarely within HTSUS 9503, as toys, and therefore classification is resolved at GRI 1 without resort to further interpretive rules.

Where a tariff term is not defined in either the HTSUS or its legislative history, the Court construes HTSUS terms according to their common and commercial meanings, which are presumed to be the same in the absence of a contrary legislative intent. *Carl Zeiss, Inc. v. United States,* 195 F.3d 1375, 1379 (Fed.Cir.1999). In construing tariff terms "a court may rely upon its own understanding of the terms used and may consult lexicographic and scientific

authorities, dictionaries, and other reliable information sources." *Id*. at 1378. Among the other reliable information sources, courts may also look to expert testimony, to ensure that the HTSUS is interpreted in light of commercial realities and the practical context of the industries in which the subject merchandise exists. *Kahrs Int'l., Inc. v. United States*, 791 F.Supp.2d 1228, 1241 (Ct. Int'l Trade 2011) (opinions of expert witnesses pertaining to the common meaning of tariff terms may be considered to the extent they are supported, and not contradicted, by reliable textual sources). In understanding the language of HTSUS, the court may also utilize the Explanatory Notes of the Harmonized Commodity Description and Coding System, which constitute the official interpretation of the HTSUS at the international level. While neither dispositive nor legally binding, the Explanatory Notes provide a commentary on the scope of each heading and are generally indicative of the proper interpretation of the HTSUS. *See*, T.D. 89-80, 54 Fed. Reg. 35127 (August 23, 1989).

Furthermore, because both heading 9503 and heading 8477 are principal use provisions, they are governed by ARI 1(a).[3] "[A] tariff classification controlled by use (other than actual use) is to be determined in accordance with the use in the United States at, or immediately prior to, the date of importation, of goods of that class or kind to which the imported goods belong, and the controlling use is the principal use." ARI 1(a); *see also*, *Primal Lite, Inc. v. United States*, 182 F.3d 1362, 1363 (Fed.Cir.1999). "Principal use" is defined as the use "which exceeds any other *single* use." *Id*. Fundamentally, the purpose of "principal use" provisions is to classify imported merchandise according to the ordinary use of such merchandise, even though specific imported goods in a particular may be put to some atypical, "fugitive" use. *Id*.

---

[3] Heading 9503 is a "principal use" provision within the meaning of ARI 1(a), HTSUS. In *Minnetonka Brands v. United States*, 110 F. Supp. 2d 1020, 1026 (Ct. Int'l Trade 2000), the U.S. Court of International Trade (CIT) construed heading 9503 as a "principal use" provision insofar as it pertains to "toys." Heading 8477 is also a "principal use" provision. *EOS of North America, Inc. v. United States*, 911 F. Supp.2d 1311, 1336 (Ct. Int'l Trade 2013) ("Tariff terms using the term "for" in the way that it is used in heading 8477 have been considered to be provisions "controlled by use" governed by Additional Rule of Interpretation 1(a).")

at 1364. The fact that the merchandise may have numerous significant uses does not prevent the Court from classifying the merchandise according to the principal use of the class or kind to which the merchandise belongs. *Automatic Plastic Molding, Inc. v. United States*, 26 C.I.T. 1201, 1206 (Ct. Int'l Trade 2002).

In *Primal Lite*, Federal Circuit construed ARI 1(a) to "call for a determination as to the group of goods that are commercially fungible with the imported goods." 182 F.3d at 1365. The *Carborundum* factors provide guidance in determining what goods are commercially fungible with the imported goods. *BenQ Am. Corp.*, 646 F.3d at 1377; *United States v. Carborundum Co.* (*Carborundum*)*, 63 CCPA 98, 536 F.2d 373, 377 (1976). Thus, where both headings are principal use provisions, the analysis requires determining whether the articles fall within the scope of each heading as informed by their terms and notes and then applying the principal use test to determine the correct classification.

Under the governing rules of interpretation, the 3D-Pen Sets are properly classified in heading 9503, HTSUS, as toys. By operation of Section XVI Note 1(p), this classification then forecloses their inclusion in heading 8477, HTSUS. Even aside from that exclusion, the 3D-Pens are decidedly not of a class or kind principally used as "machinery for working plastics" or "machinery for the manufacture of products from plastics." The statutory terms, section and chapter notes, Explanatory Notes, authoritative lexicographic sources, Customs' own classification rulings, and the uncontroverted expert testimony all confirm that heading 8477 encompasses large industrial machinery of the plastics industry, not small, hand-held and manually operated devices designed and used for personal amusement. Application of the *Carborundum* factors further demonstrates that the 3D-Pens' principal use is for amusement and creative play, not for industrial processing. For these reasons, classification of the 3D-Pen Sets in heading 9503, HTSUS, is compelled as a matter of law.

14

### B. The 3D-Pen Sets are Prima Facie Classifiable in HTSUS 9503 Because They are Invented, Designed and Used for Amusement, Diversion or Play of Children and Adults, Rather than Practicality

The subject 3D-Pen Sets possess all the physical, market, and consumer attributes of "toys." Their principal use is for amusement, creative exploration, and hands-on play for consumers of all ages, including children, adults, "kidults," and "prosumers," rather than practicality. Any utilitarian uses are secondary and do not alter their principal use. Under the GRIs, Chapter 95 notes, Explanatory Notes, and binding CIT and Federal Circuit precedent, and uncontroverted expert testimony, these products are properly classified under heading 9503, HTSUS, as toys.

### 1. HTSUS 9503 Provides for the Class or Kind of Merchandise That are "Toys"

Heading 9503 covers "other toys", which is intentionally broad, having been shaped by judicial precedent as describing articles designed and principally used for amusement, whether or not they have some utility. *Springs Creative Products Group v. United States*, 37 C.I.T. 1222, 1231-1232 (Ct. Int'l Trade 2013) (focusing on "amusement, diversion, or play of children or adults"); *see also*, *Minnetonka*, 110 F. Supp. 2d at 1026; *Processed Plastic Co. v. United States*, 473 F.3d 1164, 1170 (Fed. Cir. 2006) (adopting the standard in *Minnetonka* to determine whether merchandise should be classified as a toy); *Infantino v. United States*, 2014 WL 7331753, at *5, 36 ITRD 1534 (Ct. Int'l Trade 2014) (same).

Explanatory Note 95.03 states that the scope of "other toys" includes all kinds of products intended essentially for the amusement of persons (children and adults), expressly encompassing not only traditional playthings but also construction sets, educational toys, toy tools, and creative play kits:

**(D) Other toys.**

This group covers toys intended **essentially for the amusement of persons (children or adults)**. . . . This group includes:

All toys not included in (A) to (C). Many of the toys are mechanically or **electrically operated**. These include:

> (iii) **Constructional toys** (construction sets, building blocks, etc.)
>
> \*\*\*
>
> (x) **Toy tools and implements** . . .
>
> \*\*\*
>
> (x) **Toy sewing machines**.
>
> \*\*\*
>
> (xviii) **Educational Toys** (e.g., toy chemistry, printing, sewing and knitting sets).
>
> \*\*\*
>
> **Certain toys (e.g., electric irons, sewing machines, musical instruments, etc.) may be capable of a limited "use"; but they are generally distinguishable by their size and limited capacity from real sewing machines, etc.**
>
> \*\*\*
>
> **Collections of articles, the individual items of which if presented separately would be classified in other headings in the Nomenclature, are classified in this heading when they are put up in a form clearly indicating their use as toys (e.g., instructional toys such as chemistry, sewing, etc., sets).**

(Emphasis added).

Hence, Explanatory Note 95.03 expressly recognizes that functional articles, such as electric irons, sewing machines, musical instruments, etc., may be toys even when "capable of a limited 'use,'" reflecting the longstanding recognition that many goods classified as toys also possess some utilitarian value. *Infantino,* 2014 WL 7331753, at \*8 (a configured shopping cart seat cover is a toy); *Ero Indus., Inc. v. United States*, 118 F. Supp. 2d 1356, 1360-63 (Ct. Int'l Trade 2000) (a play tent with graphics of children's characters is a toy, despite its utility as a tented structure); *Ideal Toy Corp. v. United States*, 78 Cust. Ct. 28, 34 (1977) (an inflatable float is a toy); *Springs Creative*, 37 C.I.T. 1222 (a craft blanket kit is a toy, notwithstanding its

utility is a blanket). As the *Infantino* court explained, so long as the "utilitarian value cannot be said to outweigh its amusement value, the product is *prima facie* classifiable as a toy." 2014 WL 7331753, at *8.

Thus, the applicable authorities recognize a broad array of playthings – even those that provide educational or skill-development benefits – as within the scope of HTSUS 9503, so long as amusement remains their primary purpose. An article may therefore be classified as a "toy" under heading 9503 even where it also offers some incidental utility or functional value.

### 2. *The Class or Kind to Which The 3D-Pen Sets Belong is "Toys"*

Because classification under heading 9503, HTSUS, turns on principal use, once the Court construes the relevant tariff terms, it must then determine the class or kind of goods to which Plaintiffs' merchandise belongs. ARI 1(a); *Minnetonka*, 110 F. Supp. 2d at 1026–27 (the class or kind of articles to which the imported goods belong is controlling). In practical terms, this requires the Court to identify the group of goods that are commercially fungible with the imported products. *Aromont,* 671 F.3d at 1313. To determine the "class or kind" of goods to which the imported merchandise belongs, the Court applies the well-established *Carborundum* (536 F.2d 373 at 377) factors, which include: the general physical characteristics of the merchandise; the expectation of the ultimate purchasers; the economic practicality of so using the import; the channels of trade in which the merchandise moves; use in the same manner as merchandise which defines the class; the environment of the sale; and the recognition in the trade of this use.

Across all models, the 3D-Pens' physical characteristics – handheld size; colorful, playful or cool aesthetic design; fun packaging, simple controls, safety features; and whimsical, user-dependent output – make them products intended for amusement and creative play. SUMF ¶¶39-54. Their packaging and marketing consistently target children, teens, "kidults" and families: they are sold in toy, game, and craft aisles and marketplaces of major retailers,

17

featured in toy industry gift guides and awards, and exhibited at international toy fairs.  SUMF ¶¶80-81, 96-100. Their channels of trade confirm this identity, with sales through Amazon's *Toys & Games* category, Kohl's *Educational Toys*, Walmart's *Crafts*, Target, Best Buy's *STEM Toys*, Michaels, Camp, NYC, and similar toy and craft outlets.  SUMF ¶¶80-81. MSRP likewise reflects their nature as play products, generally ranging from $20 to $80 – well within the typical price range for toys and craft kits. SUMF ¶¶94-95. Consumers overwhelmingly describe them in reviews as "playful," "a cool toy," "a fun little toy for kids and adults," or "fun toy not pro tool," confirming their amusement value.  SUMF ¶87.  In educational environments, the 3D-Pens serve as playful learning aids, making lessons more engaging and sometimes given to students as rewards, functioning in much the same way as LEGO® or K'NEX® sets that blend entertainment with learning. SUMF ¶91. While some users may occasionally experiment with 3D-Pens for tasks like a household repair, such uses are secondary, and neither economically practical nor efficient.  SUMF ¶¶67, 70.  Across markets, their predominant role is as objects of amusement, and any incidental utility is clearly outweighed by their principal use for creative play. Accordingly, the 3D-Pen Sets are *prima facie* classifiable in heading 9503, HTSUS, as "other toys."

### (a) *Physical Characteristics of the 3D-Pen Sets Show They are Toys*

The 3D-Pen Sets' physical characteristics demonstrate it is in the same class or kind of goods that are toy features, confirming their principal use as a toy.  When considering general physical characteristics of the merchandise, samples are "potent witnesses" and have great probative effect respecting the purpose for which they are designed.  *Springs Creative*, 37 C.I.T. at 1236, ¶26, citing *Janex Corp. v. United States*, 80 Cust. Ct. 146, 148, C.D. 4748 (1978).  SUMF ¶¶2-3, **Comp. Ex. A1-8**.

The samples of the 3D-Pen Sets make clear their unmistakably toy-like character. Across all models, the products exhibit features characteristic of toys as described in the

Explanatory Note, including elements of educational and construction play, craft kits, and electronic tech toys, demonstrating their essential nature as items designed for amusement of consumers of children and adults.

All 3D-Pens in this line share the same patented mechanism: a handheld body the size of a marker, a low-voltage heating element, a small motor and gear assembly, and a nozzle that dispenses colorful plastic filaments which harden quickly in the air, allowing the user "doodle" shapes in mid-air or on surfaces. SUMF ¶¶ 40. Each model, whether SCRIB3D P1, SCRIB3D Advanced, PiKA3D Super, Create+, or PRO+, incorporates this same core mechanism. The patented technology itself was designed for playful doodling, not practicality.

All models are designed to be held comfortably within one's hand and used in a manual fashion. SUMF ¶¶40, 47, **Comp. Ex. A1-8**. Their bodies are lightweight, predominantly plastic, brightly colored or aesthetically styled, and ergonomically shaped for small and large hands alike. *Id.* Many models incorporate prominent, oversized buttons for easy operation and safety features such as low-heat or tip guards. SUMF ¶¶48-49.

Their sets are packaged in playful boxes designed to attract and delight children and families. SUMF ¶¶51-52, 54. Most sets include playful activity guides with fun eye-catching illustrations and step-by-step simple instructions for an array of creative projects, along with an assortment of brightly colored filaments in various hues and finishes, stencils, molds, and themed accessories that encourage imaginative doodle play. SUMF ¶61. All these features clearly serve to amuse, engage, and inspire children, teens, and adults alike. Notably, even the "pro" pens, despite their name, retain these toy-like features and are designed, packaged, styled, and marketed for creative play and exhibited at toy fairs alongside the other models. SUMF ¶¶67, 70, **Comp. Ex. A2**, **Comp. Ex. E**. While the PRO+ adds luxury finishes, like an OLED screen and accepts specialty filaments, its mechanism, size, ergonomics, and output speed are identical to the others. SUMF ¶50, Kazmer Decl. ¶¶31, 66. The enhancements serve only to

broaden the creative variety of play.  SUMF ¶64.  Consumer reviews confirm the perception: e.g., the PRO+ model is described as "fun … but not exactly a . . . tool," PiKA 3D Pro – "Fun toy not pro tool."  SUMF ¶¶86-90, Bogue Decl. ¶112.  Its physical identity is continuous with other 3D-Pens.

For a direct appreciation of the pens toy-like appeal, in addition to the physical samples, the Court is invited to view product demonstrations and marketing materials available on the official websites for 3Doodler®, PiKA, and SCRIB3D, as well as numerous playful, hands-on videos posted to their official YouTube channels, and 3Doodler apps (available for Apple and Android devices), all of which vividly showcase the products' core amusement characteristics. SUMF ¶72, **Comp. Ex. B**.

The toy industry offers analogues: Easy-Bake Ovens[4] actually function as utilitarian ovens to cook, sing toy sewing machines actually function to sew,[5] yet both are toys because their primary function is amusement.  Explanatory Note 95.03 and judicial precedent confirm that "toy tools," "educational toys" and "constructional toys" remain toys even with working mechanisms. The same logic applies to 3D-Pens.

As Plaintiffs' toy industry expert Mr. Bert Reiner, drawing on nearly six decades of expertise in toy design and safety standards, confirms *"all these 3D Pens, including 'Pro' versions, possess the physical characteristics of toys."*  Reiner Decl. ¶25.

### (b)    The Ultimate Purchaser Expects to Use the 3D-Pens as a Toy

Purchasers of the 3D-Pen Sets across the line expect amusement, not utility.  Marketing and packaging are overtly playful.  SUMF ¶¶51-52, 60.  Names like "3Doodler," "Scrib3D," and "Pika3D" communicate whimsy, not function.  SUMF ¶53.  The company's websites,

---

[4] *See*, NY L83330 (Mar. 30, 2005)(classifying an Easy-Bake Oven within heading 9503).

[5] *See*, HQ 953215 (July 14, 1993)(classifying a Singer lockstitch sewing machine as a toy under heading 9503).

YouTube tutorials, and mobile apps uniformly present stencils and craft projects designed for entertainment, yielding a wide range of fun content from various creators of various skill levels. SUMF ¶72.

Consumer reviews reinforce these expectations. Parents report their children "played with the 3Doodler since Christmas Day" and enjoyed it more than other gifts. Reiner Decl. ¶32. Reviews describe the pens as "fun little toys." *Id.*, **Ex. F**. Even negative reviews confirm the point, with complaints that they are "not a real 3D printer" or "sloppy." *Id.* That dissatisfaction only proves that purchasers never saw them as utilitarian tools, they expected toys.

The "pro" models have a higher price points targeting a monied "prosumer" category (consumers of all ages who pursue higher-end features for personal projects and pay a premium for perceived enhanced functions). SUMF ¶¶65, 66. Despite taglines (such as "professional-grade" and "for architects"), the engineering and marketing of the PRO+ remains similar to any other 3D-Pens, merely adding enhancements. SUMF ¶¶67, 81. While this may attract "prosumers," actual demanding professionals understand the limitations inherent to a manual pen (including the enormous time required and unsteady work product) and opt for professional solutions (such as a 3D printer joined to architectural design software). *Id.* This aligns with the "kidult" phenomenon – adults purchasing toys for themselves. "Kidults" account for 18% of U.S. toy sales, the fastest-growing sector. SUMF ¶77. The PRO+ simply serves this older demographic and price-point, just as LEGO® offers $850 Millennium Falcon[6] sets to adult hobbyists. The entertainment value of the product remains its primary intended purpose. The pens' marketing to "kidults," "prosumers," and older teens is echoed in consumer reviews, which overwhelmingly emphasize their amusement value. SUMF ¶¶88-90, **Ex. F**.

---

[6] https://www.lego.com/en-us/product/millennium-falcon-75192, last accessed August 24, 2025.

The 3D-Pens are sometimes used in educational settings, to make learning more interactive, much like using chemistry sets, LEGO® bricks, K'NEX® construction sets, or other hands-on toy STEM kits that blend play with problem-solving.  SUMF ¶¶63, 91. Their primary value as educational toys lies in entertainment and amusement.  *Id*.

Across the board, the 3D-Pens are predominantly expected to be used as toys (Reiner Decl. ¶33); any occasional practical use is incidental and secondary to their core purpose of creative play. SUMF ¶70.

> *(c)*  *The 3D-Pens Move in The Same Channels, Class, and Kind of Trade as Toys of HTSUS 9503*

The sales channels of the 3D-Pen Sets are primarily in retailer stores (both physical and online), where toys are commonly sold. SUMF ¶¶79-81. The 3D-Pens are widely available through e-commerce platforms, including major online marketplaces and the websites of various retailers in toys/games categories.  *Id*. The products are also sold in brick-and-mortar retail locations, typically in toy and craft departments.  *Id*. Some 3D-Pens may also be available in specialty stores focusing on arts and crafts, educational supplies, or technology products.  *Id*.

The Pro+ is sold through the same channels, including toy categories at Kohl's and Best Buy.  SUMF ¶81.  No evidence exists that any model has been sold in in retail tooling stores such as Home Depot or Lowe's. That absence is conspicuous and reflects the trade recognizes these products as toys rather than tools or industrial equipment.

This channel breadth mirrors how toys (like LEGO®) are sold across multiple categories (toys, crafts, gifts), yet always within consumer toy spaces. The consistency across all models, including PRO+, shows that as a class or kind, these pens occupy toy channels of trade.  Reiner Decl. ¶35.

> *(d)*  *Environment of the 3D-Pen Sets Sale is Consistent with Toys of HTSUS 9503*

22

The environment of sale across all models is unmistakably toy-focused, dominated by toy marketing.  Mr. Reiner observes that the marketing of 3D-Pens uses *"bright colors, playful graphics, and [an] emphasis on fun and creativity,"* and that these products are showcased at toy industry events alongside other children's playthings.  SUMF ¶61, Reiner Decl. ¶37.  Packaging is colorful, with playful graphics and stencils for whimsical objects. *Id*.  The products consistently appear in Amazon's "Holiday Kids Gift Book" and other toy gift catalogs and featured in toy publications such as *The Toy Insider* and *Teen Vogue* (media that target younger audience interested in toys and trendy items), as well as many others.  SUMF ¶¶96-99, **Comp. Ex. D**.  The 3D-Pens are exhibited at global toy fairs.  SUMF ¶100, **Comp. Ex. E**.  These are the premier venues where the toy industry itself defines and markets its products.

The way 3D-Pens are sold further demonstrates their identity as play products for all ages.  Mr. Reiner conducted a detailed survey of how and where the pens are sold at retail.  He found that major retailers consistently categorize and shelve 3D-Pens in their toy, craft, or educational product sections, not with industrial or hardware goods.  Reinder Decl. ¶35, SUMF ¶¶78-81.  For example, on Amazon.com the full line of the subject 3D-Pens is sold under the "Toys & Games" category; Target's website markets them under "Home Arts & Crafts"; Walmart lists them under "Crafts"; and Best Buy similarly placed them in the STEM toys/games category online. *Id*.  Brick-and-mortar store placement is consistent with this: the pens are stocked in arts-and-crafts aisles or toy departments, and they have even been sold in dedicated toy stores. *Id*., **Comp. Ex. C**.  In addition, the Pen Sets are supplied to educational and specialty distributors. SUMF ¶80.

       *(e)*        *The 3D-Pens are Used in the Same Manner as Toys of HTSUS 9503*

The record shows that consumers use 3D-Pens predominantly for amusement, as intended. [7]  Photos, customer reviews, websites and YouTube videos show doodled Eiffel Towers, whimsical animals, crafts, and decorations.  SUMF ¶¶85-93, **Exs. B, F**.  The brand itself promotes project stencils and apps for silly, imaginative designs. Some models are also used for fun learning and rewards in classrooms as educational toys, akin to LEGO® Education sets,  reinforcing their status as plaything, not utility.  SUMF ¶91, Bogue Decl. ¶¶107, 118–121.

The same usage pattern applies to "pro" models, which are consistently described as toys in reviews. **Ex. F**.  There is no evidence architects or engineers actually use any "pro" pens for professional work as the output is crude and ineffective; rather, testimony shows that the pens were never designed to replace professional 3D printers.  SUMF ¶67, **Ex. F**.  As with other toys that can have incidental function, all 3D-Pens are actually predominantly used for amusement, not utility.[8]

*(f)*  <u>*The Toy Industry Recognizes that 3D-Pens Are Used as Toys*</u>

The toy industry recognition of the 3D-Pens is overwhelming. The product's line has been exhibited at the premier toy fairs worldwide, including New York, Nuremberg, London, Hong Kong – alongside dolls, board games, LEGO® sets, and other toys. SUMF ¶100, **Comp. Ex. E**. This positioning defines them as toys within the trade.  They have never been displayed at industrial shows or CAD/CAM conferences.  Kazmer Decl. ¶¶39, 51, 90.  3D-Pens have won major toy awards and are featured in leading toy catalogs, confirming their recognition by trade

---

[7] "Actual use of the goods is . . . perhaps one of the more important of the *Carborundum* factors." *Aromont*, 671 F.3d at 1313.

[8] To the extent Defendant seeks to rely on utility patent filings for classification purposes, the Court should reject any inference that legal claims drafted to secure broad IP protection early in product development constitute determinative evidence of principal use.  *See Len-Ron Mfg. Co. v. United States*, 334 F.3d 1304, 1313 (Fed. Cir. 2003) (stating that "principal use," not design potential or theoretical function, governs classification). *See also*, Reiner Decl. ¶40, Kazmer Decl. ¶72-74.

as toys.  SUMF ¶¶96-99, **Comp. Ex. D**.  Such recognition extends across all models, including
"pro" models. The premium model is exhibited and promoted in the same toy fairs and
publications as the entry- and middle-level models. **Comp. Ex. E**.

The company's own websites, apps and YouTube channels frame the pens as toys,
offering stencils and projects like "draw your favorite animal" or "make a toy car."  SUMF
¶92, **Comp. Ex. B**. In short, the 3D-Pens, across all models, *"are widely recognized in the
trade as toy."* Reiner Decl. ¶50.

### (g)    The 3D-Pen Sets are Only Economically Practical if Used as Toys

The 3D-Pen Sets are priced comparably to other toys.

As a class or kind, the pens' economic practicality is consistent with toys. Prices range
from $29.99 for entry-level models to $199.99 for the PRO+.  SUMF ¶¶94-95. Classroom
packs are more expensive, but on a per-pen basis remain within toy norms. These prices are
directly comparable to premium toys: LEGO® dioramas ($149), LEGO® Creator Piano
($399), Gundam models, Ravensburger puzzles, and the LEGO® Millennium Falcon at $850.
SUMF ¶95.

The PRO+ price point reflects market segmentation within toys. Parents and adults
routinely pay hundreds of dollars for toys: consoles, LEGO sets, dolls.  Premium price does
not disqualify classification.  Instead, it reflects the premium "kidult" and "prosumer" market.
Reiner Decl. ¶¶23, 43; Bogue Decl. ¶¶13, 50-52.

Every *Carborundum* factor supports the classification of the subject merchandise as
toys.  The record demonstrates that the "class or kind" of merchandise to which 3D-Pens belong
is the toy class; they are commercially fungible with educational and construction toys,
craft/build kits, and tech toys. 3D-Pens are marketed as toys, sold through toy and craft
channels, and used primarily by children and families for amusement and creative play. This
is further reinforced by their repeated recognition as toys in industry expert opinion and at toy

25

trade shows.  Plaintiffs' toy industry expert, Mr. Reiner, expressly concluded that these products are properly "toys," as identified in HTSUS 9503.  Reiner Decl. ¶51.  Any incidental utilitarian value that 3D-Pens possess is more than outweighed by their predominant purpose: amusement and play for children and adults, which defines their principal use. The introduction of the "PRO+" model does not change this outcome. The Pro+ shares the same patented technology, brand identity, channels of trade, consumer expectations, and uses as the rest of the 3D-Pen line; its additional features and price simply reflect segmentation for "prosumers" within the toy marketplace, rather than any shift toward a utilitarian function.  Bogue Decl. ¶¶11, 50–52; Reiner Decl. ¶43.

Based on the totality of the *Carborundum* factors, the 3D-Pens, including the 3Doodler® Pro+, are properly classifiable under HTSUS 9503.00.00, as toys.

### 3.  *The 3D-Pen SETS Are Classified as Toys in HTSUS 9503.00.00 Under GRI 3(b)*

In accordance with GRI 3(b), the 3D-Pen *Sets* likewise should be classified as toys in HTSUS 9503.00.00.  GRI 3(b), HTSUS.

3D-Pens are imported not only individually but also as part of 3D-Pen Sets containing pens, filaments, stencils, activity guides, and small tools. Note 4 to Chapter 95 provides that "heading 9503 applies, *inter alia*, to articles of this heading combined with one or more items, which cannot be considered as sets under the terms of GRI 3(b), and which, if presented separately, would be classified in other headings, provided the articles are put up together for retail sale and the combinations have the essential character of toys."

GRI 3 provides rules for classification of goods that are *prima facie* classifiable under two or more headings; where two or more headings may apply to items in a retail set, those headings are treated as equally specific. GRI 3(b) then directs classification of "goods put up in sets for retail sale" according to the component that imparts the essential character of the set. Explanatory Note X to GRI 3(b) defines such sets as those which: (a) consist of at least two

26

different articles, which are, *prima facie*, classifiable in different headings; (b) consist of products or articles put up together to meet a particular need or carry out a specific activity; and (c) are put up in a manner suitable for sale directly to end users without repackaging (e.g., in boxes or cases or on boards)."

3D-Pen Sets plainly satisfy these criteria. They include different articles (e.g., the pen, filaments, stencils, accessories) that are, *prima facie*, classifiable in different subheadings. They are put up together for the specific activity of amusing three-dimensional doodling. The articles are put up in a manner suitable for sale directly to end users in retail-ready packaging. Applying GRI 3(b), the component that imparts the essential character to the sets is unquestionably the 3D-Pen itself, as it is the central device enabling play. The accessory components are subordinate, designed to support the pen's amusement function. Therefore, the 3D Pen Sets should be classified as if they consist of the component which gives them their essential character. Therefore, the sets are properly classified in HTSUS 9503.00.00.

### 4. *Exclusionary Note Forecloses Classification of the 3D-Pen Sets in Chapter 84*

Crucially, if the 3D-Pen Sets are found to be *prima facie* classifiable under heading 9503, their classification under heading 8477 is precluded by Note 1(p) to Section XVI, which expressly excludes goods of Chapter 95 from classification there. Chapter 84 (which contains heading 8477) is part of Section XVI of the HTSUS, and Section XVI Note 1(p) explicitly excludes "[a]rticles of chapter 95" from classification in Section XVI. This binding legal note mandates that merchandise properly described as toys under Chapter 95 cannot be simultaneously classified as machinery under Chapter 84. As the Court recognized in *Minnetonka*, which addressed a similar exclusion in Chapter 39, "Pursuant to this chapter note, the court finds that if the subject merchandise is *prima facie* classifiable under heading 9503, as Plaintiff claims, the merchandise may not be classified in Chapter 39." 110 F. Supp. 2d at

1026. Here, an identical analysis applies: once the 3D-Pens are properly determined to belong to heading 9503, classification in heading 8477 is foreclosed.

### C. 3D-Pen Sets Are Not Properly Classified in Heading 8477, HTSUS, as Machinery for Working Plastics or the Manufacture of Products from Plastics

3D-Pens are not classifiable under HTSUS 8477. The language and scope of heading 8477, as evidenced by its terms, legal notes, Explanatory Notes, judicial precedent, and uncontroverted expert testimony, as well as the *Carborundum* analysis, demonstrate that it is a provision covering industrial machinery used in commercial plastic/rubber processing, not consumer-oriented devices used for personal amusement.

#### 1. *HTSUS 8477 Provides for the Class or Kind of Merchandise That are Machinery for Working Plastics or the Manufacture of Products from Plastics*

Classification under the HTSUS begins with GRI 1, according to the terms of the headings and any relative Section or Chapter Notes. GRI 1, HTSUS.  HTSUS 8477 falls in Chapter 84 is part of Section XVI, generally covering industrial machinery ("[n]uclear reactors, boilers, machinery and mechanical appliances; parts thereof.") Ch. 84, HTSUS. By its terms, HTSUS 8477 specifically encompasses "machinery for working rubber or plastics or for the manufacture of products from these materials, not specified or included elsewhere in [Chapter 84]; parts thereof."

Under settled law, since neither "machinery," "working plastics," nor "manufacture of products" are defined in the HTSUS itself or in the Explanatory Notes, the Court must discern their ordinary commercial meaning, relying on HTSUS structure as a whole, dictionary definitions, industry practice, judicial precedent, and authoritative expert testimony from the plastics field reflecting industry understanding.

Note 5 to Section XVI defines the term "machine" broadly as "any machine, machinery, plant, equipment, apparatus or appliance cited in the headings of chapter 84 or 85." Explanatory Notes to Chapter 84, however, clarify that headings 84.25 through 84.78

28

(including 8477) cover machines "classified by reference to the field of industry in which they are used." This focus on "industry" is central here, as Plaintiffs' expert Dr. Kazmer, a plastics engineering professor with extensive experience in plastic manufacturing machinery (Kazmer Decl. ¶¶ 1-10, Attach. 1), explains that the terms "machinery for working plastics" and "machinery for the manufacture of products from plastics" in heading 8477 specifically denote equipment used within the plastics manufacturing industry – industrial, commercial-grade machines intended for processing plastics and producing finished plastic articles. Kazmer Decl. ¶15.

The HTSUS context confirms that 8477 covers industrial machinery used in the plastics/rubber industries, as reinforced by its subheadings: *"Injection-molding machines" (8477.10), "Extruders" (8477.20), "Blow-molding machines" (8477.30), "Vacuum-molding and other thermoforming machines" (8477.40), machinery for molding or retreading pneumatic tires (8477.51), and other plastic/rubber molding or forming machinery (8477.59 and 8477.80)*. The Explanatory Note to heading 84.77 also confirms the industrial scope. It lists exemplars of machinery covered by 8477 (*molding machines for tyres or other articles of rubber or plastics (e.g. tire molding machines), inner-tube valve hole cutting machines, rubber-thread cutting machines and appliances, forming presses for rubber or plastics, special presses for molding thermoplastic powders, presses for making gramophone records, machinery for manufacturing vulcanized fibre, and extruders*, among others), which share essential characteristics: they are typically stationary, large-scale, and designed for continuous, automated operation in commercial processing and production environments. The structure of the HTSUS, along with its legal notes and explanatory materials, makes clear that heading 8477 is meant for industrial-grade machinery – the kind recognized by the trade as "for working plastics" or "for the manufacture of products from plastics," as emphasized by Dr. Kazmer.

The commercial reality is that such machinery is distributed through industrial supply channels, showcased at trade expos like the National Plastics Expo (NPE), and used by manufacturers to produce goods for commerce. Kazmer Decl. ¶39, 49. Its scope does not encompass small, handheld, low-powered devices designed for personal, educational, or recreational use, including products sold through consumer and toy-market channels.  As detailed below, this understanding is entirely consistent with dictionary definitions and common commercial usage.

Dr. Kazmer confirms that terms like "working," "machinery," and "manufacture" in heading 8477 should be interpreted according to their common and commercial meaning in plastics industry.  Kazmer Decl. ¶14. The Court may consult lexicographic sources and expert testimony, which is especially probative for trade-specific terms, when, as here, industry understanding aligns with common usage and standard dictionaries. *Kahrs Int'l*, 791 F.Supp.2d at 1241.

(a)   *Machinery for Working Plastics" Defined*

In the phrase "machinery for working plastics", the term "machinery" is generally understood in the industry to be an assembly of moving components for the processing of materials."  Kazmer Decl. ¶18.  Further, the Oxford English Dictionary (OED) authoritatively defines the verb "to work" (transitive) as *"to produce (a material thing) by, or as by, labour or exertion; to make, construct, manufacture; to form, [or] fashion."* Counsel Decl. ¶ 7, **Ex. K** (OED).  In essence, "working [a material]" requires the deliberate application of energy or effort to transform the material's physical structure or shape.  This definition finds direct support in the field of plastics manufacturing. As Dr. Kazmer, a leading expert in the plastics industry (who routinely relies on such dictionary sources in his practice), confirms, this common meaning is consistent with trade understanding.  Kazmer Decl. ¶14.  In plastics processing, "working" specifically means the *"application of forces, motion, and energy to*

*actually impart a change in the form of the material, thereby converting it from a lower valued feedstock to a higher valued product.*"  Kazmer Decl. ¶18.  "Machinery for working plastics," therefore, refers to machines that perform on plastic material (raw or semi-finished plastic) through *substantial* mechanical or thermal exertion to convert low-value feedstock into a higher-value intermediate.  Notably, this category does *not* necessarily require that a finished end-use article results from the process; the output could be an intermediate shape or component. The focus is on the *process* (working the plastic via machinery) rather than the completeness of the end product.  Kazmer Decl. ¶21.  The convergence of the statutory context and the common/commercial usage confirms that "working" in heading 8477 also denotes the same industrial-style mechanical processing, that is exemplified by the named articles within its scope (injection-molding machines, blow-molding machines, etc.), not the manual, free-form heating and bending of plastics performed by the subject 3D-Pens. Thus, statutory context, authoritative lexicography and expert industrial practice give "working plastics" a technical meaning that excludes mere casual or playful manipulation.  Customs itself has recognized this interpretation: in HQ 960374 (August 8, 1997), Customs classified GK-N and GK-E series internal mixers (huge machines used to blend rubber under high shear and heat) as machinery for "working rubber" because they "work" rubber by processing it into a homogeneous mass for subsequent manufacturing. demonstrating the industrial scale of equipment intended for heading 8477. (A quick image search confirms these mixers are full-scale industrial mixing systems.) This ruling confirms that "working" refers to substantial mechanical processing in an industrial setting, not manual manipulation of plastics by a consumer product.

To the extent the Government advances the contention that the 3D-Pens fall within heading 8477 as "machinery for working plastics" simply because they soften plastic filaments, allowing the user to doodle mid-air or on surfaces (Counsel Decl. ¶6, **Ex. J** (Defendant's

Verified Responses to Plaintiffs' Interrogatories, Set One)), courts have warned against overbroad readings of "work." In *Consolidated Int'l Equip. & Supply Co. v. United States*, 280 F. Supp. 886, 889 (Cust. Ct. 1968), the Customs Court, citing to *United States v. Kurt Orban Co.*, Inc., 47 CCPA 28, C.A.D. 724 (1959), rejected the Government's interpretation of "metal working" to mean "any alteration of metal," emphasizing Congress did not intend such an expansive reading: "The word 'work' is susceptible of such a wide variety of meaning that we have grave doubts Congress intended it to be construed as broadly as the Government urges." *Id*. The same reasoning applies here: "working plastics" does not extend to every device that heats or manipulates plastic, particularly where, as here, the device is consumer-oriented and designed for play. Accepting the Government's view that any device which shapes or manipulates plastic belongs in 8477 would lead to absurd outcomes. A child's Perler Beads®, Stinky Dinks®, LEGO® press, or toy plastic molds would qualify as "machinery for working plastics." Thus, context, exemplars, and precedent require a more limited, industrial interpretation, the one that 3D-Pens simply do not meet.

### (b)  *"Machinery for the Manufacture of Products from Plastics" - Defined*

The phrase "machinery for the manufacture of products from [plastics]" is related but distinct. To "manufacture" commonly means to make a finished product from raw materials, usually on a larger (e.g., industrial) scale. The OED defines "manufacture" as *"to make (a product, goods, etc.) from, of, or out of raw material; to produce (goods) by physical labor, machinery, etc., now esp. on a large-scale"*. Counsel Decl. ¶7, **Ex. K**. Thus, "machinery for the manufacture of products from plastics" refers to machines whose purpose is to produce complete plastic articles (finished goods) from plastic materials. Kazmer Decl. ¶21. In essence, this covers industrial equipment that takes raw plastic (whether in pellet, resin, powder, etc.) and outputs a finished, saleable item made of plastic. For example, an injection

molding machine that molds plastic toys or components, or an additive manufacturing system that prints a fully-formed plastic part, would be machinery for manufacturing plastic products.

The scope of "machinery for the manufacture of products" is broader than "machinery for working plastics" in one sense as it does not explicitly state the method of working (it need not apply heavy forces if, say, assembly or other processes yield the product). Kazmer Decl. ¶21. However, it is narrower in that it requires the machinery to produce a complete product (an "article … for sale" in OED's terms). In short, this sub-category emphasizes the end result (a finished plastic product) rather than the process, as it *"[requires] 'to produce an article for commerce.'" Id*.

This principle is reinforced in judicial precedent: in *EOS*, a laser sintering printer that manufactures entire articles from plastic powder was held to *"fall literally within the common meaning of... 'machinery... for the manufacture of products' from plastics"*. *EOS,* 911 F. Supp.2d at 1336. In other words, because that machine's only use was to produce complete plastic objects from raw material, it squarely met the "manufacture of products from plastics" criterion. (Whether it also could be viewed as "working" plastics was moot, since making finished articles from plastic is expressly covered by the latter clause of heading 8477).

Although the categories of heading 8477 represent different facets of plastic-processing machinery, both are understood in the industry to mean large, stationary factory machinery used to process raw or semi-finished plastics into usable goods. Kazmer Decl. ¶¶18-22.

3D-Pens do not fall under either category. They are small, low-voltage consumer devices that function only with continuous manual guidance. They merely soften thin plastic filaments so that users can manually doodle free-form shapes; and their outputs are whimsical doodles and highly variable creations dependent on user creativity, not consistent or saleable plastic goods. 3D-Pens do not "work" plastics in any industrial sense because they do not process plastics through automated mechanical force or on any production scale. Nor do they

"manufacture" products from plastics because they do not transform raw inputs into uniform valuable goods; their outputs lacking the consistency, repeatability, and commercial viability that define manufactured goods. Their lack of power, precision, and automation essential to industrial machinery within the plastics trade combined with inability to possibly yield consistent, repeatable goods suitable for sale or use in industrial production renders them *fundamentally* distinct from the machines contemplated by heading 8477. Kazmer Decl. ¶¶ 68-71, 81-83. Thus, the 3D-Pens are not classifiable as 8477 machinery.

Heading 8477 is a principal use provision, so it applies only if 3D-Pens belong to the class or kind of goods principally used as "machinery for working rubber or plastics or for the manufacture of products from these materials," triggering a *Carborundum* analysis. Because 3D-Pens obviously fall outside the definitional scope of 8477, they cannot, as a matter of law, be deemed *prima facie* classifiable there. Even if heading 8477 were considered, the *Carborundum* factors still preclude their classification there.

### 2. *The Carborundum Factors Demonstrate that the 3D-Pens are Not of a Class or Kind Principally Used for Working Plastics or the Manufacture of Products from Plastics*

All *Carborundum* factors confirm that the 3D-Pen Sets are not classifiable in 8477.

### (a) *The Relevant Physical and Functional Characteristics of the 3D-Pens are Dramatically Different from Those of Machinery Covered by Heading 8477, HTSUS*

3D-Pens are *dramatically* different in size, construction, power, and output from the machinery covered by heading 8477, HTSUS. Industrial plastic-processing machines are sizable, often stationary, heavy pieces of equipment (often weighing thousands of pounds and measuring many feet in length/height) built of steel for durability, with powerful motors and heaters (on the order of 2,000 watts or more) that operate on high-voltage industrial electrical

supply. Kazmer Decl. ¶27.  A simple Google image search overwhelmingly yields depictions

of large, industrial-grade equipment, which bears no resemblance to the small handheld pens:



Counsel Decl. ¶8, **Ex. L**; *see also*, SUMF ¶105, Kazmer Decl. ¶26, Attach. 4, for examples.

In stark contrast, 3D-Pens are *"orders of magnitude smaller,"* handheld, made mostly

of lightweight plastic, draw minimal power, and are engineered to heat and dispense only tiny

amounts of plastic at a time. Kazmer Decl. ¶¶33-34.  Dr. Kazmer measured the  processing rate

of the 3D-Pens at only around 0.1 pounds of material per hour – *"less than one-hundredth"* of

the  throughput  of  even  a  small  industrial  plastics  machine.  Kazmer  Decl.  ¶34.   In  fact,  a

standard injection-molding machine is supplied with plastic pellets by the 50-pound bag, using

a large hopper, yet *"there is no way to provide [the 3D-Pens] with a hopper-full of plastic*

*pellets (typically 50 lb bags) since the [pens] are themselves much smaller than just the size of*

*a typical hopper alone."* Kazmer Decl. ¶33. The pens are operated by hand, with no fixed frame

or  automated  control,  whereas  industrial  machines  are  engineered  for  automatic,  precision

operation within a fixed frame.  Kazmer Decl. ¶36. The result is that the 3D-Pen user can create

fun shapes or small objects, but with *notably imprecise* results (for example, if the user moves

too fast or slow the extruded plastic either stretches into a weak strand or forms a sagging blob). Kazmer Decl. ¶37. Machinery, with its modular steel-based construction for durability and replaceability, also contrasts with 3D-Pens, which employ integral plastic-based designs that emphasize light weight and comfort but limit repairability. Kazmer Decl. ¶35. The pens are physically incapable of performing the high-volume, continuous processing/manufacturing of plastic products that HTSUS 8477 machinery is designed to do; based on their physical attributes, the pens are not processing/manufacturing machinery. Kazmer Decl. ¶38.

(b)  *Expectations of the Ultimate Purchasers*

The ultimate purchasers of industrial plastic-working machinery are typically manufacturers who expect heavy-duty machines capable of *"reliably and consistently"* processing large volumes of material (measured in kilograms or tons per hour) to make finished products on a commercial scale. Kazmer Decl. ¶41, 45, 46. The purchaser would also expect the sales of products made with the machinery to far exceed the purchase cost of the machinery, and an operating lifetime on the order of ten thousand to a hundred thousand hours. Kazmer Decl. ¶44-45. In contrast, 3D-Pens *"are expected to be used and are predominantly used by consumers of all ages as toys."* Reiner Decl. ¶33. The record is devoid of any evidence that commercial manufacturers ever purchase these pens to use in factories – and it would be economically absurd for them to do so, given the device's *de minimis* output and manual operation. Kazmer Decl. ¶45. *"There is no feasible way for a purchaser of the products at issue to use the products at issue to manufacture products to recoup their costs."* Kazmer Decl. ¶47.

(c)  *3D-Pens Do Not Move in the Same Channels, Class, and Kind of Trade In Which Industrial Machinery of Heading 8477 Moves*

The ultimate purchasers of plastics machinery are industrial manufacturers and plastic processors, who use such machinery to make components or finished goods for further

commercial production. Kazmer Decl. ¶40, 49.  These machines are sold through industrial suppliers or distributors, strictly business-to-business (B2B) channels involving specialized trade shows, face-to-face technical sales, deep procurement research, and custom specification. Buyers require extensive technical support and training, and these machines are rarely, if ever, found in consumer retail venues.  Kazmer Decl. ¶50. Dr. Kazmer confirms, *"I have never seen any of the products at issue sold in the B2B trade channel,"* and a search of the NPE (National Plastics Exposition) exhibitor directory yielded zero listings for companies or products related to the 3D-Pens among thousands of plastics-industry vendors.  Kazmer Decl. ¶51. Nothing of sort applies to 3D-Pens, which are purchased by end-users (consumers, not manufacturers) almost exclusively through business-to-consumer (B2C) retail channels such as Amazon, Walmart, or other standard retail outlets.  SUMF ¶80-81, 83-84, Kazmer Decl. ¶52.

Further, when searched Amazon specifically for "machinery," industrial plastics-working machinery has no presence in consumer retail or online stores.  Kazmer Decl. ¶53, Attach. 4.  No evidence exists that businesses in the plastics manufacturing sector purchase 3D-Pens for any production use.

Even where a 3D-Pen might be sold through an online marketplace's "industrial/scientific" category as a secondary listing, such dual-listing is isolated and did not change the reality that *"the products are clearly not being offered for industrial 'working of plastics' or 'for manufacture of products from plastics' at a commercial scale."* Kazmer Decl. ¶89; Counsel Decl. ¶3, **Ex. G** (Cowen Depo. 30:38:24).

> (d) *The 3D-Pens Environment of Sale is Fundamentally Distinct from That of Industrial Machinery of Heading 8477*

The environment of sale for 3D-Pens is also fundamentally distinct from that of industrial machinery contemplated in heading 8477.  Machinery sales occur in highly technical, industrial contexts involving professional sales engineers, live equipment demonstrations at

trade shows, and rigorous technical evaluations. Purchases involve customized negotiations and ongoing technical support, with machines advertised in industry publications and at specialized exhibitions, and packaged only for industrial transport rather than retail display. Kazmer Decl. ¶¶56–58, 60.  Heading 8477 machinery is not sold at retail stores at all.  One does not find injection molding machines or extruders on the shelf at Walmart or Amazon marketplace. Kazmer Decl. ¶53. The environment of sale for 3D-Pens is categorically distinct from that of plastics machinery. *See*, Section B.2.(d), *supra*.

(e)    *The 3D-Pens are Not Used In The Same Manner As Merchandise Which Defines the Class Under Heading 8477*

The use of machinery of heading 8477 is in large-scale industrial plastics manufacturing.  Both precedent and expert testimony demonstrate that the 3D-Pens bear none of the operational attributes of industrial equipment and thus do not fall within that class of goods.  Both the expert witness, Dr. Kazmer, and Customs' own classification rulings, as well as judicial precedent establish that machinery contemplated by heading 8477 refers to industrial assemblies such as injection molding machines, extruders and other industrial machinery, which are recognized within the plastics industry as capital equipment for factories and production facilities.

HTSUS 8477 machinery is defined by scale, durability, and purpose: the processing or conversion of bulk plastics into higher-value goods, not the creation of whimsical objects for play. Kazmer Decl. ¶27-19, 41.  Customs' numerous classification rulings under heading 8477 consistently identify heading 8477 merchandise as industrial machinery intended for commercial production environments. *See*, e.g., For example, in HQ H293457 (Jan. 7, 2025) (a large industrial-scale recycling system, designed to process bulk waste polymers into reusable feedstock for commercial manufacturing operations classified under 8477.80.00, as "other machinery"); NY D84411 (Nov. 24, 1998) (a 1.5-ton pelletizing machine, an industrial

model used in the recycling of polypropylene and ABS plastic scrap, classified under 8477.59.80, HTSUS, as "other machinery for molding or otherwise forming: other"); *see also*, *supra*, HQ 960374 (August 8, 1997) (massive internal mixers for working rubber).

The *EOS* decision also reinforces the industrial scope of heading 8477: the P390 system at issue there was sophisticated, computer-driven, and sold to commercial entities for use in factories to create functional plastic parts. *EOS*, 911 F. Supp.2d at 1336-1338.  The Court's analysis was limited to determining the correct machinery heading within Chapter 84, and it treated as undisputed that the product was an industrial machine, confirming heading 8477 is intended for *bona fide* processing and manufacturing equipment (extruders, injection molding machines, or laser-sintering systems), machines that occupy a recognized place in the plastics industry and perform large-scale, automated processes. Small, handheld 3D-Pens are worlds apart from such machinery. To extend heading 8477 to 3D-Pens simply because they soften plastic filament and make little objects would ignore the industrial focus confirmed by Customs and courts, and distort the structure of the HTSUS.

### (f)   *Economic Practicality Of So Using the Imported Merchandise*

Industrial plastic-working machinery is designed for high throughput, e.g., injection molding machines can churn out dozens of molded parts per minute, and extruders process many pounds of plastic per hour. Purchasers of such machinery expect significant output to recoup the equipment and material costs. Kazmer Decl. ¶43. A 3D-Pen, on the other hand, has an extremely low processing rate. Dr. Kazmer's measurements found an average output of only about 0.03 kg of plastic per hour (roughly 0.07 lbs/hr) – meaning it would take *three hours* of continuous drawing just to use a 100g packet of plastic strands. Kazmer Decl. ¶82. This is orders of magnitude slower than even the smallest industrial plastic machines. In fact, no user could economically produce goods in significant volume with a 3D-Pen – the labor time and costly feedstock filament (often $40+ per pound) far exceed any value of the trinkets produced.

39

As Dr. Kazmer opined, there is essentially *"no feasible way for a purchaser of [a 3D-Pen] to use [it] to manufacture products [at a commercial scale] to recoup their costs"*, because the device's material throughput and efficiency are practically nil for manufacturing purposes. Kazmer Decl. ¶¶47, 81. Indeed, Dr. Kazmer is not aware of any instance of someone using these pens as "machinery" to profitably manufacture plastic products. Kazmer Decl. ¶47. This factor demonstrates that 3D-Pens are not productive machinery.

(g)   3D-Pen Sets Are Not Recognized by the Plastics Industry As Machinery for Working Plastics or the Manufacture of Products from Plastics

Industrial plastic-working machines come with voluminous technical documentation, installation requirements, and often require skilled operators; they are recognized in the trade as capital equipment. Kazmer Decl. ¶¶84-86. To illustrate how the plastics industry views such machinery, Dr. Kazmer references a two-minute "Highlights of Plastics Industry Association" video, which was manually submitted to the Court as a demonstrative exhibit (Attachment 5). Counsel Decl. ¶3. This video depicts a wide range of industrial plastics-working machinery in commercial operation and showcases sales activities at key industry events such as NPE, further reinforcing that the trade environment and community for these machines is strictly industrial, focused on commercial production and technical capability. Kazmer Decl. ¶86. Needless to say, anything like the 3D-Pens ever appear in technical publications or industry events relating to plastics industry. Kazmer Decl. ¶¶ 86-88.

The *Carborundum* evidence concludes that 3D-Pens do not belong to the class or kind of goods that heading 8477 describes. These products are not "machinery" in the sense intended by heading 8477, as their principal use is far removed from the industrial processing and manufacturing activities contemplated by heading 8477.

In *Carborundum* terms, 3D-Pens are commercially fungible educational and construction toys, craft kits, or tech toys, not with injection molding machines, laser sintering

40

printers, or other industrial equipment.  *See*, Section I.B.2, *supra*.  Therefore, by application of ARI 1(a) and GRI 1, heading 8477 cannot be the correct classification. As Dr. Kazmer's ultimately opines, *"the products at issue cannot be considered 'machinery for working plastics' or 'machinery for the manufacture of products from plastics' under HTSUS heading 8477."* Kazmer Decl. ¶93–94.

For these reasons, the 3D-Pen Sets are excluded from classification under HTSUS 8477.

## II.  Alternatively, the 3D-Pens Are Classifiable in Heading 8516, HTSUS, as Domestic Appliances

If the subject merchandise is not considered a toy[9], then Plaintiffs contend that it is alternatively classifiable under heading 8516, HTSUS, as " . . . other electrothermic appliances of a kind used for domestic purposes." The central criteria required for classification under this heading is whether the 3D-Pens are of the same class or kind as "appliances" used for "domestic" purposes in a principal use analysis.  *See*, *Hartz Mountain Corp. v. United States,* 903 F. Supp. 57, 59 (Ct. Int'l Trade 1995).

The ordinary meaning of "domestic appliance" can be derived from the structure of the tariff.  Elsewhere the HTS provides for "household articles," which Explanatory Note 39.24 describes as objects principally used in the home, such as tableware, kitchenware, and containers.); in 85.16 "domestic appliances" are not static things, but rather "equipment designed to perform a domestic task."[10]  The Explanatory Note 85.16 encompasses both large household appliances and small consumer devices.  Explanatory Note 85.16 states the heading

---

[9]  Section XVI, Note 1(p) excludes articles of Chapter 95.

[10] *See*, Oxford English Dictionary, "appliance (n.), sense 2.a," March 2025, (stating, "Something applied as a means to an end; a piece of apparatus. Now often: spec. a utensil or other piece of (electrical) equipment designed to perform a specific (usually domestic) task (cf. household appliance"); and Cf. Oxford English Dictionary, "household appliance (n.)," June 2025, (stating, "A piece of equipment used to perform a domestic task."). Counsel Decl. ¶7, **Ex. K**.

"includes all electro-thermic machines and appliances, provided they are normally used in the household."  As examples, the Explanatory Note 85.16 lists hair dryers, smoothing irons, bottle heaters, face dryers, facial saunas, towel airers and heated towel rails, bed warmers, and perfume or incense heaters.  These products are generally known to be compact, low-voltage devices intended for ordinary consumer use in the home.

The subject 3D-Pens are small, low-voltage consumer appliances intended for home use. They operate by gently heating plastic filament for shaping during play, educational activities, and crafting, in the same manner as the small electrothermic appliances listed in the Explanatory Notes, such as hair dryers, bottle heaters, and incense heaters.  Like domestic appliances, the 3D-Pens are marketed predominantly through consumer channels (toy and craft retail channels), with congruent expectations shaped by their packaging, and playful stencil patterns to kickstart the creative use of children and other consumers wishing to experiment with 3D plastic doodling.  As such a consumer product designed for play, these are by nature used in the home (not industrial settings).[11]    Incense heaters, for example, are listed in Explanatory Note 85.16, and yet may be used to scent the air in any location – whether a spa, restaurant, or an industrial setting.  While the activity of scenting air does not necessitate domestic use; it is recognized that consumer products, such as incense heaters, are within the class of devices principally used in the home.

Finally, the subject 3D-Pens also resemble glue guns which Customs has previously classified within heading 8516 in HQ 950627 (Mar. 30, 1992) (classifying glue guns under subheading 8516.79.00 as electrothermic appliances "normally used in the household").  In the first ruling to consider these 3D-Pens, NY N248177 (Dec. 18, 2013), Customs determined that a 3Doodler Create Pen would be classified within heading 8516, based on its similarity to glue

---

[11] Company co-founder and 3D Pen inventor Maxwell Bogue confirmed that the pens were always conceived as creative, consumer-oriented products.  Bogue Decl. ¶¶18, 23.

guns and other consumer household appliances.  Counsel Decl. ¶4, **Ex. H**.  Later, in NY N289201 (Sept. 12, 2017), Customs issued reviewed a comparable "Hot Melt Glue Gun" and classified it within the same provision.

In 2019, Customs issued its revocation ruling HQ H293445 of 2019 (Counsel Decl. ¶5, **Ex. I**) and reached the conclusion that the 3D-Pens were not "domestic appliances" due to the presence of educational and commercial uses.  Customs approach was inconsistent with law, as incidental uses do not defeat a classification premised on principal use.  *See*, *Primal Lite*, 182 F.3d at 1365–66; *Len-Ron*, 334 F.3d at 1309–10; *Clarendon Mktg., Inc. v. United States,* 144 F.3d 1464, 1467–68 (Fed. Cir. 1998).  The record at the time demonstrated that the goods did belong to the class or kind of consumer product known as a 3D-Pen, and that its features aligned with small domestic appliances used in the home (not with those of industrial machinery).

The 3D-Pens are alternatively classified under subheading 8516.79.00, HTSUS as "other electrothermic appliances of a kind used for domestic purposes . . .Other electrothermic appliances: Other."

### III.   Alternatively, the 3D-Pens Are Classifiable in Heading 8467, HTSUS, as Handheld Tools

If the Court declines to classify the subject merchandise under the more specific headings 9503 and alternatively, 8516, HTSUS, then the subject 3D-Pens would be classified under heading 8467, HTSUS, which covers "Tools for working in the hand, pneumatic, hydraulic or with self-contained electric or non-electric motor."

#### A.  *Heading 8467, HTSUS, Covers Portable Hand Tools*

The Explanatory Note to heading 8467 confirms that the heading encompasses tools which incorporate their own motor and are "designed to be held in the hand during use." These include both powered and mechanically assisted tools operated through manual control.

43

3D-Pens conform to the scope of HTSUS heading 8467.  Each device is a handheld, electrically powered instrument incorporating a self-contained motor and heating mechanism. The device dispenses thermoplastic filament, heated and expelled under user control, allowing for the creation of three-dimensional shapes and objects by freehand. Functionally and operationally, these pens are closely analogous to other tools expressly referenced in the EN to heading 8467, HTSUS, such as engraving pens, rotary shears, and precision cutters. The devices are used for shaping material by extrusion under human control and are designed to be directed manually during operation.

The Explanatory Notes confirm that heading 8467 encompasses tools "designed to be held in the hand during use and includes examples, such as drills, saws, grinders, and screwdrivers.  Each of the subject 3D-Pens is a self-contained electric device held in the hand during operation and which functions to heat plastic in a manner similar to a glue guns.

### B.  Customs Analysis in HQ H293445 Was Unreasonable

Customs issued the 2019 ruling, HQ H293445, to determine that 3D-Pens could not be classified under heading 8467 because of a "common characteristic" that such tools "alter the composition of the material being worked, whether by making a hole, inserting a screw, or removing a top layer."  Counsel Decl.¶6, Ex. I.  This "altered composition" principle was not drawn from text of the heading, from the Legal Notes, or even from the Explanatory Notes.

Plaintiffs assert that creation of a requirement from mere characterization of coincidental products (without inserting or entertaining any independent legal authority) is an unreasonable legal analysis.  Interpretations of statutory language must at least contain some scintilla of legal authority following the GRI analysis.  *Orlando Food Corp.*, 140 F.3d at 1440 (Fed. Cir. 1998) (holding that tariff classification must be determined according to the terms of the headings and relevant section or chapter notes).   Nothing in heading 8467 or even its Explanatory Notes supported the existence of such an "altered composition" requirement,

which CBP derived from its own select observations.  Quite the opposite, the tariff broadly construes "tools for working in the hand, pneumatic, hydraulic or with self-contained electric or non-electric motor," and the Explanatory Notes confirm that such tools are broadly construed as being held in the hand during use.  Customs' invention of an extra-textual "altered composition" test was entirely unmoored from the statute.  The unreasonableness of Customs analysis is illustrated by HQ H319727 (Apr. 8, 2024), where Customs shortly later, again, classified glue guns under heading 8467, without application, or mention, of this "altered composition" criterion.  *See*, HQ H319727, April 8, 2024 (glue gun kits).

Even if an "altered composition" requirement existed, the 3D-Pens would qualify, as they do function to allow for manual addition of plastic in order to build up a shape.  While "wrenches, screwdrivers, nut setters" are used to add nuts/screws, the 3D-Pens add plastic.

While heading 8467 (hand tools) is a less specific provision than heading 8516 (domestic appliances); it has always been a *prima facia* classification.  Accordingly, if the Court rejects classification under both HTSUS headings 9503 or 8516, it should classify the subject merchandise under subheading 8467.29.0090, HTSUS.

### C.  Heading 8477 Could Never Have Applied

Classification under HTSUS heading 8477 remains improper because heading 8477 is expressly residual to other headings in Chapter 84, and the 3D-Pens are expressly provided for under heading 8467 as electric handheld tools.

In this litigation, the Government has contended that the 3D-Pens fall under heading 8477, which covers "machinery for working . . . plastics . . . *not specified or included elsewhere*."  This provision is explicitly a residual provision which applies only when no other heading can be applied.  It is well-settled that residual or "basket" provisions such as heading 8477 are provisions of last resort and cannot be used when merchandise is *prima facie* classifiable under a more specific heading.  *Rollerblade, Inc. v. United States*, 282 F.3d 1349,

1353 (Fed. Cir. 2002). Because these 3D-Pens are *prima facie* described by headings 9503, 8516, and 8467, the Government's resort to heading 8477 has at all times been both unwarranted and unreasonable.

Should the Court determine that classification of 3D-Pen Sets under HTSUS heading 9503 is inapplicable, Plaintiffs respectfully submit, in the alternative, that the imported merchandise is properly classifiable under HTSUS heading 8467, and more specifically under subheading 8467.29.0090, HTSUS as "other tools for working in the hand, with self-contained electric motor."

## CONCLUSION

For these reasons, and as established by record evidence and uncontroverted expert and inventor testimony, 3D-Pen Sets are properly classified under HTSUS heading 9503 (toys) and excluded from heading 8477 (industrial machinery) both by operation of law (Section XVI Note 1(p)) and by the principal use of the products. Accordingly, Plaintiffs respectfully request that the Court grant their Motion for Summary Judgment and order the Government to re-liquidate the subject entries under subheading 9503.00.00, HTSUS, and refund all deposited duties and fees, with interest, as well as grant Plaintiffs any other relief the Court deems appropriate.

Dated:    August 25, 2025    Respectfully submitted,

*/s/ Alena A. Eckhardt*
Alena A. Eckhardt
Matt Nakachi

NAKACHI ECKHARDT & JACOBSON, P.C.
50 California Street, Suite 1500
San Francisco, CA 94111
Tel.: (415) 498-0070
Email: alena@tradelawcounsel.com
           matt@tradelawcounsel.com

*Counsel for Consolidated Plaintiffs*

**UNITED STATES COURT OF INTERNATIONAL TRADE**

QUANTIFIED OPERATIONS LIMITED,
WOBBLEWORKS (HK) LIMITED,

                      Consolidated Plaintiffs,

          v.

UNITED STATES,

                      Defendant.

Before: Hon. Richard K. Eaton, Judge

Consol. Court No. 22-00178

**WORD COUNT CERTIFICATE OF COMPLIANCE**

Pursuant to the Standard Chambers Procedures of the U.S. Court of the International Trade, the undersigned certify that this brief complies with the court limitation requirement. This Memorandum of Law in Support of Motion for Summary Judgment contains 13,507 words, as computed by word processing system (Microsoft Word). This word count is within the limit of 14,000 words set forth in Rule 2(B)(1).


Dated: August 25, 2025


Respectfully submitted,

/s/ Alena A. Eckhardt
Alena A. Eckhardt

NAKACHI ECKHARDT & JACOBSON, P.C.
50 California Street, Suite 1500
San Francisco, CA 94111
Tel: (415) 498-0070
Email: alena@tradelawcounsel.com

*Counsel for Consolidated Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on August 25, 2025, she served a copy of the

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN**

**SUPPORT OF THEIR MOTION, DECLARATIONS AND EXHIBITS** upon the

Defendant United States, via the U.S. Court of International Trade's CM/ECF System:

Luke Mathers
Trial Counsel
U.S. Department of Justice
Commercial Litigation Branch
Int'l Trade Field Office
26 Federal Plaza, Room 346
New York, NY 10278

Physical samples of the imported merchandise and other items were previously

provided to the Defendant United States at the address listed above, as referenced in Plaintiffs'

Certification of Filing and Service of Physical Exhibit or Item (Form 23).

*/s/ Alena A. Eckhardt*
Alena A. Eckhardt
