UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. RICHARD K. EATON, JUDGE

| | | |
|---|---|---|
| | : | |
| QUANTIFIED OPERATIONS LTD, *ET AL.*, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Consol. Court No. 22-00178 |
| | : | |
| UNITED STATES, | : | |
| | : | |
| Defendant. | : | |
| | : | |

## <u>ORDER</u>

Upon consideration of defendant's cross-motion for summary judgment and response in opposition to plaintiffs' motion for summary judgment, and upon consideration of all other papers and proceedings had herein; it is hereby

ORDERED that plaintiffs' motion for summary judgment is denied; and it is further

ORDERED that defendant's motion for summary judgment is granted; and it is further

ORDERED that judgment is entered for defendant and this action is dismissed.


_____
RICHARD K. EATON, JUDGE

Dated: _____
New York, New York

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. RICHARD K. EATON, JUDGE

| | | |
|---|---|---|
| | : | |
| QUANTIFIED OPERATIONS LTD, *ET AL.*, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Court No. 22-00178 |
| | : | |
| UNITED STATES, | : | PUBLIC VERSION |
| | : | |
| Defendant. | : | |
| | : | |

**DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE IN
OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

AIMEE LEE
Assistant Director

*Of Counsel:*

MATHIAS RABINOVITCH
Trial Attorney

VALERIE SORENSEN-CLARK
Office of the Assistant Chief Counsel
International Trade Litigation
U.S. Customs and Border Protection

U.S. Department of Justice, Civil Division
Commercial Litigation Branch
26 Federal Plaza, Room 346
New York, New York 10278
(212) 264-0484
*Attorneys for Defendant*

March 11, 2026

## TABLE OF CONTENTS

INTRODUCTION ......................................................................................................... 1

BACKGROUND ......................................................................................................... 2

    A. Description of the Subject Merchandise ........................................................ 2

    B. Administrative and Procedural Background .................................................. 5

QUESTION PRESENTED ......................................................................................... 7

SUMMARY OF ARGUMENT .................................................................................. 7

ARGUMENT .............................................................................................................. 8

I.   Legal Framework ............................................................................................. 8

    A. Legal Standard for Summary Judgment ........................................................ 8

    B. Legal Standard for Classification ................................................................. 9

II.  The 3D Printing Pens Are Not "Other Toys" of Heading 9503 ........................... 11

    A. Heading 9503 Does Not Cover Articles Used to Create Art or Crafts ........................... 11

    B. The 3D Printing Pens Do Not Belong to a Class or Kind of Merchandise Classified as "Toys" but Rather to a Class or Kind of Merchandise Used to Create Art and Crafts ................................................................................. 14

III. The 3D Printing Pens Are Classified in Heading 8477 as "Machinery for Working Plastics" .............................................................................................. 24

IV. The 3D Printing Pens Are Not Classified in Heading 8467 as "Tools for Working in the Hand" ................................................................................................... 32

V.  The 3D Printing Pens Are Not "Other Electrothermic Appliances of a Kind Used for Domestic Purposes" of Heading 8516 ................................................ 34

CONCLUSION ........................................................................................................ 37

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Airflow Technologies, Inc. v. United States,*
   524 F.3d 1287 (Fed. Cir. 2008) ............................................................................... 11

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986) ........................................................................................... 8, 9

*Aromont USA, Inc. v. United States,*
   671 F.3d 1310 (Fed. Cir. 2012) .................................................................... 15, 16, 22

*Bausch & Lomb, Inc. v. United States,*
   148 F.3d 1363 (Fed. Cir. 1998) ......................................................................... 9, 31

*BenQ Am. Corp. v. United States,*
   646 F.3d 1371 (Fed. Cir. 2011) ......................................................................... 9, 15

*Carl Zeiss, Inc. v. United States,*
   195 F.3d 1375 (Fed. Cir. 1999) ............................................................................. 10

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986) ............................................................................................. 8

*Childcraft Education Corp. v. United States,*
   742 F.2d 1415 (Fed. Cir. 1984) ............................................................................. 13

*Clarendon Marketing, Inc. v. United States,*
   144 F.3d 1464 (Fed. Cir. 1998) ......................................................................... 8, 30

*The Container Store v. United States,*
   864 F.3d 1326 (Fed. Cir. 2017) ....................................................................... 10, 29

*Degussa Corp. v. United States,*
   508 F.3d 1044 (Fed. Cir. 2007) ............................................................................. 10

*Drygel, Inc. v. United States,*
   541 F.3d 1129 (Fed. Cir. 2008) ............................................................................. 10

*EOS of North America, Inc. v. United States,*
   911 F. Supp. 2d 1311 (Ct. Int'l Trade) .............................................................. 18, 30

*Gerson Co. v. United States,*
   898 F.3d 1232 (Fed. Cir. 2018) ............................................................................. 29

*In Zone Brands, Inc. v. United States,*
   456 F. Supp. 3d 1309 (Ct. Int'l Trade 2020) ..................................................... 11, 13

*Jarvis Clark Co. v. United States,*
    733 F.2d 873 (Fed. Cir. 1984)......................................................................... 28, 31

*Kalencom Corp. v. United States,*
    450 F. Supp. 3d 1318 (Ct. Int'l Trade 2020) ................................................... 25

*Lynteq, Inc. v. United States,*
    976 F.2d 693 (Fed. Cir. 1992)............................................................................ 10

*Millennium Lumber Distribution Ltd. v. United States,*
    558 F.3d 1326 (Fed. Cir. 2009)..................................................................... 10, 31

*Minnetonka Brands, Inc. v. United States,*
    110 F. Supp. 2d 1020 (Ct. Int'l Trade 2000) .................................................... 13

*Mita Copystar Am. v. United States,*
    21 F.3d 1079 (Fed. Cir. 1994)............................................................................ 10

*N. Am. Processing Co. v. United States,*
    236 F.3d 695 (Fed. Cir. 2001)............................................................................. 9

*Orlando Food Corp. v. United States,*
    140 F.3d 1437 (Fed. Cir. 1998).......................................................................... 29

*Primal Lite, Inc. v. United States,*
    182 F.3d 1362 (Fed. Cir. 1999)............................................................... 14, 15, 30

*Processed Plastics Co. v. United States,*
    473 F.3d 1164 (Fed. Cir. 2006)................................................................ *passim*

*RKW Klerks Inc. v. United States,*
    592 F. Supp. 3d 1349 (Ct. Int'l Trade 2022), *aff'd*, 94F.4th 1374 (Fed. Cir. 2024).............. 8, 9

*SC Johnson & Son Inc. v. United States,*
    999 F.3d 1382 (Fed. Cir. 2021)........................................................................... 11

*Simon Marketing, Inc. v. United States,*
    395 F. Supp. 3d  (Ct. Int'l Trade 2005) ...................................................... 13, 18

*United States v. Carborundum Co.,*
    536 F.2d 373 (Cust. & Pat. App. 1976) ...................................................... *passim*

*Universal Electronics Inc. v. United States,*
    112 F.3d 488 (Fed. Cir. 1997)............................................................................ 31

*Warner-Lambert Co. v. United States,*
    407 F.3d 1207 (Fed. Cir. 2005)........................................................................... 10

**Harmonized Tariff Schedule Of The United States**

Additional Rule of Interpretation 1(a) ............................................................. 14, 15, 30

Section XVI

Note 1(p) to Section XVI ............................................................................... 24

Note 3 to Section XVI .................................................................................... 31

Note 4 to Section XVI .................................................................................... 31

Note 5 to Section XVI .................................................................................... 25

Chapter 32

Heading 3213 ................................................................................................ 13

Chapter 34

Heading 3407 ................................................................................................ 13

Chapter 49

Heading 4903 ................................................................................................ 13

Chapter 73

Heading 7321 ................................................................................................ 35

Chapter 84

Explanatory Note to Chapter 84 .............................................................. 29, 31

Heading 8467 ............................................................................................ *passim*

    Subheading 8467.29.00 ............................................................................ 6, 7

    Explanatory Note to Heading 8467 ...................................................... 32, 33

Heading 8477 ............................................................................................ *passim*

    Subheading 8477.80 ................................................................ 2, 27, 28, 29

    Subheading 8477.80.00/01 .................................................................. 13, 28

Chapter 85

Heading 8516 ......................................................................................*passim*

    Subheading 8516.79.00 ............................................................... 34

    Explanatory Note to Heading 8516 ............................................ 35

Heading 8509 ...................................................................................... 35

Chapter 95

Heading 9503 ......................................................................................*passim*

    Subheading 9503.00.00 .......................................................... 6, 11

    Explanatory Note to Heading 9503 ................................ 11, 12, 13

 Chapter 96

Heading 9603 ...................................................................................... 13

Heading 9608 ...................................................................................... 13

Heading 9609 ...................................................................................... 13

**Statutes**

Trade Act of 1974 (Pub. L. 93–618, 19 U.S.C. § 2411) .................. 6, 24, 32

**Rules**

USCIT R. 56(a) ................................................................................... 8, 9

**Regulations**

80 Fed. Reg. 34,924 (June 18, 2015) ............................................. 27, 28

86 Fed. Reg. 73,593 (Dec. 23, 2021) ................................................... 6

**Rulings**

CBP Ruling HQ H293445 (Oct. 7, 2019) ............................................... 5

CBP Ruling HQ H195956 (Feb. 27, 2012) ........................................... 12

CBP Ruling N342417 (Sep. 17, 2024) ................................................. 29

CBP Ruling HQ 950627 (Mar. 30, 1992) ............................................. 36

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. RICHARD K. EATON, JUDGE

| | | |
|---|---|---|
| QUANTIFIED OPERATIONS LTD, *ET AL.*, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Court No. 22-00178 |
| | : | |
| UNITED STATES, | : | PUBLIC VERSION |
| | : | |
| Defendant. | : | |
| | : | |

## **DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the United States Court of International Trade (USCIT), defendant, the United States (the Government), respectfully cross-moves this Court for an order: (1) denying plaintiffs' Quantified Operations Limited (Quantified) and WobbleWorks (HK) (WobbleWorks) (collectively Plaintiffs) motion for summary judgment; (2) granting summary judgment in the Government's favor; (3) entering judgment for the Government and dismissing this actions; and (4) granting the Government such other and further relief as may be just and appropriate. As we demonstrate below, summary judgment in favor of the Government is appropriate because there are no genuine disputes of material fact, and the Government is entitled to judgment as a matter of law.

## **INTRODUCTION**

This case concerns the classification of various models of 3D Printing Pens imported with plastic filaments, power adapters, instructions, and user guides. A 3D Printing Pen is a pen that extrudes a heated filament that is fed through the pen's body. The heated filament quickly cools and hardens. A 3D Printing Pen is used to draw either a raised graphic on a flat surface or

to "draw" in the air, creating a three-dimensional object. The 3D Printing Pens at issue are marketed and advertised as being able to draw all sorts of objects, from shapes, trinkets and figurines, to ornamentation and art, and even complex architectural structures.

Plaintiffs claim that its imported merchandise is classified as other toys of heading 9503, which are merchandise essentially for the amusement of persons. However, as the undisputed facts show, the imported 3D Printing Pens are principally used as arts and craft devices to create—or draw—a three-dimensional object. Such three-dimensional "drawing" devices are not classified as toys, as informed by the exclusions in the Explanatory Notes. Instead, the 3D Printing Pens are machines that function to extrude plastic filaments. Such articles are classified under heading 8477, as machines for working plastics. The World Customs Organization, which drafts the tariff provisions up to the six-digit level, agrees, as it classified identical merchandise under subheading 8477.80. Moreover, the 3D Printing Pens are not more correctly classified as tools for working in the hand of heading 8467 because the subject pens are not "tools for working" as that term is understood in that heading. Nor are the 3D Printing Pens other electrothermic appliances for domestic purposes of heading 8516 because they do not perform a household function, as explained further below.

## BACKGROUND

### A. Description of the Subject Merchandise

There are six models under three brands of the imported 3D Printing Pens: the 3Doodler, the PiKA3D, and the SCRIB3D. Defendant's Statement of Undisputed Material Facts (DSOF) ¶ 1; Plaintiffs' Statement of Undisputed Material Facts (PSOF) ¶ 2. Within the six models there are three lower-end, *i.e.* beginner, pens (3Doodler Create+, SCRIB3D P1, and the PiKA3D Pro) and three higher-end, *i.e.* professional or advanced, pens (3Doodler Create PRO+, SCRIB3D

THIS PAGE CONTAINS CONFIDENTIAL INFORMATION

Advanced, and PiKA3D Super).  DSOF ¶ 1.  Plaintiffs also imported 3Doodler Create+ learning

packs that include six or 12 pens as part of a student kit and teacher kit that include lesson plans.

*Id.*  The 3D Printing Pens were usually imported with a power adapter, a user guide and

instruction manual, maintenance tools, and filaments.  DSOF ¶ 2.

All 3D Printing Pens at issue are electrically operated devices.  DSOF ¶ 8.  They have a

tapered, cylindrical shape, similar to an oversized marker.  DSOF ¶ 9.  The cap end contains two

holes: one for the power cord and another for the plastic filament.  DSOF ¶ 10.  The other end

contains a conical point, where the ceramic or metal nozzle is located.  DSOF ¶ 11.  The middle

of the 3D Printing Pen is curved for ergonomic grip and contains buttons, while some models of

the 3D Printing Pens also include a display.  DSOF ¶ 12.  The barrel of the 3D Printing Pens

contains one or two motors and heating elements.  DSOF ¶ 13.  The filaments are generally made

of polylactic acid (PLA) or acrylonitrile butadiene styrene (ABS) plastic, but some filaments are

made of flexy, wood, or copper.  *See* DSOF ¶ 14.  The filaments ▉▉▉▉▉▉▉ are fed

through the pen during use.  DSOF ¶ 15.

To operate the pen, the user powers the device and inserts a filament into the opening in

the back of the pen.  DSOF ¶ 16.  A guide tube leads the filament to the nozzle.  DSOF ¶ 17.  A

direct current motor, connected to a gearbox, drives the filament towards the nozzle when a

button is pressed.  DSOF ¶ 18; PSOF ¶ 43.  During operation, the nozzle is heated with a heated

element and temperature-controlled with a sensor.  DSOF ¶ 19.  As the filament moves through

the pen, the filament is heated to a temperature determined by the type of filament, causing the

filament to melt enough to make it soft and malleable.  PSOF ¶ 43; What Is A 3D Pen?,

3Doodler, https://learn.the3doodler.com/about/what-is-a-3d-pen (last accessed Mar. 11, 2026)

(provided in Defendant's Exhibit I); *see* Pls.' Mot. Summ. J. (Pls. Br.) at 20, ECF No. 41

(August 25, 2025) (inviting the Court to view product material available on the official websites for 3Doodler, PiKA, and SCRIB3D). The filament is then extruded out of the pen's nozzle and when it makes contact with the air or a surface, it cools and hardens, creating a solid structure. DSOF ¶ 20; PSOF ¶ 44. The 3Doodler series has replaceable nozzles that extrude differently shaped strands. DSOF ¶ 21. Some models of the 3D Printing Pens contain a fan to help cool the filament as it exists the pen. DSOF ¶ 22.

The 3D Printing Pen is used to draw three-dimensional objects. DSOF ¶ 23–24. Plaintiffs provide guides to its users on how to use the pen, how to draw with the pen, and what to make with the pen. DSOF ¶ 25. Plaintiffs' websites and catalogs for the subject 3D Printing Pens highlight a myriad of artistic or crafty creations that can be made with the pen. DSOF ¶ 26. For example, the websites, catalogs, and user guides offer projects like drawing or making shapes, animals, tassels, earrings, and even the Eiffel Tower. DSOF ¶ 27; PSOF ¶ 92; How To Draw With a 3D Pen, 3Doodler, https://learn.the3doodler.com/about/how-to-draw-with-a-3d-pen (last accessed Mar. 11, 2026) (provided in Def. Ex. I). Plaintiffs provide stencils to assist the user in creating a specific object. DSOF ¶ 28.

Plaintiffs advertise their product as a "3D Printing Pen" that is mainly used by artists, makers, fashion and home designers, educators, students, engineers, Do-It-Yourself (DIY) fixers, and hobbyists. DSOF ¶ 23, 29. The 3Doodler's website spotlights several artists that use the 3D Printing Pens for artistic creations, including fashion designers, and highlights that the 3D Printing Pen is used for "crafting and decorating," to "make art," to "design wearables," or to "doodle whimsical characters, beautiful typography, an intricate patterns, and more." DSOF ¶ 30; Drawing 3D Art With A 3D Pen, 3Doodler, https://learn.the3doodler.com/about/3d-drawing-pen-art (last accessed Mar. 11, 2026) (provided in Def. Ex. I). The user guide for the 3Doodler

similarly proposes that the user make art, doodle characters, create wearable fashion, design or personalize items, or fix things.  DSOF ¶ 31.

Plaintiffs provide similar uses on the products' packaging.  The packaging for the PiKA3D include exclamations such as: "draw anything in 3D," "express yourselves in 3D," "decorate & design," "find your style," "start simply and expand."  DSOF ¶ 32.  The packaging for the 3Doodler Create+ advertises the product as used to create "handmade crafts," "DIY fixes," and "wearable pieces," and explains how to draw in 3D.  DSOF ¶ 33.  In addition, its catalog, sell sheets, and user guides similarly advertise or describe the 3D Printing Pen as used for these purposes.  DSOF ¶ 35.  For example, the sell sheet and catalog for the 3Doodler Create+ markets the 3D Printing Pen to students, hobbyists, DIYers, artists, and designers as a way to make art, design objects, fix things, build models, and decorate the space around them. DSOF ¶ 36.  The 3D Printing Pens are essentially drawing tools that break free from the two-dimensional mold in that it allows users to create an object.

### B.  Administrative and Procedural Background

Between September 21, 2020 and March 21, 2023, the fifteen entries covered by the four actions in this consolidated court case were made by either Quantified or WobbleWorks. Plaintiffs declared the various models of 3D Printing Pens at issue under heading 8477, HTSUS, pursuant to CBP's ruling in HQ H293445 (Oct. 7, 2019).  Specifically, in entries made before January 27, 2022, the 3D Printing Pens models were declared under subheading 8477.80.00, HTSUS.  Subject models entered on or after January 27, 2022 were declared under subheading 8477.80.01, HTSUS.[1]  Both subheadings were for "[m]achinery for working rubber or plastics or

---

[1]  Effective January 27, 2022, subheading 8477.80.00 was redesignated as 8477.80.01. *See Modifications to the Harmonized Tariff Schedule of the United States under Section 1206 of* (cont'd)

for the manufacture of products from these materials, not specified or included elsewhere in this chapter; parts thereof: Other machinery," with regular duties of 3.1 percent *ad valorem* and subject to additional 25 percent *ad valorem* duties under Section 301 of the Trade Act of 1974 (Pub. L. 93–618, 19 U.S.C. § 2411) (Section 301).  All 15 entries auto-liquidated (i.e., with no CBP review or change to the declared HTSUS provisions) between December 18, 2020, and February 9, 2024.

Between June 15, 2021 and February 23, 2024, Quantified and WobbleWorks filed protests challenging the liquidation of their respective entries.  For the two protests covered by Court Nos. 22-00178 and 22-00179, Quantified and WobbleWorks argued that the 3D Printing Pens were properly classified under subheading 8467.29.00, HTSUS, as "[t]ools for working in the hand, pneumatic, hydraulic or with self-contained electric or nonelectric motor, and parts thereof: With self-contained electric motor: Other: Other," which is a duty-free provision but was subject to additional 7.5 percent *ad valorem* Section 301 duties at the time of entry, or, alternatively, that the subject 3D Printing Pens were properly classified under subheading 9503.00.00, HTSUS, as "[t]ricycles, scooters, pedal cars and similar wheeled toys; dolls' carriages; dolls, other toys; reduced-scale ("scale") models and similar recreational models, working or not; puzzles of all kinds; parts and accessories thereof," which is also a duty-free provision and was not subject to additional Section 301 duties at the time of entry.

On June 21, 2022, Quantified filed a summons in Court No. 22-00178 to contest CBP's denial of Protest No. 0417-21-100346.  WobbleWorks filed a summons in Court No. 22-00179

---

the Omnibus Trade and Competitiveness Act of 1988 and for Other Purposes, USITC Pub. 5240 (Dec. 2021), available at https://www.usitc.gov/publications/tariff_affairs/pub5240.pdf; *see also To Modify the Harmonized Tariff Schedule of the United States and for Other Purposes*, 86 Fed. Reg. 73,593 (Dec. 23, 2021).  The article description for the subheading remained the same.  For ease of reference, the Government will refer to the subheading as 8477.80.00/01.

to contest CBP's denial of Protest No. 0417-21-100360 on the same day.  On January 8, 2024,

the Court issued an order to consolidate Court Nos. 22-00178 and 22-00179 under lead Consol.

Court No. 22-00178.  *See* ECF No. 12.  Additional actions filed by the plaintiffs were

consolidated under this action.  *See* ECF Nos. 15, 18.

## QUESTION PRESENTED

Whether the imported 3D Printing Pens are correctly classified as (i) other toys of

heading 9503, HTSUS, (ii) machinery for working plastics of heading 8477, HTSUS, (iii) tools

for working in the hand of heading 8467, HTSUS, or (iv) other thermoelectric appliances for a

domestic purpose of heading 8516, HTSUS.

## SUMMARY OF ARGUMENT

The subject 3D Printing Pens are not classified under heading 9503, HTSUS.  Heading

9503 excludes from the "toy" provision articles that are used to create art or crafts, such as the

3D Printing Pen, because such articles are not principally used for amusement, diversion or play.

As instructed and interpreted by the Explanatory Notes, heading 9503 explicitly exclude paints,

modeling paste (such as Play-Doh), and crayons that are intended for children's use.  This

demonstrates that items used in drawing, painting, sculpting and other art or craft-related

activities, including paints, modeling pastes, picture books, drawing books, coloring books,

chalk, crayons, and pastels—even if explicitly designed or intended for children's use—are not

classified as toys.  3D Printing Pens are part of this class or kind of merchandise, which are

provided for elsewhere in the HTSUS.

The 3D Printing Pens are appropriately classified under heading 8477, HTSUS, which

provides for "machinery for working plastics."  The 3D Printing Pens are covered by the plain

meaning of the terms "machinery" for "working" plastics.  They are machinery because they are

electrically and mechanically operated devices that push filament through a heated nozzle. And they "work" plastics because they heat and extrude plastic filament from the housing of the pen. The WCO agrees with this reasoning, as it issued a classification opinion classifying identical merchandise in heading 8477.

Further, the 3D Printing Pens are not "tools for working in the hand" of heading 8467. The term "tools for working," in the context of the HTSUS and in the light of the Explanatory Notes, covers tools used to alter or manipulate another material, such as drills, saws, screwdrivers, and the like. Here, the 3D Printing Pens are used to create a three-dimensional object and are not used to alter or manipulate another material. Nor are the 3D Printing Pens "other electrothermic appliances of a kind used for domestic purposes" of heading 8516. Again, in the context of the HTSUS and in the light of the Explanatory Notes, the term "appliances . . . for domestic purposes" refers to goods used for a household function, such as coffee makers, hair dryers, electric heaters, and other similar articles.

We discuss each provision further below.

## ARGUMENT

## I. Legal Framework

### A. Legal Standard for Summary Judgment

On a motion for summary judgment, the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." USCIT R. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The burden of establishing the absence of a genuine issue of material fact lies with the moving party. *Id.* The Court must view the evidence in the light most favorable to the non-movant and may not weigh the evidence, assess the credibility of witnesses, or resolve issues of fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citation omitted);

USCIT R. 56(a).  However, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249.  In the absence of genuine factual issues, whether to grant summary judgment in a classification case turns on the proper construction of the HTSUS, which is a question of law.  *Clarendon Marketing, Inc. v. United States*, 144 F.3d 1464, 1466 (Fed. Cir. 1998).

##### B.    Legal Standard for Classification

"The [C]ourt's review of a classification dispute involves two steps.  First, it must determine the meaning of the relevant tariff provisions, which is a question of law."  *RKW Klerks Inc. v. United States*, 592 F. Supp. 3d 1349, 1354 (Ct. Int'l Trade 2022), *aff'd*, 94 F.4th 1374 (Fed. Cir. 2024) (citing *Bausch & Lomb, Inc. v. United States*, 148 F.3d 1363, 1365 (Fed. Cir. 1998)).  "Second, it must determine whether the merchandise at issue falls within a particular tariff provision, as construed, which is a question of fact."  *Id.* (citations omitted).  When, as here, "no factual dispute exists regarding the merchandise, resolution of the classification turns solely on the first step," a "question of law" that the court determines *de novo*.  *Id.* (citations omitted).  That question of law is governed by the HTSUS's General Rules of Interpretation (GRIs).  *Id.* at 1355.

The GRIs provide the analytical framework for the classification of goods under the HTSUS.  *BenQ Am. Corp. v. United States*, 646 F.3d 1371, 1376 (Fed. Cir. 2011) (citing *N. Am. Processing Co. v. United States*, 236 F.3d 695, 698 (Fed. Cir. 2001)).  A classification analysis begins with applying GRI 1, which requires that classification be "determined according to the terms of the headings and any relative section or chapter notes" as HTSUS chapter and section notes are considered binding statutory law.  GRI 1; *BenQ*, 646 F.3d at 1376; *see also RKW*, 592

F. Supp. 3d at 1354–5 ("The HTSUS is designed so that most classification questions can be answered by GRI 1.") (citation omitted).

HTSUS terms generally are construed "according to their common commercial meanings." *Millennium Lumber Distribution Ltd. v. United States*, 558 F.3d 1326, 1329 (Fed. Cir. 2009). In doing so, "Courts may rely upon their own understanding of terms or consult dictionaries, encyclopedias, scientific authorities, and other reliable information" in ascertaining common meaning. *Carl Zeiss, Inc. v. United States*, 195 F.3d 1375, 1379 (Fed. Cir. 1999) (citations omitted).

In addition, courts have recognized that the Explanatory Notes (ENs), although not binding law, are intended to clarify the scope of tariff provisions, are instructive, persuasive, and provide useful interpretive guidance for determining the scope of tariff provisions. *See, e.g. Drygel, Inc. v. United States*, 541 F.3d 1129, 1134 (Fed. Cir. 2008); *Mita Copystar Am. v. United States*, 21 F.3d 1079, 1082 (Fed. Cir. 1994); *Lynteq, Inc. v. United States*, 976 F.2d 693, 699 (Fed. Cir. 1992). The ENs are the official interpretation of the Harmonized Commodity Description and Coding System (Harmonized Tariff System) at the international level. The Harmonized Tariff System is the international coding system that formed the basis for the HTSUS, which the United States and its trading partners adopted in its entirety up to the six-digit level. *Carl Zeiss*, 195 F.3d at 1378 n.1. Thus, the ENs are "generally indicative of the proper interpretation of a tariff provision." *Degussa Corp. v. United States*, 508 F.3d 1044, 1047 (Fed. Cir. 2007); *see also Warner-Lambert Co. v. United States*, 407 F.3d 1207, 1209 (Fed. Cir. 2005). If, however, the language of an EN conflicts with the language of the related tariff provision, the statutory provision prevails. *See The Container Store v. United States*, 864 F.3d 1326, 1331–32

(Fed. Cir. 2017); s*ee also Airflow Technologies, Inc. v. United States*, 524 F.3d 1287, 1293 (Fed.

Cir. 2008).

## II.    The 3D Printing Pens Are Not "Other Toys" of Heading 9503

The 3D Printing Pens are not classified as "toys" in heading 9503.  The relevant tariff

provisions provide, in relevant part, as follows:

> 9503.00.00[2]    Tricycles, scooters, pedal cars and similar wheeled toys;
> dolls' carriages; dolls, *other toys*; reduced-scale ("scale")
> models and similar recreational models, working or not;
> puzzles of all kinds; parts and accessories
> thereof . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Free

*See* subheading 9503.00.00, HTSUS (emphasis added).  The provision for "toys" of subheading

9503.00.00 is a principal use provision.  *See SC Johnson & Son Inc. v. United States*, 999 F.3d

1382, 1389 (Fed. Cir. 2021); *see also Processed Plastics Co. v. United States*, 473 F.3d 1164,

1170 (Fed. Cir. 2006).  "To determine whether subject merchandise is a 'toy' under Chapter 95,

the court must determine whether its principal use is for 'amusement, diversion, or play.'"  *In

Zone Brands, Inc. v. United States*, 456 F. Supp. 3d 1309, 1317–18 (Ct. Int'l Trade 2020) (citing

*Processed Plastics*, 473 F.3d at 1170).

### A.    Heading 9503 Does Not Cover Articles Used to Create Art or Crafts

The relevant inquiry is whether the 3D Printing Pens are "other toys" of heading 9503.

The Explanatory Note to heading 9503 provides guidance on the kinds of articles encompassed

within the scope of this heading.  The term "other toys" in heading 9503 "covers toys intended

essentially for the amusement of persons (children or adults)."  EN 95.03(D).  The ENs further

provide examples of thirteen categories of products that fall under this provision, including

---

[2]  Heading 9503 is not further subdivided into subheadings at either the 6- or 8-digit
level.  Therefore, the language of the 8-digit subheading is the same as the language of the
heading.

constructional toys, toy vehicles, toy tools and implements, toy instruments, toy sewing machines, dolls' houses, and "educational toys (e.g., toy chemistry, printing, sewing and knitting sets)". *See* EN 95.03(D)(i)–(xxiii). Plaintiffs selectively point to some of these categories to argue that the ENs encompass "not only traditional playthings, but also construction sets, educational toys, toy tools, and creative play kits"[3] in attempt to demonstrate that the 3D Printing Pens are toys. *See* Pls. Br. 15. However, plaintiffs cannot make such a showing.

The listed exemplars are all traditional playthings with no function other than their use as toys. For example, constructional toys (such as construction sets or building blocks) and toy tools are not actually used for construction. Moreover, where the ENs state that certain toys may be capable of a limited "use," it identified miniature toys, such as toy electric irons, sewing machines, and musical instruments, which are "generally distinguishable from a real [article]" given their "size and limited capacity." EN 95.03 (D). Finally, as to the educational toys, the ENs list toy chemistry, printing, sewing, and knitting sets, which all have limited use, limited capacity, and are also representations of an adult, or real-world, version of that article. EN 9503 (D)(xviii). As CBP has consistently stated, "[e]ducational toys are designed to allow the user to mimic or even undertake the basic activities of actual chemistry, printing, sewing or knitting sets [by] taking advantage of a child's natural curiosity and desire to role-play[, but] any actual learning of principles of chemistry or development of sewing skills is incidental to the entertainment value of the role-playing." CBP Ruling HQ H195956 (Feb. 27, 2012). The noted exemplars highlighted by plaintiff are all "intended essentially for the amusement" of children and are all used for children to engage in role play.

---

[3] Plaintiffs identify "creative play kits," distinct from the other categories, but does not explain where in the ENs such a category of products exist.

By contrast, the ENs explicitly exclude several categories of products, deemed to be functional and not for amusement, including "[p]aints put up for children's use," "modelling pastes put up for children's amusement," children's "drawing or colouring books," "[c]rayons and pastels for children's use," and "slates and blackboards."  EN 95.03.  These exclusions indicate that articles that may be used for creation are not toys of heading 9503.  Instead, these types of articles are used to express oneself by creating an external object or thing, such as pastels, pens, chalk, modeling paste, crayons, paints, and related articles such as drawing and coloring books, slates, or blackboards, are excluded from heading 9503, regardless of whether they are put up for children's use.  The distinction made in the ENs between the exemplar toys and these excluded articles rests on the nature of the activity: items are classified as toys when the amusement is an end in itself, whereas items used to produce a tangible output—such as a drawing or painting—are instruments of creation classified elsewhere in the HTSUS.  *See, e.g.*, heading 3213 (paints), heading 3407 (modeling pastes), 4903 (picture, drawing and coloring books), 9603 (paint brushes), heading 9608 (pens), heading 9609 (pencils, crayons, chalks, pastels).  That is because any amusement or diversion is incidental, and derived entirely, from the use of the instrument or utensil to draw, paint, model, or otherwise create art or crafts.

This understanding is consistent with prior cases considering classification under the tariff provision for "toys" whereby the court compares an amusement, diversion, or play use against a utilitarian or practical use.  *See generally Processed Plastics*, 473 F.3d 1164 (alternatively using the term "play value"); *In Zone Brands*, 456 F. Supp. 3d 1309; *Minnetonka Brands, Inc. v. United States*, 110 F. Supp. 2d 1020 (Ct. Int'l Trade 2000); *Simon Marketing, Inc. v. United States*, 395 F. Supp. 3d 1280 (Ct. Int'l Trade 2005); *see also Childcraft Education Corp. v. United States*, 742 F.2d 1415 (Fed. Cir. 1984) ("When amusement and utility become

13

locked in controversy, the question becomes one of determining whether the amusement is incidental to the utilitarian purpose, or the utilitarian purpose incidental to amusement.") (citations omitted).

Here, the utilitarian or practical use of the 3D Printing Pens is that it draws, or creates, albeit 3D objects, similar to crayons, modeling paste, or colored pens, and is therefore excluded from classification as toys.  Plaintiffs throughout their brief claim that the article does not perform a utilitarian function, that "any occasional practical use," Pls. Br. at 22, or "any utilitarian value," Pls. Br. at 26, is incidental, but plaintiffs provide no explanation for why the 3D Printing Pens provide no utilitarian function.  The utilitarian function of the 3D Printing Pen, however, is to draw in three dimensions.  Plaintiffs' analysis wholly ignores this, even though the official websites, catalogs, sell sheets, and user guides for the products explain that they are essentially drawing tools.  *See* DSOF ¶ 24–35.  A crayon has the utility of performing the function of drawing just as the 3D Printing Pen has the utility of drawing in three dimensions.  Further, Plaintiffs unduly limit any meaning of a utilitarian or practical use when describing their product.  Plaintiffs claim, for example, that using the 3D Printing Pens for tasks such as household repair are "secondary" and not practical or efficient.  *See* Pls. Br. at 15, 18.  But the relevant metric for comparison is not the article's capacity to efficiently repair household items—which is merely the eventual outcome—but rather its principle use.  The 3D Printing Pen's use, as explained further below, is to draw three-dimensional arts and crafts objects.

    **B.**    **The 3D Printing Pens Do Not Belong to a Class or Kind of Merchandise Classified as "Toys" but Rather to a Class or Kind of Merchandise Used to Create Art and Crafts**

Additional Rule of Interpretation (ARI) 1 "dictates how tariff classifications should be construed when the classification decision is controlled by use."  *Primal Lite, Inc. v. United*

*States*, 182 F.3d 1362, 1363 (Fed. Cir. 1999); *see also* ARI 1, HTSUS.  ARI 1(a) provides that, in "the absence of special language or context which otherwise requires, a tariff classification controlled by use (other than actual use) is to be determined in accordance with *the use* in the United States at, or immediately prior to, the date of importation, *of goods of that class or kind to which the imported goods belong*, and the controlling use is the principal use."  ARI 1(a), HTSUS (emphasis added).

Under ARI 1(a), the Court must thus determine the "class or kind" of goods to which the subject merchandise belongs and does so by reference to "those goods that are commercially fungible with the imported goods."  *Primal Lite*, 182 F.3d at 1364.  The Court may consider the so-called *Carborundum* factors for "guidance in determining what goods are commercially fungible with the imported goods."  *Aromont USA, Inc. v. United States*, 671 F.3d 1310, 1312–13 (Fed. Cir. 2012) (citing *BenQ Am. Corp.*, 646 F.3d at 1377).  These factors include: (i) use in the same manner as merchandise which defines the class; (ii) the general physical characteristics of the merchandise; (iii) the economic practicality of so using the import; (iv) the expectation of the ultimate purchasers; (v) the channels of trade in which the merchandise moves; (vi) the environment of the sale, such as accompanying accessories and the manner in which the merchandise is advertised and displayed; and (vii) the recognition in the trade of this use.  *See United States v. Carborundum Co.*, 536 F.2d 373, 377 (Cust. & Pat. App. 1976).  But the *Carborundum* factors "are simply areas of inquiry that may prove useful in determining what is the principal use of merchandise alleged to be a 'toy.'"  *See Processed Plastics*, 473 F.3d at 1170 (rejecting an argument that the factors are "definitive" or "carry[] weight equal to principal use in defining 'toys'").

The subject merchandise belongs to the class or kind of articles principally used for drawing, coloring, sculpting, or painting because its purpose is to draw in three-dimensions using plastic filaments.  A 3D Pen, compared to an ink pen, a crayon, or other traditional drawing tool, differs in that it extrudes heated or warm filament from the pen's nozzle to draw a solid object instead of a two-dimensional image on a surface.  *See* DSOF ¶ 20, 24–35.  It is essentially a pen that is used by "artists, makers, designers (fashion and home), educators, engineers, DIY fixers, hobbyists, and just about anyone."  Def. Ex. I.  And because drawing utensils do not have manipulative play value, the 3D Printing Pens are not *prima facie* classifiable as "other toys" of heading 9503.

Consideration of the *Carborundum* factors weighs in favor of finding that the 3D Printing Pens are commercially fungible with other utensils or devices used for making art or crafts, because they are principally used to draw, not principally used for amusement, diversion, or play.

*Use in the Manner that Defines the Class*

The first factor, "the use in the manner that defines the class" (referred to as the actual use) strongly indicates that the subject printing pens are commercially fungible with other articles for arts and crafts.  The 3D Printing Pen's actual use, particularly in this instance, is the most probative evidence of its principal use.  *See Aromont,* 671 F.3d at 1313 ("Actual use . . . is . . . perhaps one of the more important of the *Carborundum* factors.").  The 3D Printing Pens are actually used to "draw" three-dimensional objects, for the purpose of creating art, a craft, a Do-It-Yourself (DIY) fix, or any other creation.  The official websites, catalogs, and user guides provide the best evidence of their intended and actual uses.  *See* Pls. Br. at 20 (directing the court to the official websites); PSOF ¶ 72.  The 3Doodlers website has a dedicated page to teach users "how to draw with a 3D Pen" and describes the process of "drawing in 3D."  Def. Ex. I.  The

PiKA3D website states that the pens allow users to "go beyond the world of 2D drawing" with pens that "model 3D creations" or use "3D Drawing Technology."  PiKA3D, https://pika3d.com (last accessed Mar. 11, 2026).   The PiKA brand seeks to "open up the world of 3D printing for everyone."  About Us, PiKA3D, https://pika3d.com/pages/about-us (last accessed Mar. 11, 2026).  On the SCRIB3D page, the brand provides articles states that "[w]ith a 3D pen, the traditional drawing process evolves to help [one] craft three-dimensional things instead."  Are Scrib3D Pens Right For Your Kids?, SCRIB3D, https://scrib3dpen.com/blogs/news/are-scrib3d-pens-right-for-your-kids (last accessed Mar. 11, 2026).  The catalogs and user guides further demonstrates the principle use of the 3D Printing Pens as creating 3D art, craft, Do-It-Yourself (DIY) fix, or other creation.

The objects created with the 3D Printing Pens are depicted as cubes, spheres, dogs, tassels, holiday wreaths, earrings and demonstrate that the 3D Printing Pens are designed and used to create art or crafts.  Plaintiffs also describe the pen as used for crafting and decorating, to make art, to design wearables, or to doodle whimsical characters, beautiful typography, intricate patterns, and more.  DSOF ¶ 24–35.  Tellingly, Plaintiffs describe the 3Doodler as a "hybrid of Harry Potter meets Harold and the Purple Crayon."  Def. Ex. I.  In other words, the 3D Printing Pen is a magical crayon that can draw in three dimensions.  Crayons and similar articles are all used to make a creation, whether it be art, design, or even just to doodle.  But rather than flat images on paper, the 3D Printing Pens extrude the heated filament to create a three-dimensional object.

Plaintiffs admit that the 3D Printing Pens are drawing devices used to make crafts and decorations, and that the brand promotes stencils and apps that assist with creating such art or crafts.  *See* Pls. Br. 24; PSOF Ex. B; *see also* Def. Ex. H.  But plaintiffs do not explain how the

use of the 3D Printing Pens is for amusement, other than by reference to the fact that some 3D amusing creations can be made with the pen.  That some people create whimsical, silly, or imaginative designs does not necessarily result in the 3D Printing Pens' classification as toys.  *See Simon*, 395 F. Supp. 2d at 1291 ("To classify every eye-catching, child-friendly article as a toy, *simply because it enhances a child's imagination*, is to unacceptably blur the HTSUS headings defeating their purpose and leading to absurd results.") (emphasis added).  Paint, crayons, and modeling pastes designed for children also "enhance[] a child's imagination," but are explicitly excluded from heading 9503.  *See Simon*, 395 F. Supp. 3d at 1291.  There is no evidence that children, or adults, engage with the pen for a purpose other than drawing in three-dimensions.  Drawing in three dimensions is the article's *only* use.  *See EOS of North America, Inc. v. United States*, 911 F. Supp. 2d 1311, 1336 (Ct. Int'l Trade 2013).  Any amusement from use of the pen, therefore, is derived entirely from using it to draw.

*Physical Characteristics*

The second factor, the "general physical characteristics of the merchandise," also favors the conclusion that the subject merchandise is not a toy of heading 9503 but a three-dimensional drawing instrument for arts and crafts.  The 3D Printing Pens are shaped and sized like a marker.  DSOF ¶ 9; PSOF ¶ 40.  Because it is designed to be held in the hand, their shape is defined by ergonomics.  DSOF ¶ 12.  They are electrically powered and require filaments to be inserted into the back of the pen.  DSOF ¶ 2, 8, 15; PSOF ¶ 41.  During use, the filament is fed through the pen, is heated so that it can be malleable, and as it is pushed through the nozzle, it is cooled so that it can harden and retain its shape.  DSOF ¶ 15–21; PSOF ¶ 42–44.

Other traditional writing instruments to render art or crafts are designed in a similar way.  They are all hand-held devices that contain or apply a material that is consumed during use.  For

# THIS PAGE CONTAINS CONFIDENTIAL INFORMATION

example, a mechanical pencil contains graphite that is pushed through the tip by pressing the top. Similarly, fountain pens use ink cartridges that need to be replaced. Crayons generally come in a variety of colors and produce coarse, imprecise, lines on the drawing surface. The subject merchandise is thus comparable to children's modeling paste, colored pens, or crayons excluded from heading 9503. ███████ Confidential - Subject to Protective Order ███████

███████ DSOF ¶ 4; *see also* Crayola, Double Doodlers Dual-Ended Market Set, https://www.crayola.com/products/markers/double-doodlers-dual-ended-marker-set-588310 (selling a product advertised as a "doodler") (last accessed Mar. 11, 2026).

The physical characteristics of the subject merchandise do not "make clear their unmistakably toy-like character." *See* Pls. Br. at 18. There is nothing inherent in the pens that suggests that they are toys. Instead, plaintiffs point to colorful plastic filaments that allow a user to playfully doodle. That the plastic filaments are colorful does not distinguish them as toys, and further suggest that they are more like crayons, which come in a variety of colors to create doodles on a two-dimensional surface, rather than in three dimensions. Like crayons, pens, and other drawing utensils, the 3D Printing Pens do not have any manipulative play value. Their value is derived entirely from their ability to draw. Moreover, the different physical characteristics of these products, ranging from entry-level pens to professional ones mirror the class or kind of merchandise belonging to drawing instruments, which also come in a variety of products spanning those for children's use to professional ones for artists.

Plaintiffs point to an Easy-Bake Oven and toy sewing machines as analogs in the toy industry to their 3D Printing Pens. *See* Pls. Br. at 20. But neither the function nor the purpose of the Easy-Bake Oven or toy sewing machine is to bake or sew. Instead, it is to pretend-play those

activities, and it is the role-playing that provides the amusement.  The 3D Printing Pens, by contrast, function and are used to create an object—whether it be art, or decoration, or a Do-It-Yourself fix.  The 3D Printing Pens are not miniatures of adult objects, as the set of pens at issue are targeted to either or both children and adults.  Thus, the 3D Printing Pens are not comparable to those products.

*Environment of Sale*

The environment of the sale, such as the accompanying accessories and the manner in which the merchandise is advertised and displayed, demonstrates that the subject merchandise is similar to other arts and crafts articles.  The 3D Printing Pens are usually sold with a power cable and an assortment of plastic filaments.  DSOF ¶ 2; PSOF ¶ 55.  Other accessories include activity guides, project booklets, and lesson plans, as well as cleaning tools, unblocking rods, and silicone work mats.  DSOF ¶ 2; PSOF ¶ 61–63.  These all function to assist the user of a 3D Printing Pen to draw in three dimensions.

The advertising and marketing of the pens on its packaging further emphasizes the 3D Printing Pen's use for drawing.  The packaging for the 3Doodler Create+ advertises the product as used to create "handmade crafts," "DIY fixes," and "wearable pieces."  DSOF ¶ 33.   The PiKA 3D Pro packaging also explains that the user can "draw anything" and "express [them]selves" in 3D.  DSOF ¶ 32.  Other words on the packaging are "decorate and design" "find your style" "start simply and expand" and "acquire new skills," all emphasizing the use of the product to create a piece of art, design, craft, or other creation.  *See* DSOF ¶ 32  The 3Doodler Pro states on its packaging that it is a "professional grade 3D Printing Pen."[4]  DSOF ¶ 34.

---

[4]  The packaging for the 3Doodler Pro, the predecessor to the Pro+ states on the front of the packaging, "design your projects in 3D," and the user guide states on the cover page that the user is now "ready to create 3D designs."  *See* 3Doodler, 3Doodler PRO 3D Printing Pen Set,

*(cont'd)*

20

Although the packaging for all but the 3Doodler Pro may be colorful, none of the depictions on the packaging suggest a use beyond for arts and crafts.  Moreover, as plaintiff admits, the merchandise is sold in arts and crafts stores, craft departments, or craft sections of retail stores. *See* Pls. Br. at 22, 23.

*Expectations of the Ultimate Customers*

The next factor, "the expectations of the ultimate customers," further indicates that the subject 3D Printing Pens are of a class or kind of merchandise used to create art or crafts.  The products' official websites directly identify the ultimate customers: "Our community is very varied and there's no one size fits all, but we see 3D pens mainly being used by artists, makers, designers (fashion and home), educators, engineers, DIY fixers, hobbyists, and just about anyone who wants to have some creative fun."  Def. Ex. I.  The website further identifies artists and artistic creations and fashion designers with fashion products made by the 3D Printing Pen.  The catalogs and user guides also emphasize that the customers expect to use the pens for arts and crafts.  Even its promotional video asks: "What will you create today?"  *See* 3Doodler, *3Doodler: What Will You Create Today*, https://youtu.be/eg-PVMhpC6Y (Oct. 9, 2024) ("Whether you're a child drawing just for fun, a student designing a school project, or an engineering solving critical problems, 3Doodler helps you bring life to your ideas.").  Therefore, as stated by plaintiffs, the ultimate customers are creators (of all ages) that reasonably expect to use the 3D Printing Pen to make art or crafts.

Although some reviews of the products refer to it as a toy, many others emphasize its use as a drawing utensil.  Reviews describe it as "a 3D crayon" and a "magical crayon," and

---

https://the3doodler.com/products/pro-pen-set (last visited Mar. 11, 2026); BLICK Art Materials, 3Doodler Pro 3D Printing Pen Set, https://www.dickblick.com/items/3doodler-pro-3d-printing-pen-set (last visited Mar. 11, 2026).

21

highlight that the 3D Printing Pen was purchased "to craft," such as for making Halloween masks or decorating lamp shades. DSOF ¶ 37. Others explain that it is a cool product "for creative crafts or art" or for "the artistic type." *Id.* Thus, the product reviews confirm that ultimate customers purchase these 3D Printing Pens for their use as a drawing utensil for arts and crafts.

### *Economic Practicality, Channels of Trade, and Recognition in the Trade*

The economic practicality of using the article, which looks to the price of the merchandise, the channels of trade in which the merchandise moves, and the recognition in the trade of this use do not weigh in favor of classification of the merchandise as a toy.

First, the prices of the 3D Printing Pens reveal little about the class or kind of merchandise to which it belongs. Plaintiffs identify the prices of the 3D Printing Pens as varying from $29.99 for the entry-level model to $199 for the higher end models. *See* Pls. Br. at 25. But these costs prove little because toys are sold in a very wide range of prices, as are drawing, painting, or sculpting instruments, which can vary depending on entry-level products for children to higher-end products for professionals, similar to the pricing of the 3D Printing Pens at issue. *See Aromont*, 671 F.3d at 1315; *Processed Plastics*, 473 F.3d at 1170 (suggesting that a *Carborundum* factor may not necessarily prove useful).

Second, the channels of trade in which the 3D Printing Pens move are the same as for arts and craft items although they may overlap with the channels of trade for toys. Though the 3D Printing Pens are sold in toy stores and toy aisles, they are also sold in arts and craft stores, such as Michaels,[5] Blick, Jo-Ann, and Hobby Lobby. PSOF ¶ 80. In the Hobby Lobby store, the 3D

---

[5] Michaels lists the 3Doodler Pro and the 3Doodler Flow (a product similar to the Create+) under its "craft machines" node on its website. *See* 3Doodler PRO+ Printing Pen Set,

*(cont'd)*

Printing pens are placed near "sign boards" and wooden craft items, DSOF ¶ 38, and Michaels displays it near art supplies. DSOF ¶ 39. In addition to these stores, the 3D Printing Pens are sold in Target's Home Arts and Crafts & Sewing Craft Kits department and Walmart's Crafts – Kids Department. PSOF ¶ 80. But Amazon sells 3D Printing Pens under both a "toys and games" department and an "industrial and scientific" department. *See* DSOF ¶ 40. Given the dual channels of trade for the subject merchandise, this factor has limited significance. *See Processed Plastics*, 473 F.3d at 1170 (finding that the significance of the channels of trade for backpacks and beach bags sold in sets with sand toys was low).

And third, as to the recognition in the trade of the 3D Printing Pens, their exhibition at toy fairs provides weak evidence of their recognition because such shows admittedly also exhibit merchandise not classified as "toys" under heading 9503, such as board games, *see* Pls. Br. at 24, musical instruments, *see* PSOF Ex. E, and conceivably a variety of other items explicitly excluded from heading 9503. Moreover, the Holiday Kids Gift Book includes merchandise beyond toys, such as kid's electronic tablets, board and card games, video games, books, clothing, musical instruments, etc. *See* PSOF Ex. D. As to the 3D Printing Pen's feature in *Toy Insider* and *Teen Vogue*, which honored the product as "Best Gadget for Creativity," PSOF ¶ 98, such publications also feature merchandise that are not toys for purposes of tariff classification, such as markers, crayons, and similar drawing instruments. The same is true for the variety of publications featuring gifts submitted by plaintiffs. *See* PSOF Ex. D. Accordingly, the trade

---

Michaels, https://www.michaels.com/product/3doodler-pro-3d-printing-pen-set-D303817S (last accessed Mar. 11, 2206); 3Doodler Flow Essentials 3D Printing Pen Set, Michaels, https://www.michaels.com/product/3doodler-flow-essentials-3d-printing-pen-set-330057161133293574 (last accessed Mar. 11, 2026).

does not conclusively recognize the 3D Printing Pens as belonging to a class or kind principally for amusement, diversion, or play.

* * *

In sum, the totality of the *Carborundum* factors supports the conclusion that the subject merchandise is part of a class or kind of merchandise principally used for drawing, painting, sculpting, or otherwise making art and crafts. Such merchandise is expressly excluded from classification under heading 9503 as informed by the Explanatory Notes, which exclude from such heading paints, crayons, and modeling paste, even if primarily intended for children's use. Because the merchandise is not *prima facie* classified as an "other toy" of heading 9503, it is not excluded from classification in heading 8477, the Government's classification, by way of Note 1(p) to Section XVII, which excludes articles of chapter 95 from chapter 84.

## III.    The 3D Printing Pens Are Classified in Heading 8477 as "Machinery for Working Plastics"

By application of GRI 1, the subject 3D Printing Pens are *prima facie* classifiable under heading 8477, HTSUS, as "machinery for working . . . plastics, not specified or included elsewhere in this chapter[.]" Heading 8477 and subheadings 8477.80.00 and 8477.80.01, HTSUS, provide, in relevant part:

| | |
|---|---|
| 8477 | Machinery for working rubber or plastics or for the manufacture of products from these materials, not specified or included elsewhere in this chapter; parts thereof: |
| 8477.80.00/01 | Other machinery . . . . . . . . . . . 3.1% *ad val.*[6] |

---

[6] Subheading 8477.80.00/01 was subject to additional duties pursuant to Section 301 of the Trade Act of 1974, at an additional duty rate of 25 percent *ad valorem*. *See* subheading 9903.88.01, HTSUS.

24

The tariff term "plastic" is defined in note 1 to chapter 39 as "those materials of Headings 3901 to 3914 which are or have been capable, either at the moment of polymerization or at some subsequent stage, of being formed under external influence (usually heat and pressure, if necessary with a solvent or plasticizer) by molding, casting, extruding, rolling or other process into shapes which are retained on the removal of the external influence."  Note 1, Ch. 39, HTSUS; *see also Kalencom Corp. v. United States*, 450 F. Supp. 3d 1318, 1328 (Ct. Int'l Trade 2020) (applying the chapter 39 definition of plastic to the classification of merchandise under a provision covering containers "with outer surface of sheeting of plastics").

The HTSUS does not define the terms "machinery"[7] or "working" appearing in heading 8477.  The term "machinery" is defined as "machines in general or as a functioning unit." *Machinery*, *Merriam-Webster Dictionary*, available at https://www.merriam-webster.com/dictionary/machinery (last accessed March 11, 2026).  A "machine," in turn, is "a mechanically, electrically, or electronically operated device for performing a task."  *See Machine*, *Merriam-Webster Dictionary*, available at https://www.merriam-webster.com/dictionary/machine (last accessed March 11, 2026).

The relevant entries in the Oxford English Dictionary (OED) for the noun "working," under the general meaning of "[t]he action of work," provide for "[t]he action of doing something" and "[t]he action or fact of operating or doing work on something, . . . the shaping of a substance[.]"  *See working*, Oxford English Dictionary, available at https://doi.org/10.1093/OED/6581833911 (last accessed March 11, 2026).  The "action of work"

---

[7] Plaintiff separately refers to Note 5 to Section XVII for a definition of "machine."  But Note 5 provides merely that "for purposes of these notes, the expression 'machine' means any machine, machinery, plant, equipment, apparatus or appliance cited in the headings of chapter 84 or 85."  Note 5, Sec. XVII, HTSUS.  It does not provide a definition of machine for the HTSUS.

simply means "to work" which the OED defines variously as "to act, do, function, operate," "to bring about or act to bring about," and "to bestow labour on, do work on; to shape, craft, manipulate." *See work*, Oxford English Dictionary, available at https://doi.org/10.1093/OED/8816303876 (last accessed March 11, 2026).

Here, the 3D Printing Pens are machines that work plastics. The filaments used as the feedstock[8] material for the 3D Printing Pens are principally made of the thermoplastics PLA and ABS, a type of plastic. *See* DSOF ¶¶ 2, 14, 15; PSOF ¶¶ 57–59. The 3D Printing Pens are machines because they are a device that is mechanically and electrically operated to perform the task of heating and pressing the filament through the device. DSOF ¶¶ 8, 16–22; PSOF ¶¶ 40–44. Finally, the 3D Printing Pen "work" plastic because it softens the filament with heat, presses the heated plastic through the pen nozzle, then cools the plastic—essentially an extruding process—thereby allowing the user to shape or manipulate the plastic into various 3D forms. PSOF ¶¶ 40–44; DSOF ¶¶ 20–21. Thus, the 3D Printing Pen fits within the plain meaning of "machinery for working . . . plastics" of heading 8477.

Classification of the 3D Printing Pens under heading 8477 is also consistent with a classification decision on identical merchandise issued by the 62nd Harmonized System Committee (HSC) of the World Customs Organization (WCO). By way of background, "[t]o foster international uniformity in tariff classification matters under the HS, contracting parties[, including the United States,] have vested the WCO with responsibility for securing uniform interpretation of the HS and its periodic updating in light of developments in technology and

---

[8] In patents for the subject merchandise, the filament is referred to as "feed stock," *see, e.g.,* U.S. Patent No. 11,766,819; Patent No. 9,731,444 (Aug. 15, 2017), a term that means "raw material to supplied to a machine or processing plant." *Feedstock*, *Merriam-Webster Dictionary*, https://www.merriam-webster.com/dictionary/feedstock (last accessed Mar. 11, 2026).

changes in trade patterns." *Notice of Opportunity and Procedures To Request Assistance on*

*Tariff Classification and Customs Valuation Treatment by Other Customs Administrations*

*Affecting United States Exports*, 80 Fed. Reg. 34,924, 34,924 (June 18, 2015) (citing Int'l

Convention on the Harmonized Commodity Description and Coding System, art. 7, June 14,

1983, 1503 U.N.T.S. 3, 10 (hereinafter "HS Convention")). "The WCO manages this process

through the Harmonized System Committee (HSC), a committee composed of contracting parties

to the HS Convention[.]" *Id.* Under Article 7 of the HS Convention, the HSC is responsible for,

*inter alia*, proposing amendment to the Harmonized System, preparing "Explanatory Notes,

Classification Opinions or other advice as guides to the interpretation of the Harmonized

System," and preparing "recommendations to secure uniformity in the interpretation and

application of the Harmonized System." *See* HS Convention, art. 7.

Pursuant to its Article 7 mandate, the HSC published Classification Opinion 8477.80/1,

which provides in its entirety as follows:

1. **Hand-held printing pen** which operates by extruding a heated plastic thread made of either acrylonitrile butadiene styrene (ABS) or polylactic acid (PLA), which cools almost instantly into a solid structure, allowing for the free-hand creation of three-dimensional objects by hand. The plastic thread is heated in the body of the pen and extruded through the nozzle at the front. **Application of GIRs 1 and 6.**
*Adoption : 2019*

 

*See* Classification Opinion 8477.80/1, Harmonized System Committee, World Customs

Organization (2019). The classification opinion describes a "printing pen" that operates by

27

extruding ABS and PLA plastic that is then cooled, to create free-hand three-dimensional objects.  The illustration provided by the HSC for the intended product strikingly resembles the 3Doodler Create+.  *See* PSOF Ex. A1; Def. Ex. E.  Indeed, the product image on the left is identical to plaintiffs' product, but for the logo, and the image of the Eiffel Tower mirrors the image on the packaging for the product, in which 3Doodler tasks user to "create something more challenging" and displays a partial rendition of the Eiffel Tower.  *Id.*  The WCO classification opinion, therefore, clearly sought to cover plaintiffs' 3D Printing Pens.  Classification of the 3D Printing Pens under heading 8477 would further "foster international uniformity in tariff classification" and "secure uniformity in the interpretation and application" of the Harmonized System.  *See* 80 Fed. Reg. at 34,924; HS Convention, art. 7; *see also Jarvis Clark Co. v. United States*, 733 F.2d 873, 877 n.2, n.5 (Fed. Cir. 1984) (stating that the "desire for certainty" in the customs laws "is the same motivation that led, for example, to the development of the Brussels Nomenclature [the predecessor to the HTS] so that the terminology used in different countries might be uniform and predictable for importers.").

Therefore, pursuant to the plain language of heading 8477 and the WCO's classification position on the precise 3D Printing Pens at issue, the subject merchandise is classified under six-digit subheading 8477.80, and eight-digit subheading 8477.80.00/01, as other "machinery for working plastics."  *See* subheading 8477.80.00/01, HTSUS.

Plaintiffs' arguments to the contrary are unavailing.  Plaintiffs first rely on the Explanatory Notes and subheadings for heading 8477 to define a narrow class of merchandise that is classified under heading 8477 as "machinery for working . . . plastics."  Pls. Br. at 28–30.  But neither the ENs nor the subheadings limit merchandise of heading 8477 to "industrial" plastic-working machines.  Plaintiffs' cite to the EN for the proposition that the provision covers

"machines by reference to the field of industry in which they are used," s*ee* Pls. Br. at 29, but omits the language that it so covers "with certain exceptions" and is part of the section on the "general arrangement of the chapter." *See* EN to Ch. 84 (B).[9] Instead, the ENs specify that chapter 84 covers "all machinery" but for exceptions not relevant here. *See* EN to Ch. 84 (A). Further, the exemplars in the ENs and subheadings cannot be used to narrow the coverage of a tariff heading. Classification under the GRIs "must take a 'top-down' approach, beginning, 'as it must, with the language of the headings,' and ending with the language of the subheadings." *Gerson Co. v. United States*, 898 F.3d 1232, 1240 (Fed. Cir. 2018) (citing *Orlando Food Corp. v. United States*, 140 F.3d 1437, 1440 (Fed. Cir. 1998) ("[A] court should compare only the language of the headings and not the language of the subheadings.")). Moreover, the heading covers extruders, which operates under similar principles. In any event, plaintiffs' reliance on this particular EN is belied by the HSC's Classification Opinion, which is the same body that authored the Explanatory Notes, suggesting that machinery for working plastics are classified by reference to their function under subheading 8477.80. *See* EN Ch. 84 (B).

Having incorrectly interpreted heading 8477 to limit its coverage to industrial machines, plaintiffs' argument further subverts classification principles. First, plaintiffs conflate two

---

[9] Part (B) of the EN to chapter 84 is exactly what it purports to be: a *general* arrangement of Chapter 84. Subparts (B)(2) and (B)(3) make sweeping statements regarding this arrangement, but even (B)(3) notes that there are exceptions to the notion that each heading describes a particular industry. For instance, headings 8432 through 8438 describe the industry in which goods of that heading are found, whereas other provisions cover a single "industry" (*e.g.*, heading 8444 through 8449 seem to pertain to the textile industry). Likewise, a single heading could be said to cover multiple "industries." Given that heading 8477 covers "machines for working rubber or plastics," the general EN to chapter 84 cannot be read to support the notion that this heading covers goods of any particular "industry," contrary to the language of the provision. *See The Container Store*, 864 F.3d at 1331–32; *see also* CBP Ruling N342417 (Sep. 17, 2024) (classifying a manually operated injection molding machine in hearing 8477, used to produce small plastic trinkets and promote recycling awareness).

separate products classified under heading 8477: machinery for working plastics and machinery for the manufacture of products from plastics. For this reason, plaintiffs' reliance on the decision in *EOS* to interpret heading 8477 to cover only "industrial-grade machinery" is inapposite. *EOS*, 911 F. Supp. 2d at 1336. The Government does not argue that the merchandise is classified as machinery for the manufacture of products from plastics, the provision at issue in *EOS*.

Second, plaintiffs invert the analysis under ARI 1(a) in their *Carborundum* factors analysis. Plaintiffs narrowly limits the class or kind of merchandise classifiable under heading 8477 to industrial machinery, thereby comparing *Carborundum* factors of articles to which the 3D Printing Pens do not belong. Thus, plaintiffs' recitation of the *Carborundum* factors, which compare the subject merchandise to a manufactured category of products only covering "industrial" machinery is wrong.[10] Plaintiffs' error stems from *first* defining a class or kind of merchandise classified under 8477, and *then* determining whether the subject merchandise at issue meets that class. Of course, if the class is defined as limited to industrial plastic-working machinery, the 3D Printing Pens would be excluded. But ARI 1(a) does not invite the exercise of determining every article that could be classified under a specific heading. Rather, "[t]he purpose of 'principal use' provisions in the HTSUS is to classify particular merchandise according to the ordinary use of such merchandise, even though particular imported goods may be put to some atypical use." *Primal Lite*, 182 F.3d at 1364; *Clarendon,* 144 F.3d at 1467 (a principal use provision "may function as a controlling legal label, in the sense that even if a particular import is proven to be actually used inconsistently with its principal use, the import is nevertheless classified according to its principal use").

---

[10] For this reason, an expert's opinion as to industrial plastic-working machinery has little probative value on the class or kind of merchandise to which the 3D Printing Pens belong.

To ensure that the "ordinary use" of the subject merchandise is the basis for classification under a principal use provision, the court looks to the "class or kind of merchandise" to which the *subject merchandise* belongs. To be sure, comparison to the merchandise undisputedly classified in heading 8477 may be helpful, but only insofar as it does not distort or limit the correct interpretation of the statutory provision based on its plain meaning. *See Millennium Lumber*, 558 F.3d at 1329; *Bausch & Lomb*, 148 F.3d at 1365. As we explained above, the 3D Printing Pens belong to a class or kind of merchandise for drawing or otherwise creating art or crafts, such as crayons and colored pens. Because there is no use provision covering such merchandise, which are classified in various provisions under the HTSUS, the Court must find the provision which best describes the subject merchandise. *See Universal Electronics Inc. v. United States*, 112 F.3d 488, 492 n.3 (Fed. Cir. 1997) (citing *Jarvis Clark*, 733 F.3d at 876). Here, heading 8477 covers all machines for working plastics. The Explanatory Notes explain that merchandise of chapter 84 should be classified according to their function, where the context requires. *See* EN Ch. 84 (B) (stating that certain machines of this chapter "are classified mainly by reference to their function" and that certain other machines, "with certain exceptions, are classified mainly by reference to [their] industry"); *see also* Note 3 & 4 to Ch. 84, HTSUS (explaining that composite machines should be classified based on its principal function). Here, it is undisputed in this case that the 3D Printing Pens are machines that function to heat and mold plastic to create free-form objects. *See* Pls. Br. at 31; DSOF ¶¶ 8, 14–22, 24; PSOF ¶¶ 40–44. This function plainly falls under the definition of "working plastics."

## IV.    The 3D Printing Pens Are Not Classified in Heading 8467 as "Tools for Working in the Hand"

Heading 8477 covers machines for working plastics "not elsewhere specified or included in the chapter." *See* heading 8477, HTSUS.  Plaintiff argues alternatively that the 3D Printing Pens are specified or included by heading 8467. *See* Pls. Br. at 43–46.  Heading 8467 and subheading 8467.29.00, HTSUS, provide in relevant part as follows:

> 8467            Tools for working in the hand, pneumatic, hydraulic
>                 or with self-contained electric or nonelectric motor,
>                 and parts thereof:
>
>                 With self-contained electric motor:
>
> 8467.29.00         Other machinery . . . . . . . . . . . . . . . . . Free[11]

The 3D Printing Pens, however, are not "elsewhere specified or included" in heading 8467 because they are not "tools for working" of that heading.  The Explanatory Note to heading 8467 provides interpretive guidance on the kinds of articles encompassed within its scope.  According to the Explanatory Note, "tools for working in the hand" are "tools designed to be held in the hand during use, and also heavier tools . . . which are portable, . . . in particular *while work is in progress*, and which are also designed to be controlled and direct by hand during operation."  EN 84.67 (2017) (emphasis added).  The Explanatory Note also includes a list of exemplars that includes, *inter alia*:

> (1) Drilling, tapping or reaming machines.
> (2) Boring machines, rock drills and the like.
> (3) Wrenches, screwdrivers, nut setters.
> (4) Planing, gauging, surfacing or similar appliances.
> (5) Filing machines, grinders, sanders, polishers and the like.
>                              [. . .]
> (7) Circular saws, chain saws and the like.

---

[11]  Subheading 8467.29.00 was subject to additional duties pursuant to Section 301 of the Trade Act of 1974, at an additional duty rate of 7.5 percent *ad valorem*.  *See* subheading 9903.88.15, HTSUS.

(8) Hammers of various types, such as chipping hammers, de-scaling hammers, caulking hammers, riveting hammers, concrete breakers.

[. . .]

(22) Electric hand scissors, comprising a fixed cutter blade and a mobile cutter blade operated by a built-in electrical motor, for use in dressmakers' and milliners' workrooms, households, etc.

EN 84.67. These listed exemplars include tools that utilize various methods to perform work on different materials, including drilling, tapping, reaming, boring, wrenching, screwing, gauging, surfacing, filing, grinding, sanding, and polishing. *Id.* A common characteristic among these methods is that they alter or manipulate the material being worked on, whether by making a hole, inserting a screw, removing a layer, or cutting into more than one piece. In other words, while these handheld tools are in use, "work is in progress" on another material. *See* EN 84.67. This interpretation is also supported by the text of the heading covering "tools for working in the hand." *Cf.* Pls. Br. at 44. The prepositional phrase "in the hand" simply describes that the tool is held in the hand during use. *See* EN 84.67. It is not the object of the verb "working." Thus, the relevant term in the heading is "tools for working." Unlike the term "working" plastics in heading 8477, which describes the effect a machine has on plastic (*i.e.*, by shaping it), "working" in heading 8467 is used to mean that work is being done by use of the tool.

Here, the 3D Printing Pens at issue are not used to alter or manipulate any material being worked on, such as by removing or refining an already existing material. Instead, the 3D Printing Pens extrude plastic to create a unique object in the first instance. Although the pens are used in the hand, the pens are not used to do any work, *i.e.* by altering or manipulating something already in existence. In other words, the 3D Printing Pens are not tools for working. Thus, the 3D Printing Pens are not classifiable in this heading. Because the subject merchandise is not "elsewhere specified or included" in heading 8467, they are properly classified in heading 8477.

V.    **The 3D Printing Pens Are Not "Other Electrothermic Appliances of a Kind Used for Domestic Purposes" of Heading 8516**

The 3D Printing Pens do not fall within heading 8516 as an electrothermic appliance used for domestic purposes. The heading and relevant subheading provide as follows:

> 8516    Electric instantaneous or storage water heaters and immersion heaters; electric space heating apparatus and soil heating apparatus; electrothermic hairdressing apparatus (for example, hair dryers, hair curlers, curling tong heaters) and hand dryers; electric flatirons; other electrothermic appliances of a kind used for domestic purposes; electric heating resistors, other than those of heading 8545; parts thereof:
>
> Other electrothermic appliances:
>
> 8516.79.00                Other…………………………2.7% *ad val.*

The 3D Printing Pens do not readily fall within the category for heaters, hairdryers, flatirons or resistors as specified in the heading.  The only possible category is "other electrothermic appliances of a kind used for domestic purposes."  Although the subject 3D Printing Pens may be electrothermic appliances, crucially, the 3D pens here are not used for "domestic purposes."

The term "domestic" is understood to mean relating to the house or home.  Although the term "domestic" is not defined in the HTSUS, lexicographic sources define "domestic" as "of or relating to the household or the family," *domestic, Merriam Webster Dictionary*, https://www.merriam-webster.com/dictionary/domestic (last accessed Mar. 11, 2026), and "belonging or relating to the home, house, or family."  *Domestic, Cambridge Dictionary*, https://dictionary.cambridge.org/us/dictionary/english/domestic (last accessed Mar. 11, 2026).

The common definition of appliance is "a device, machine, or piece of equipment, especially an electrical one that is used in the house, such as a stove or washing machine." *Appliance, Cambridge Dictionary*,

34

https://dictionary.cambridge.org/us/dictionary/english/appliance (last accessed Mar. 11, 2026).

Appliance has also been defined as "an instrument or device designed for a particular use or

function . . . specifically : a household or office device (such as a stove, fan, or refrigerator)

operated by gas or electric current." *Appliance*, *Merriam Webster Dictionary*,

https://www.merriam-webster.com/dictionary/appliance (last accessed Mar. 11, 2026). Based on

the above lexicographic sources, an appliance for domestic purposes is an electrical device

designed for a household function.

This understanding is consistent with the term "domestic appliance" used elsewhere in

the HTSUS, which references vacuum cleaners and cooking appliances. *See* heading 8509,

HTSUS (providing for "[e]lectromechanical domestic appliances . . . other than vacuum

cleaners"); heading 7321, HTSUS (providing for "[s]toves, ranges, grates, cookers . . . ,

barbecues, braziers, gas rings, plate warmers and similar nonelectric domestic appliances[.]").

The Explanatory Notes provide further guidance and support this interpretation.

Explanatory Note 85.16(E) states "This group includes all electro-thermic machines and

appliances provided they are normally used in the household." The Explanatory Notes helpfully

provide examples of such appliances and lists: electric fires, geysers, hair dryers, smoothing

irons, facial saunas, heated towel rails, bed warmers, waffle irons, bottle heaters, popcorn

cookers, coffee makers, etc. *See id*. The named examples are easily associated with the house or

home and specifically used for household functions in the kitchen, bathroom, or bedroom, for

food preparation or personal care. In contrast the 3D Printing Pens do not perform a household

function or purpose, like the exemplars in either the dictionary definitions or the Explanatory

Notes. Instead, they are arts and crafts articles that are marketed as suitable for use in a variety

of places, including the home, schools, artist studios, and other educational and commercial settings.

Plaintiffs argue that as "a consumer product designed for play, these are by nature used in the home (not industrial settings)."  Pls. Br. at 42.  There are several flaws to this argument.  First, plaintiffs ignore the meaning of "domestic" and "appliance" that refer to particular devices made specifically for and that relate to the home.  The 3D Printing Pen is neither.  Unlike a coffee maker, curling iron, or towel warmer, plaintiffs merely argue that the 3D Printing Pen is "by nature" used in the home.  Second, even if it were enough for heading 8516 that a device can simply be used in the home (versus related to or designed for household use) the evidence demonstrates that the 3D Printing Pens are not limited to being used in the home as discussed above.  Third, plaintiffs inappropriately rely on an extreme contrast between domestic and industrial settings.  A domestic setting is not any setting that is not industrial and any appliance that is not used in an industrial setting does not mean that it is automatically labeled domestic.  In short, plaintiffs cannot demonstrate that the 3D Printing Pens are correctly classified in heading 8516.[12]

---

[12]  Plaintiffs' citation to CBP Ruling HQ 950627 (Mar. 30, 1992) is unpersuasive.  The subject 3D Printing Pens are distinguishable from glue guns because their purpose is to create, or draw, a three-dimensional object.  The purpose of the glue guns, by contrast, is to adhere materials together.

**<u>CONCLUSION</u>**

For these reasons, the Court should grant the Government's cross-motion for summary judgment, deny Plaintiffs' motion for summary judgment, enter judgment in the Government's favor, and dismiss this action.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

/s/ Aimee Lee
AIMEE LEE
Assistant Director

*Of Counsel:*

VALERIE SORENSEN-CLARK
Office of the Assistant Chief Counsel
International Trade Litigation
U.S. Customs and Border Protection

March 11, 2026

/s/ Mathias Rabinovitch
MATHIAS RABINOVITCH
Trial Attorney
U.S. Department of Justice, Civil Division
Commercial Litigation Branch
26 Federal Plaza, Room 346
New York, New York 10278
(212) 264-0484
*Attorneys for Defendant*

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. RICHARD K. EATON, JUDGE

|  |  |  |
|---|---|---|
| QUANTIFIED OPERATIONS LTD, *ET AL.*, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Consol. Court No. 22-00178 |
| | : | |
| UNITED STATES, | : | |
| | : | |
| Defendant. | : | |
| | : | |

## <u>CERTIFICATE OF COMPLIANCE</u>

I, MATHIAS RABINOVITCH, a trial attorney in the Office of the Assistant Attorney General, Civil Division, Commercial Litigation Branch, International Trade Field Office, who is responsible for the foregoing brief in support of defendant's cross-motion for summary judgment and response in opposition to plaintiff's motion for summary judgment, relying upon the word count feature of the word processing program used to prepare the brief, certify that this brief complies with type-volume limitation under USCIT Standard Chamber Procedure 2(B) and contains 11,273 words.

/s/ Mathias Rabinovitch
MATHIAS RABINOVITCH
