## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| QUANTIFIED OPERATIONS LIMITED, WOBBLEWORKS (HK) LIMITED,<br><br>Consolidated Plaintiffs,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant. | Before: Hon. Richard K. Eaton, Judge<br><br>Consol. Court No. 22-00178 |

### PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

*/s/ Alena A. Eckhardt*
Alena A. Eckhardt
Matt Nakachi

NAKACHI ECKHARDT & JACOBSON, P.C.
50 California Street, Suite 1500
San Francisco, CA 94111
(415) 498-0070
alena@tradelawcounsel.com
matt@tradelawcounsel.com
*Counsel for Consolidated Plaintiffs*

Dated: May 5, 2026

i

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

SUMMARY OF ARGUMENT .......................................................................................... 2

ARGUMENT ...................................................................................................................... 5

I.     Plaintiffs' Motion Should Be Granted Because the Imported 3D-Pen Sets Are

Toys for Purposes of Heading 9503, HTSUS ......................................................... 5

    A.  The Government Has Not Genuinely Disputed the Evidentiary Record

Supporting Toy Classification ......................................................................... 5

    B.  The Government's "Arts and Crafts" Theory Fails As a Matter of Law ........................ 8

        1.  The Government Misapplies the Principal-Use Framework ................................... 8

        2.  The 3D-Pen Is Not Physically Comparable to a Crayon, Pastel, or

Drawing Instrument ....................................................................................... 10

        3.  The EN 95.03 Exclusions Are Inapplicable and Misread ..................................... 12

        4.  The *Carborundum* Factors, Properly Applied, Compel Toy

Classification .................................................................................................. 17

II.    The Government Has Not Met Its Burden to Establish That Heading 8477,

HTSUS, Is the Correct Classification ................................................................... 33

    A.  The Government Constructs the Wrong Class or Kind and Then Exploits

That Error to Manufacture a "No Use Provision" .......................................... 34

    B.  Heading 8477 Is a Principal-Use Provision, and the Government Never

Performs the Required *Carborundum* Analysis. .......................................... 35

    C.  The Chapter 84 Explanatory Note Confirms Heading 8477 Is Industry-

Based, not Function-Based, Foreclosing the Government's Theory ........................... 35

D.  The Government Concedes That 3D-Pens Are Not "Machinery for the

Manufacture of Products from Plastics" .......................................................... 36

E.  The Government's Interpretation Ignores the Industrial Context of Heading

8477 and Unrebutted Expert Definitions ........................................................ 37

F.  The Government's Evidence Does Not Support Heading 8477. ................................ 39

G.  The WCO Opinion Does Not Carry the Government's Burden ................................ 40

III.  In the Alternative, If the Merchandise Is Not Classifiable Under Heading 9503, It

Is Still Not Classifiable Under Heading 8477 ........................................................ 42

A.  Heading 8516 Better Describes the Merchandise Than Heading 8477 ........................ 43

B.  Heading 8467 Also Fits Better Than Heading 8477 ...................................... 44

CONCLUSION ........................................................................................... 45

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*
477 U.S. 242 (1986) ................................................................................................ 6

*Aromont USA, Inc. v. United States,*
671 F.3d 1310 (Fed. Cir. 2012) ............................................................................. 6

*United States v. Carborundum Co.,*
536 F.2d 373 (C.C.P.A. 1976) ....................................................................... *passim*

*Childcraft Education Corp. v. United States*,
742 F.2d 1415 (Fed. Cir. 1984) ........................................................................... 16

*Cummins, Inc. v. United States,*
454 F.3d 1361 (Fed. Cir. 2006) ..................................................................... 41, 42

*EOS of N. Am., Inc. v. United States,*
911 F. Supp. 2d 1311 (Ct. Int'l Trade 2013) ............................................. 33, 35, 36

*Jarvis Clark v. United States*,
733 F.2d 873 (Fed. Cir. 1984) ............................................................................. 34

*Minnetonka Brands, Inc. v. United States,*
110 F. Supp. 2d 1020 (Ct. Int'l Trade 2000) .................................................... 8, 17

*Primal Lite, Inc. v. United States,*
182 F.3d 1362 (Fed. Cir. 1999) ........................................................... 8, 10, 17, 26

*Processed Plastics Co. v. United States,*
473 F.3d 1164 (Fed. Cir. 2006) ....................................... 16, 17, 18, 20, 24, 26, 32

*Simon Marketing, Inc. v. United States,*
395 F. Supp. 3d 1280 (Ct. Int'l Trade 2005) ...................................................... 16

*Springs Creative Prods. Grp., LLC v. United States,*
37 CIT 1222 (2013) .............................................................................................. 16

*Universal Elecs. Inc. v. United States,*
112 F.3d 488 (Fed. Cir. 1997) ............................................................................. 34

*Zone Brands, Inc. v. United States,*
456 F. Supp. 3d 1309 (Ct. Int'l Trade 2020) ...................................................... 16

**Harmonized Tariff Schedule of the United States**

Heading 8467, HTSUS ................................................................................... *passim*

Heading 8477, HTSUS ................................................................................... *passim*

Heading 8516, HTSUS ........................................................................ 5, 42, 43, 44

Heading 9503, HTSUS ................................................................................... *passim*

Heading 9608, HTSUS ............................................................................................ 10

Heading 9609, HTSUS ...................................................................................11, 12, 13

**Statutes**

Additional U.S. Rule of Interpretation 1(a), HTSUS............................................. *passim*

**Rules**

USCIT Rule 56 ............................................................................................................ 1

Fed. R. Civ. P. 30(b)(6) ........................................................................................... 40

**Rulings**

HQ 950627 (Nov. 21, 1991) ..................................................................................... 43

HQ 960279 (Dec. 9, 1997)........................................................................................ 25

HQ H195956 (June 22, 2015)............................................................................... 25, 26

HQ H289680 (July 1, 2019)...................................................................................... 16

HQ H293445 (Oct. 7, 2019) ................................................................................. 38, 43

NY N206016 (Mar. 9, 2012) ..................................................................................... 16

NY N248177 (Dec. 18, 2013)................................................................................... 43

NY N301828 (Aug. 28, 2018) .................................................................................. 16

NY N304432 (July 26, 2019).................................................................................... 16

NY N342040 (Aug. 15, 2024) .................................................................................. 16

NY N342417 (Sept. 17, 2024) ............................................................................. 38, 39

**Other Authorities**

Explanatory Note 84.67 ....................................................................................... 41, 44

Explanatory Note 84.77 ........................................................................................ *passim*

Explanatory Note 85.16 ............................................................................................ 43

Explanatory Note 95.03 ........................................................................................ *passim*

Explanatory Note, Ch. 84(B)(3)........................................................................ 33, 35, 36

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Rules of this Court, Consolidated Plaintiffs ("Plaintiffs"), submit this combined brief in opposition to the Government's cross-motion for summary judgment, and reply in support of their motion demonstrating that the subject merchandise is properly classified as toys under heading 9503, HTSUS, not as the industrial plastics-working machinery posited by the Government under heading 8477, HTSUS.[1]

**INTRODUCTION**

The imported 3D-Pen Sets are small, handheld consumer devices conceived, designed, marketed, sold, and principally used by children and adults to create freeform three-dimensional doodles and objects for amusement. They are properly classified as toys under heading 9503, HTSUS, not as plastics-working machinery within the industrial meaning of heading 8477. The Government does not meaningfully contest that record, and critically, never performs the required principal-use analysis for heading 8477 under ARI 1(a). Instead, the Government seeks to avoid the governing framework by inventing an "arts and crafts" class or kind that is not provided for in any HTSUS heading and is stitched from unrelated HTSUS chapters; reading heading 8477 in isolation from its statutory context and without any case law or CBP ruling classifying comparable merchandise there; and invoking a nonbinding WCO classification that did not apply the required U.S. principal-use analysis, and that the United States itself previously sought to reverse.

In doing so, the Government does not meaningfully address the extensive consumer, trade, and channel-of-trade evidence establishing principal use. It does not rebut the testimony of

---

[1] Hereinafter, Plaintiffs will refer to the Government's combined cross-motion and opposition (ECF No. 57) as "Def. Br." Reference to Plaintiffs' summary judgment motion and memorandum (ECF. No. 41) shall be to Plaintiffs' "Pls.' Br."

Plaintiffs' toy-industry and plastics-industry experts, nor does it offer competing expert testimony, *Daubert* challenge, or substantive engagement with either expert's analysis. What remains is a classification theory built on counsel's characterizations, selective references to the record and inapposite case law, without any industry or technical basis for the distinctions it asks this Court to draw.

This is not a close case. The undisputed record establishes that the 3D-Pen Sets are toys. The Government's theory is unsupported, there is no genuine dispute of material fact, and Plaintiffs are entitled to judgment as a matter of law.

## SUMMARY OF ARGUMENT

Plaintiffs are entitled to summary judgment, and the Government's Cross-Motion fails on both the undisputed record and the governing law.

First, the Government does not genuinely dispute, and therefore cannot overcome, Plaintiffs' affirmative evidentiary showing that the 3D-Pen Sets are principally used for amusement, diversion, or play. The Government's Rule 56.3 responses admit the factual record that compels toy classification under every *Carborundum* factor: the 3D-Pens were conceived as a toy concept, pitched to and optioned by major toy companies, brought to market with toy-oriented branding and packaging, placed in toy-and-craft retail channels, recognized as toys by the trade, and used by consumers of all ages as devices of fun and creative play. That record is further supported by unrebutted expert testimony from both the toy and plastics industries. The Government's response is not to contradict those facts or rebut the experts' analysis, but to reflexively object to descriptive wording and to assert that the ultimate terms "toy," "play," and "amusement" are legal conclusions. Those objections do not create a material dispute. Where the

underlying facts are admitted and the only remaining question is the legal inference to be drawn from them, summary judgment for Plaintiffs is appropriate.

Second, the Government's anti-toy theory fails as a matter of law. Its core legal claim is that heading 9503 categorically excludes "drawing instruments" used to create art or crafts, and that the 3D-Pens belong to such a class or kind.  But no such "arts and crafts" class or kind exists anywhere in the tariff. The Government manufactures a synthetic meta-category by stitching together goods scattered across unrelated HTSUS headings, including paints, pencils, crayons, modeling paste, and drawing books, none of which is commercially fungible with the 3D-Pen Sets, as they are not "drawing instruments." ARI 1(a), however, requires the Court to identify the class or kind of goods commercially fungible with the imports, not to create a free-floating category of "creative things" assembled to avoid heading 9503. The Government also overreads the EN 95.03 exclusions. The list includes a disparate mix of items, ranging from crayons to false noses, each classified in identified headings elsewhere in HTSUS. This itemized structure suggests that the exclusions reflect specific classification decisions rather than a blanket rule that products used to create something can never be toys.  Tellingly, the Government does not actually argue that the 3D-Pen Sets should be classified as any of those excluded articles.  It invokes the exclusions only to knock the 3D-Pens out of heading 9503, while offering no affirmative tariff home for the "arts and crafts" category it constructs, other than heading 8477, an industrial machinery provision. That is not how the EN exclusions work.  They redirect specific named articles to specific alternative headings; they do not create a freestanding exclusionary principle that can be deployed to defeat a heading 9503 claim without identifying where the merchandise actually belongs. In fact, the EN expressly includes a range of toys such as constructional and educational kits within heading 9503, confirming that the act of creating something does not remove a product from

heading 9503, and every case the Government cites turns on the balance between amusement and utility, not on a categorical ban for creative or constructive play.

Third, the Government has not carried its burden to show that heading 8477 provides the correct classification, and thus has failed to defeat Plaintiffs' motion or prevail on its own. By affirmatively conceding that the 3D-Pen Sets are *not* machinery for the manufacture of products from plastics, the Government has abandoned half the heading's text and rests entirely on an overbroad "working plastics" theory, one that would sweep compact, handheld, low-output consumer devices into a heading designed for large, stationary, high-throughput industrial equipment. That theory is irreconcilable with the industrial context of heading 8477 under the Chapter and section notes, ENs, CBP's own rulings, and experts' uncontroverted testimony that the 3D-Pens lack the physical scale, modularity, processing capacity, throughput, and automation characteristic of industrial plastics-working machinery, are not recognized by the plastics industry as such, do not move in industrial B2B channels, and are sold instead through ordinary consumer toy, craft, and educational channels.  The Government never identifies a coherent 8477 class or kind to which these products belong.  It identifies no contrary expert, no conflicting trade evidence, and no actual *Carborundum* factor weighing in favor of heading 8477.  It simply asserts that anything that heats and dispenses plastic "functions" as 8477 plastics-working machinery, a proposition the text, structure, and precedents of the HTSUS and plastics industry expertise uniformly reject.  The Government's appeal to the 2018 WCO classification opinion fares no better. By the Government's own admission, that opinion performed no U.S. principal-use analysis, applies none of the *Carborundum* factors, had none of the evidentiary record or the benefit of the expert testimony before this Court, and is not legally binding on this Court.  Furthermore, the Government's brief omits that the United States itself petitioned the WCO's HSC to overturn that

4

very classification, affirmatively arguing that 3D-Pens do not belong in HS heading 84.77. The Government now asks this Court to treat as authoritative the exact international classification decision the United States previously sought to undo – a litigation position directly contrary to its prior international advocacy. An opinion that is not binding, did not apply the analysis U.S. law requires, and was actively opposed by the United States, cannot carry summary judgment.

Finally, even if the Court were to reject heading 9503, the merchandise better aligns with consumer-oriented headings such as 8516 or 8467, not 8477.

Accordingly, the Government's Cross-Motion should be denied, and because the Government does not create a genuine dispute of material fact or rebut Plaintiffs' showing under the governing legal standards, Plaintiffs' Motion for Summary Judgment should be granted.

**ARGUMENT**

I.  **PLAINTIFFS' MOTION SHOULD BE GRANTED BECAUSE THE IMPORTED 3D-PEN SETS ARE TOYS FOR PURPOSES OF HEADING 9503, HTSUS**

**A. The Government Has Not Genuinely Disputed the Evidentiary Record Supporting Toy Classification**

Under ARI 1(a) and *United States v. Carborundum Co.*, 536 F.2d 373 (C.C.P.A. 1976), the question is the principal use of the class or kind of goods commercially fungible with the subject imports. The undisputed record shows that the 3D-Pen Sets belong to a class of creative-play toy sets whose principal use is amusement, and the Government has not genuinely disputed it. The Government's responses admit the underlying facts on conception, design, channels of trade, consumer use, and trade recognition; its objections are limited to word-choice quarrels and assertions that "toy" and "amusement" are "legal conclusions." Gov't Resp. to SUMF ¶¶26-38,

5

40-50, 76-84, 85-89, 96-104, 107.  Those objections do not create a triable factual dispute.[2] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), *Aromont USA, Inc. v. United States*, 671 F.3d 1310, 1312 (Fed. Cir. 2012).

The admitted record is comprehensive.  On the 3D-Pen's origins and intended market, Government admits that Plaintiffs' initial business model centered on licensing toy concepts to toy manufacturers; that the 3D-Pen concept arose while inventors were working on a toy for Meccano; that the prototype was pitched to major toy companies including Hasbro, Mattel, Spin Master, and WowWee; that one of the world's largest toy companies optioned the device; that the product was launched on Kickstarter as a fun, simple way to make three-dimensional objects; and that the entire line of 3D-Pen products is manufactured by factories specializing in toys.  Gov't Resp. to SUMF ¶¶26–38.[3]

On *physical characteristics*, the Government admits that the 3D-Pens are small, handheld, manually operated devices with low-voltage heating elements, small motors, simple controls, preset or limited temperatures, and no software, digital models, or programming. Gov't Resp. to SUMF ¶¶ 40–50. It is equally undisputed that the 3D-Pen is not a bare pen but an integrated set: the pen, brightly colored filaments, power adapter, colorfully illustrated activity guides, step-by-step stencils for toy bugs, dinosaurs, holiday villages, and three-dimensional sculptures,

---

[2] The Government's own preliminary statement in its responses to SUMF forecloses its opposition: "none of [its] responses gives rise to a disputed material fact." Gov't Resp. to SUMF (ECF. No. 57-1) at 1.

[3] The Government objects to the product's inventor/developer Mr. Max Bogue's declaration on the ground that it was "prepared solely for litigation." Gov't Resp. to SUMF ¶ 8.  That objection is meritless: declarations submitted on summary judgment are, by their nature, prepared in connection with litigation. The Government does not challenge Mr. Bogue's personal knowledge of the company's purpose, product development, or marketing, nor his competence to testify on those matters, and his declaration accordingly stands uncontroverted.

and in some models an app with further projects. Bogue Decl. ¶¶40–48, Reiner Decl. ¶¶ 21-24, Pl. Comp. Ex. A. Those are the hallmark features of the creative-play toy kits that EN 95.03(D) lists as exemplars of heading 9503, chemistry, printing, sewing, knitting, and construction sets, not the features of industrial machinery or drawing instruments.  EN 95.03(D), Reiner Decl. ¶25. On *marketing, channels-of-trade and environment-of-sale*, it admits that the Sets are designed/marketed as easy-to-use creative devices for users 14 and up, and sold to children, families, "kidults," "prosumers," and schools, in colorful packages emphasizing fun and creative play, through toy, games, and crafts channels, including Amazon, Walmart, Target, Kohl's, Best Buy, Hobby Lobby, Jo-Ann, Barnes & Noble, CAMP, and educational distributors, exclusively through business-to-consumer retail channels, and have never been seen in the business-to-business trade channels used for industrial machinery. Gov't Resp. to SUMF ¶¶76-84. On *consumer expectations and use*, it admits consumer reviews describing the product as a "fun art activity," a "fun little toy," a "fun toy not pro tool," a "novelty toy," and a "great toy for older kids and adults," with parents reporting that their children loved and played with the products.  Gov't Resp. to SUMF ¶¶85-89. On *trade recognition*, the Government admits that *The Toy Insider*, Teen Vogue and Amazon's Holiday Kids Gift Book have featured the products in toy gift guides/reviews, and that they have been exhibited at major toy trade shows.  Gov't. Resp. to SUMF ¶¶96-100.

The Government does not rebut Plaintiffs' expert testimony and offers no competing expert, no *Daubert* challenge, and no substantive engagement with either expert analysis,  and dismisses Dr. Kazmer's analysis in a single unexplained footnote. Def. Br. fn. 10.  As a result, unrebutted expert evidence establishes that the toy industry recognizes 3D-Pens as toys, the

plastics industry does not recognize them as machinery, and they are physically incapable of performing the functions of heading 8477 machinery.

**B.  The Government's "Arts and Crafts" Theory Fails As a Matter of Law**

The Government's opposition rests on a putative "arts and crafts" category that is supposedly excluded from heading 9503.  That construct misapplies the principal-use framework, lacks any support in the statute, EN, or case law, conflicts with decades of Customs and court decisions classifying craft-output kits as toys, and is flatly contradicted by the Government's own analogies and the undisputed record.

*1.  The Government Misapplies the Principal-Use Framework*

The Government's anti-toy theory fails at the threshold because it misapplies the governing principal-use framework.  Under ARI 1(a), the Court must identify the commercially fungible class or kind, determine its principal use, and then apply the heading that covers it.  *Primal Lite, Inc. v. United States*, 182 F.3d 1362, 1363-64 (Fed. Cir. 1999), *Minnetonka Brands, Inc. v. United States*, 110 F. Supp. 2d 1020, 1026-27 (Ct. Int'l Trade 2000). The *Carborundum* factors guide that inquiry; they do not permit substituting a litigation-driven label, or a preemptive exclusion, for a proper class or kind analysis. Here, the Government invokes the EN 95.03 exclusions to label 3D-Pens as "drawing instruments" within a purported "arts and crafts" category excluded from heading 9503, then applies selected *Carborundum* factors to that pre-excluded category.  Def. Br. 11-17, 16-24. That is not the required analysis. A *Carborundum* analysis applied to the wrong class answers the wrong question.

No "arts and crafts" class or kind exists in the HTSUS, the ENs, or any authority the Government cites.  It is manufactured from unrelated *eo nomine* provisions scattered across multiple HTSUS chapters – Chapter 32 (paints), Chapter 34 (modeling pastes), Chapter 49

(coloring books), Chapter 96 (crayons and pencils) – none of which covers the 3D-Pen Sets, the Government actually applies to them, or is commercially fungible with them.  It is a construct to avoid heading 9503, not a tariff term. Nor do the EN 95.03 exclusions help: they enumerate specific articles, including non-creative items, and direct them to identified headings elsewhere.  And even if the 3D-Pens could be characterized as "drawing instruments," the EN 95.03 exclusions do not exclude drawing instruments of Chapter 90 at all, nor do they establish a general exclusion for "instruments of creation" from heading 9503. The Government thus rests its theory on a construct that neither exists as a cognizable class or kind under the tariff nor is excluded by the ENs in any event.

The same error carries into the Government's heading 8477 theory.  It does not contend that the 3D-Pen Sets are classifiable as any of the *eo nomine* articles it invokes;  instead, it uses those articles only to exclude the 3D-Pens from heading 9503 and then reclassifies them as industrial "machinery for working plastics," offering no coherent account of how a supposed drawing instrument becomes plastics machinery.[4]  It defines the merchandise one way to defeat heading 9503 and another to reach heading 8477, without ever identifying the alternative class or kind.  A classification theory that leaves the goods in a tariff void and then fills that void with an unexplained leap to an implausible industrial machinery heading is not a valid classification analysis.

---

[4] The Government's reliance on heading 8477, HTSUS, is separately addressed in Section II, *infra*. It is noted here because the Government cannot simultaneously argue that the 3D-Pens are drawing instruments excluded from heading 9503 under the EN exclusions and also that they are industrial plastics-working machinery under heading 8477. The two theories are logically inconsistent, and neither is supported by the record.

The question is not whether the 3D-Pen Sets can be called "creative" or share superficial characteristics with drawing implements. It is whether their principal use is amusement. *Primal Lite*, 182 F.3d at 1363. That question must be answered on the full record, not by inventing a category, treating a label as dispositive, and isolating the factors the Government finds convenient.

2. *The 3D-Pen Is Not Physically Comparable to a Crayon, Pastel, or Drawing Instrument*

Before the EN exclusions can do any work for the Government, the threshold factual premise must hold that the 3D-Pen must actually be a "drawing" instrument. It is not, in any physically meaningful sense, and the Government's own record confirms it.

Paints, crayons, pencils, pastels, coloring books listed in EN 95.03 exclusions share defining physical characteristics: they are materials or surfaces used to apply a substance (pigment, wax, chalk, graphite to a flat medium) to produce a two-dimensional representation (a drawing, a painting, a written mark) on an external surface. A crayon is wax-pigment applied to a surface. A pen applies ink to a surface. A pastel applies powdery pigment to a surface. All of these articles work in two dimensions, on a substrate.

The crayon analogy breaks down at the level of how the 3D-Pen actually works. A crayon *is* the deposited material, the user grips the same wax stick that is laid down on the paper. The 3D-Pen operates on an entirely different physical principle; it is a motorized applicator that acts on a separate feedstock, which is the deposited material. The pen uses an electric motor and gear assembly to drive the filament into a low-voltage heater, softens it, and dispenses it through a nozzle so it cools upon contact with air into a freestanding three-dimensional structure with mass and volume. Bogue Decl. ¶¶32-33, Kazmer Decl. ¶¶30-38, Reiner Decl. ¶¶19-25. If any analogy to crayons were appropriate, it would run to the filament itself, not to the 3D-Pen or the integrated 3D-Pen Set, and the filament as a plastic material has its own tariff treatment. No heading 9608

10

pen, no heading 9609 crayon incorporates a DC motor, a gear assembly, a thermoplastic heating element, and a nozzle.  And unlike paints or crayons, which are passive artistic media, the 3D-Pen Sets are integrated, motorized creative-play systems with stencils, project guides, and toy-like packaging, the very sort of activity sets EN 95.03(D) lists within heading 9503, not coloring sticks.  The physical differences are fundamental, not incidental.

The Government's analogy that "a crayon has the utility of performing the function of drawing just as the 3D Printing Pen has the utility of drawing in three dimensions," Def. Br. 14, is overbroad to the point of meaninglessness.  Stated at that level of abstraction, a soldering iron is comparable to a fountain pen because both deposit material through a handheld device. The relevant question under the tariff is the physical nature of the article and its actual use by the class of consumers who purchase it, not whether the word "draw" can be applied loosely to describe what it does.  The phrase "draw in 3D" is colloquial marketing language chosen to capitalize on public excitement about 3D printing technology at the time of the product's launch and to translate a novel concept into familiar terms for consumers, not a technical description of the product's mechanism or classification. Bogue Decl. ¶¶18, 34, 51. In context, it describes the freehand doodling to form three-dimensional forms and shapes, rather than traditional drawing, writing, or marking.  The merchandise's actual physical mechanism and the actual use to which consumers put it bear no resemblance to the excluded articles the Government invokes. Treating three-dimensional freehand construction as conventional "drawing" collapses distinct categories and substitutes marketing vocabulary for principal-use analysis. The Government cites no heading under which the 3D-Pen falls as a "drawing instrument," for good reason: no such heading exists.

The Government's reliance on Mr. Cowen's excited remark (made at the time of the product's inception) that the product could be "the next Crayola," Def. Br. 19, as evidence that the

11

3D-Pen is analogous to crayons is a distortion of the testimony and finds no support in the record. *See* Pl. Resp. to DSOF ¶4.  Mr. Cowen made no reference whatsoever to "crayons" or to any specific Crayola product.  His statement was that the newly invented 3Doodler could be "the next Crayola, the next big toy concept" – plainly a brand-level reference to Crayola's commercial scale and ubiquity as a children's creative-play brand, not a claim that the 3D-Pens share the physical characteristics or tariff treatment of wax-based drawing implements.  Def.'s Ex. B, Cowen Dep. 9:1–20. Properly understood, the remark confirms the opposite of what the Government suggests: from inception, Mr. Cowen conceived the 3D-Pen as a toy for amusement sold at the reach of a major children's brand, not as a non-toy drawing instrument and certainly not as industrial plastics machinery.  *Id.*

3. *The EN 95.03 Exclusions Are Inapplicable and Misread*

a. **The EN 95.03 exclusions are a specific list, not a general ban on "instruments of creation."**

Even if the Government's physical characterization were accurate, its legal reading of the EN 95.03 exclusions would still fail.  The Government contends that the ENs draw a categorical line between included toys, where "amusement is an end in itself," and excluded "instruments of creation," where any amusement is "derived entirely from the use of the instrument to draw, paint, model, or otherwise create arts and crafts."  Def. Br. 13.  That principle appears nowhere in the text of EN 95.03.  The Government has extracted it by examining only certain excluded articles, ignoring the exemplars, and constructing a rule the drafters never wrote.

EN 95.03 does not distinguish between products that produce an output and products that do not.  EN 95.03 sets out a specific, itemized exclusion list.  Each excluded item is individually named and redirected to a specific *eo nomine* heading: paints (3213); modeling pastes (3407); coloring books (4903); crayons (9609).  The same provision also excludes articles that have

12

nothing to do with "creation" at all: bells (8306), unmanned aircraft (8806), musical boxes (9208), false noses (9505). Their exclusion reflects only that they are classified in other specific headings. The EN 95.03 exclusions thus operate as targeted anti-duplication rules, not as a general principle that anything used to "create" something is excluded from heading 9503. Had the drafters intended that principle, they would not have affirmatively listed toy chemistry sets, sewing sets, knitting sets and printing sets, all of which produce a tangible output, as paradigmatic examples of toys under EN 95.03(D). *See* Section 3.b., *infra*. The Government's categorical rule cannot survive the text it purports to interpret.

Significantly, "drawing instruments" (Chapter 90) do not appear anywhere on that exclusion list. The drafters expressly excluded crayons, paints, modeling pastes, coloring books, slates, and blackboards by name and heading, but they did not exclude drawing instruments. If the intent had been to carve drawing instruments out of heading 9503, they would have been listed alongside those other named articles. The Government's attempt to graft a drawing-instrument exclusion into EN 95.03 finds no support in the text of the Note.

The Government's own use of the exclusions reveals the incoherence of its position. It analogizes the 3D-Pens to crayons in order to invoke EN 95.03, yet never argues they should be classified where crayons actually go, *i.e.*, heading 9609. Instead, it leaps from an exclusion list designed to redirect specific goods to specific headings to heading 8477 (industrial machinery). EN 95.03 cannot do that work. An exclusion from heading 9503 in favor of heading 9609 does not redirect goods to heading 8477. The Government is using the exclusions not to classify the merchandise, but to create a tariff void into which it then inserts heading 8477. That is not how the tariff schedule operates.

13

b. **EN exemplars affirmatively include output-producing toys.**

More fundamentally, the ENs themselves affirmatively include within heading 9503 a wide range of output-producing toys, including constructional toys, toy tools, and educational kits such as toy chemistry, printing, sewing, and knitting sets, all of which create tangible objects. EN 95.03(D) describes these as toys even though they produce physical structures, chemical reactions, printed objects, and sewn items, respectively. These articles plainly produce tangible physical outputs achieved through use of the article, not merely simulated or role-played activity.  If the EN 95.03 exclusions established a general "no tangible output" rule, as the Government urges, those exemplars would be excluded as well.  They are not.  The organizing principle is not "creation versus non-creation," but principal use.  The Government's "creation equals exclusion" theory cannot be reconciled with the text of the ENs.  The Government cannot treat the exclusion list as establishing that principle without effectively reading the EN's own positive examples out of the heading, a result that conflicts with the EN text and settled law.

c. **Easy-Bake Oven and other functional toys analogy fatally undermines the Government's position.**

The Government's attempt to distinguish the 3D-Pen Sets from the toy exemplars in EN 95.03(D) by asserting that chemistry sets, sewing sets, printing sets, toy sewing machines, and toy ovens are merely "role-play" devices rather than "actually functional" is incorrect as a matter of fact, the EN text, and toy-industry practice. Def. Br. 12, 19-20. Those products perform real functions and produce real outputs: chemistry sets carry out actual chemical reactions; printing sets actually print; toy sewing machines actually sew fabric with a needle and thread; and the Easy-Bake Oven actually bakes edible cakes using a genuine heating element.  The finished product is not imaginary.  They are not hollow props. They are toys because children and families use them for amusement, to experience baking, sewing, or experimentation for fun, not to meet

14

any culinary or apparel-production need. EN 95.03(D).  The amusement comes from the act of creation.

The same is true of the 3D-Pen Sets. When users make a toy bug, miniature dinosaur, or whimsical figurine, they are not manufacturing for sale; they are engaging in freehand three-dimensional creation for enjoyment. Bogue Decl. ¶¶13, 16, 23, 35–36, Reiner Decl. ¶ 39. If a device that actually bakes real food (the Easy-Bake Oven) is nonetheless a toy, then a device that actually creates small three-dimensional plastic objects cannot be disqualified from heading 9503 simply because it "actually creates an object." The Government's analogy confirms that functional output does not defeat toy classification; it only confirms that the principal-use inquiry turns on whether the function is performed for amusement. On this record, it plainly is.  *Id*.

Toy-industry practice confirms this understanding. Plaintiffs' expert Reiner has nearly six decades of experience in the toy industry, including senior engineering roles at A.C. Gilbert, Ideal Toy, and Coleco. Reiner Decl. ¶¶7-11, Attach. 1. His work included designing heat-safety mechanisms for toy baking ovens that, like the Easy-Bake Oven, used real heating elements to allow children to bake edible products. *Id*., *see also* Kevin Ostoyich, *Toy Maker 2: Journeys*, American-German Institute (Mar. 12, 2026), https://americangerman.institute/2026/03/toy-maker-2-journeys/, accessed May 1, 2026.  Drawing on that experience, Reiner makes clear that the industry does not turn on whether a product produces a real output, but whether it is principally used for amusement. Reiner Decl. ¶¶16, 19, 23.  His uncontroverted opinion is that the 3D-Pen Sets are treated in the trade as creative-play toy sets, not as non-toy appliances.  Reiner Decl. ¶¶17-51. The Government offers no expert to say otherwise.

15

**d.    Controlling precedent confirms that articles producing a physical output may be classified as toys.**

If accepted, the Government's theory would require this Court to read out of heading 9503 a wide range of articles that courts and CBP have long classified as toys.

CBP has consistently classified craft and activity kits as toys under heading 9503 where the amusement value of creating the product exceeds the utilitarian value of the finished article, including fleece throw kits, cross-stitch kits, potholder kits, pillow-making kits, weaving loom kits, jewelry-making kits, bath bomb kits, and electronic hobby kits. *See, e.g.*, NY N206016 (Mar. 9, 2012)(cross-stitch fun kit classified under 9503); HQ H289680 (July 1, 2019)(Cra-Z-Art jewelry creation kit classified as toy); NY N301828 (Dec. 12, 2018)(Crayola Confetti Bath Bomb Set classified as toy); NY N342040 (Aug. 15, 2024)(miniTesla Starter Kit classified as toy); NY N304432 (June 17, 2019)(Crayola Sprinkle Art kits classified as toys). The case law confirms the same principle. *Springs Creative Prods. Grp., LLC v. United States,* 37 CIT 1222 (2013)(fleece throw kit classified as toy where play value of creating exceeds utilitarian value of finished blanket). In each instance, the same principle governs: the production of a real, functional output does not remove an article from heading 9503 where its principal use is amusement. The relevant inquiry is whether the amusement value of the creative process exceeds the utility of the finished article. Not one of those authorities endorses a rule that production of a tangible output categorically defeats toy classification.[5] The Government does not address this consistent line of

_____

[5] *Simon Marketing, Inc. v. United States*, 395 F. Supp. 3d 1280 (Ct. Int'l Trade 2005), *Childcraft Education Corp. v. United States*, 742 F.2d 1415 (Fed. Cir. 1984), *Zone Brands, Inc. v. United States,* 456 F. Supp. 3d 1309 (Ct. Int'l Trade 2020), *Processed Plastics Co. v. United States,* 473 F.3d 1164 (Fed. Cir. 2006) cited by the Government, Def. Br. 13-14, are inapposite. Each of those cases involved merchandise materially different in class, character, and use from the imported 3D Pen Sets: promotional items, watches with timekeeping utility, utilitarian educational materials, and articles with clear non-play primary functions. Those decisions reflect the limited rule that where amusement is incidental to a predominant utilitarian or educational function, toy

16

authority. The Government has invented that rule without authority, and this Court should reject it.

The 3D Pen Sets follow this same paradigm: the value lies in the creative amusement of doodling in 3D, not in the trinkets produced. The solidified plastic output of a play session, produced at an average 0.0089 grams per second, has negligible material value; no consumer pays the purchase price for a few cents of plastic. They pay for the experience, for the amusement of creative, freehand, three-dimensional doodling. Rather than applying the *Carborundum* factors to that reality, the Government selectively characterizes certain features, affixes an "arts and crafts" label, and treats that label as dispositive. That approach displaces, rather than informs, the principal-use inquiry required by ARI 1(a).

4. *The Carborundum Factors, Properly Applied, Compel Toy Classification*

The Government's *Carborundum* analysis, Def. Br. 16-24, is built on a methodological error that infects every factor it addresses: it benchmarks the 3D-Pen Sets against an invented "arts and crafts" class rather than identifying the class or kind of goods commercially fungible with the imports and asking whether that class is principally used for amusement. *Primal Lite,* 182 F.3d at 1363–64. Selecting favorable factors, applying them to a litigation-constructed class, and then presenting the result as a *Carborundum* analysis is not the law. It is a substitution of the Government's preferred answer for the required legal inquiry.

The Government also ainvokes *Processed Plastics*, 473 F.3d 1164, as apparent authority for this selective approach, citing it for the unremarkable proposition that the *Carborundum/Minnetonka* factors are not "definitive." Def. Br. 15. But *Processed Plastics* does

classification may be inappropriate. The record here compels the opposite conclusion. 3D-Pens are stand-alone consumer play products designed to entertain through the activity of drawing in three dimensions. The amusement is not collateral – it is the point.

17

not authorize the selective use of a subset of favorable factors to avoid the ultimate inquiry. 473 F.3d at 1170. The Government's selective application is precisely the analytical error *Processed Plastics* guards against.

The facts here are also the mirror image of *Processed Plastics*. There, the plaintiff sought toy classification for backpacks/beach bags, articles whose primary function, carrying things, was evident, and could not produce a shred of non-conclusory evidence of play value. 473 F.3d at 1170–71. The court found that any play use appeared incidental to the utilitarian function, not the other way around. *Id.* Here, the evidentiary record is the opposite of that in every respect. Plaintiffs have done precisely what the *Processed Plastics* plaintiff failed to do: they have submitted detailed, non-conclusory expert declarations from a toy industry veteran (Reiner Decl.) and a leading plastics engineer (Kazmer Decl.), the sworn testimony of the product's inventor (Bogue Decl.) and co-founder (Cowen Dep.); documented trade recognition across national/international toy fairs and toy industry publications; numerous consumer reviews describing the pens as fun, playful, and toys; and record evidence of retail placement in toy, educational, and craft channels – never in industrial or B2B plastics channels. Reiner Decl. ¶¶17-51, Kazmer Decl. ¶¶26-94, Bogue Decl. ¶¶13-139. And unlike the products in *Processed Plastics*, the 3D-Pen Sets have no evident primary utilitarian function; any utilitarian beyond-fun use is incidental. Bogue Decl. ¶ 36, 66, 108, Def.'s Ex. B, Cowen Dep. 29:13-38:15, 53:15-20, 54:4-21. *Processed Plastics* compels toy classification here, not the opposite.

Plaintiffs maintain that the Government's "arts and crafts" class or kind has no basis in the HTSUS, the ENs, or any binding authority, and that a *Carborundum* analysis conducted against a litigation-constructed category answers the wrong question. To the extent the Court nonetheless

18

examines the *Carborundum* factors against the Government's proposed class, each factor independently confirms toy classification.

The Government selects a few factors it finds convenient, characterizes each through the lens of its predetermined label, and declares victory. But the framework requires application of all relevant factors to the full evidentiary record, not a curated subset. When that full record is examined, every factor confirms that 3D-Pen Sets are principally used for amusement. No factor in the *Carborundum* analysis, properly applied to the actual record, supports the Government's position, and the factors the Government most heavily relies upon – actual use and physical characteristics – in fact confirm toy classification when the full, unselected evidence is considered rather than the portion the Government chose to present.

Actual Use

The Government asserts that "actual use" is one of the more important of the *Carborundum* factors, and then claims the 3D-Pens are actually used to "draw three-dimensional objects," and that "drawing in three dimensions is the article's only use." Def. Br. 16-17. The Government's conception of actual use is flawed.

At the outset, the Government conflates *mechanism* with *use*. How the article mechanically functions is not the actual-use inquiry, how it is actually used by consumers in the marketplace is. Describing the product as "drawing in three dimensions" merely restates how it operates; it does not answer the relevant question of principal use.

At a sufficiently abstract level, any toy can be redescribed as performing a non-toy function. A child playing with LEGO is "assembling modular plastic components into structural forms." A water gun is "projecting liquid under pressure." A puzzle is "arranging interlocking components to complete a defined structure." A person using a 3D-Pen is "drawing in 3D" in that

19

same purely descriptive sense. In each case, the verb describes how the article works, not why it is bought or used. What the user *does with* the pen determines its use, not the physical mechanism by which the pen functions. Reiner Decl. ¶¶25, 39-41, Bogue Decl. ¶¶13, 35-36. The Government's error is to treat "how it works" as equivalent to "what it is principally used for." The record shows that consumers use the 3D-Pen Sets because they are fun, creative, and amusing, not because they need to perform a utilitarian "drawing" task.

As detailed above, the premise that the 3D-Pens are "drawing" instruments is itself incorrect. In the context of the EN 95.03 exclusions and the headings the Government invokes, "drawing" refers to applying a marking substance to a surface to create a two-dimensional representation. Crayons, pens, and technical drawing instruments all operate in that manner. The 3D-Pen Sets do not. They dispense plastic into free space to construct three-dimensional objects with independent form and structure. The Government's entire "actual use" discussion rests on a colloquial marketing use of the verb "draw" ("drawing in 3D"), then treats that borrowed word as if it determined both physical character and principal use. That is not a permissible shortcut under ARI 1(a).

The marketing language the Government relies on reinforces the point. The Government quotes the 3Doodler® website's reference to "how to draw with a 3D Pen" and "drawing in 3D" as if those marketing phrases define the tariff classification. They do not. They are colloquial descriptions used to explain a novel product to consumers in familiar terms, not technical definitions of use. Marketing language is not a legal test. *See Processed Plastics*, 473 F.3d at 1170. The same website the Government cites describes 3Doodler's community as including people who want "to have some creative fun," Def.'s Ex. I, and the company's own promotional video states that the product serves "child drawing just for fun." *Id*. The Government quotes the

20

first half of the sentence and ignores the second. "Drawing just for fun" is amusement. It is precisely the use that heading 9503 was designed to capture.

When actual use is assessed as required by ARI 1(a), looking to the commercially fungible class or kind of goods in the marketplace, the evidentiary record is unambiguous. Consumer reviews describe the products as toys. Videos on Plaintiffs' own site and YouTube channel show children and families laughing, making whimsical creations for enjoyment, not using the 3D-Pens as professional drafting tools or production machines. Toy-industry sources have recognized them as a "hot" toy, major retailers promote them in children's gift guides, and Amazon's human buyers place the pens in Toys & Games rather than Office Products, Industrial. SUMF ¶¶40, 98–99, Def.'s Ex. B, Cowen Dep. 29:12–30:12, 31:6–34:22. The products are exhibited at toy fairs and sold through toy channels. Toy expert, after reviewing these materials and operating the products himself, concluded that the principal use of the 3D-Pen Sets is amusement. Reiner Decl. ¶¶32, 39-41, 46-51. This is precisely the type of marketplace evidence that courts rely on to determine actual use under *Carborundum*.

The Government offers no competing expert and no contrary trade or consumer evidence; its reliance on selective quotation of a handful reviews describing the pens as "a 3D crayon" ignores the overwhelming body of evidence of actual use and does not constitute record evidence sufficient to create a genuine dispute. *See* Pls.' Resp. to DSOF ¶37.

Even the Government's own description of use confirms Plaintiffs' position. It says that the 3D-Pens are used to create "art, or decoration, or a Do-It-Yourself fix." Def. Br. 16. But in the hands of actual users, "art" and "decoration" are themselves forms of amusement. A child building a mask from a stencil guide, a teenager making a colorful dragon sculpture for amusement, a kidult constructing an ornamental piece for personal enjoyment, or a parent and child decorating a

lampshade together are not engaged in industrial production or professional drafting; they are playing. The Government's own examples are exactly the kind of whimsical, imaginative projects that courts and CBP have consistently recognized as hallmarks of play and creative amusement.

As for "Do-It-Yourself fixes," the record establishes that any such use is occasional and peripheral.  As the inventor testified, using the pen for household repairs is "secondary, and neither economically practical nor efficient." Bogue Decl. ¶ 36. Both co-founders of WobbleWorks confirmed that any beyond-fun, utilitarian use is a "fringe" use.  Bogue Decl. ¶¶66, 106–108; Cowen Dep. 54:4–21. Fringe uses do not control principal use. On this record, any utilitarian function is incidental to amusement, not the other way around.

The Government asserts that Plaintiffs "provide no explanation for why the 3D Printing Pens provide no utilitarian function." Def. Br. 14. That assertion misconstrues both the record and the legal standard. Plaintiffs do not argue that no utilitarian characterization of the pen is conceivable; they argue, with extensive record support, that the utilitarian use is incidental to the product's dominant use for amusement. The Government's response is to define "utilitarian function" as the act of drawing in three dimensions and to insist that all use of the pen is therefore "utilitarian."  But that formulation swallows the test: by that logic, the act of playing with a toy chemistry set is "utilitarian" because it performs a chemical reaction; using a toy printing set is "utilitarian" because it actually prints. The Government's circular reasoning – any act of creation is utilitarian, and any article used to create is therefore not a toy – simply restates its flawed categorical premise, and does not engage with the actual evidence of principal use.

The Government's reliance on the "Harry Potter meets Harold and the Purple Crayon" marketing phrase as evidence of the 3D-Pens "magical crayon" identity also fails.  Def. Br. 17-18. That title references a beloved children's book in which a small boy draws imaginative adventures

into existence; it is a story about the magic of creative play, not a technical statement that the product is a crayon or a non-toy drawing implement. Invoking it in the context of a tariff dispute over toy classification is, if anything, a concession that the product belongs in the toy heading. The operative word in the phrase is "magical," not "crayon." Magic, wonder, and imaginative creation are the hallmarks of amusement. They are why children and adults buy these sets.

The Government's claim that Plaintiffs rely only on "some 3D amusing creations" made by the pen and that whimsical/imaginative designs "do not necessarily" make a toy, Def. Br. 19, misstates the record. Plaintiffs have offered expert testimony from Reiner that, in toy-industry practice, integrated, motorized creative-activity sets of this type are developed, marketed, and bought as toys, and that the 3D-Pen Sets fit squarely within that category; sworn testimony from Messrs. Bogue and Cowen that the 3D-Pens were conceived from inception as a "toy concept" and developed for play, not for professional drawing or industrial fabrication; trade evidence of repeated exhibition at major international/national toy fairs and toy-industry awards and publications; retail-placement evidence confirming sale through toy and creative-play channels; numerous consumers' reviews describing the products and their use as "fun," "playful," and "toys"; video evidence, including promotional videos and third-party content on the 3Doodler® website and YouTube channels, depicting children and families using the pens in precisely the way Plaintiffs describe: experimenting and playing, not engaged in professional drafting or utilitarian production; and plastics-engineering evidence from Kazmer demonstrating that the pens' output rate and precision are incompatible with any plausible professional use. This is far more than referencing "some 3D amusing creations." It is a comprehensive evidentiary record showing that the principal way the class of 3D-Pen Sets is actually used in the marketplace is for amusement.

That is exactly the type of detailed, non-conclusory evidence of amusement that the plaintiff in *Processed Plastics* lacked.

Properly applied, the actual use factor confirms that the 3D-Pen Sets are used, in practice and in the marketplace, for amusement, diversion, and play.

<u>Physical Characteristics</u>

The Government argues that the 3D-Pen Sets' physical characteristics do not reflect an "unmistakably toy-like character" because the pens are shaped like markers and are functionally analogous to crayons or mechanical pencils. Def. Br. 18-19. This analysis draws a false physical analogy to drawing instruments.

The crayon analogy fails at every level. As explained in Section I.B.3, crayons are wax-pigment sticks directly applied to a flat surface, whereas the 3D-Pens are motorized applicators that process separate thermoplastic feedstock through a heated dispensing system to create freestanding three-dimensional structures. Bogue Decl. ¶¶32–33, Kazmer Decl. ¶¶30–38, Reiner Decl. ¶¶19–25. These are not analogous technologies and do not share the same physical characteristics in any respect relevant to classification. A product is not a "drawing instrument" simply because it is held in the hand and produces a visual result. By that logic, a hot-glue gun, a cake-decorating icing bag, or a caulking gun would be "drawing instruments" because each is gripped like a pen and leaves a visible line of material behind. The Government's test reduces to "anything cylindrical that puts material somewhere is a drawing instrument," which is not a workable or legally recognized standard. Superficial physical similarity of form does not establish functional or classificatory equivalence.

The Government also compares the 3D-Pen to a mechanical pencil and a fountain pen because all are handheld devices that consume a material during use. Def. Br. 18-19. That

24

comparison proves only that all three objects fit in a hand.  It says nothing about principal use.  A toy ray gun fits in a hand and consumes batteries; it is still a toy.  What distinguishes the 3D-Pen Sets is that they are designed, packaged, powered, and engineered like toys rather than utilitarian instruments. The meaningful physical characteristics are the ones the Government dismisses: the lightweight, ergonomic form designed for all ages; the colorful, child-oriented packaging; the brightly colored filament strands; the playful activity guides and stencils; the simplified controls; the absence of software, design files, or programming; the conspicuous child-safety features, and the low-voltage USB power input limiting the product to safe consumer use.  Bogue Decl. ¶¶32-34, 39-46, Reiner Decl. ¶¶19–25.

The Government also argues that the pens lack "manipulative play value" because their "value is derived entirely from their ability to draw."  Def. Br. 19.  That argument fails on multiple levels.  First, it is circular: it assumes the product is a drawing instrument, then concludes it lacks toy characteristics because drawing instruments do not have play value. Second, and more fundamentally, "manipulative play value" is not a threshold requirement derived from heading 9503, ARI 1(a), EN 95.03, or any Federal Circuit decision.  The phrase originates in CBP's own internal framework for evaluating educational toy sets, set out in HQ 960279 (Dec. 9, 1997) and applied in rulings such as HQ H195956 (Feb. 27, 2012).  In that context, CBP required that an educational toy set possess "some form of manipulative play value" to distinguish interactive, hands-on educational kits from passive instructional materials such as books. That is a narrow internal CBP framework; it is not a freestanding exclusionary principle applicable across heading 9503, and it does not establish that a product lacking the specific characteristics of a flat drawing implement is ineligible for classification as a toy.  The Government attempts to import that administrative shorthand as if it were controlling law, and then to apply it mechanically. The

25

controlling standard, as stated by the Federal Circuit, is whether the principal use of the class or kind is amusement, diversion, or play. *Processed Plastics*, 473 F.3d at 1170 (Fed. Cir. 2006), *Primal Lite*, 182 F.3d at 1363. Elevating an administrative phrase from a CBP ruling into a categorical threshold test that pre-empts the principal-use inquiry is not a permissible analytical shortcut under ARI 1(a).

Regardless, the actual evidence forecloses the Government's conclusion: consumers of all ages manipulate the 3D-Pens freehand in open-ended, imaginative, three-dimensional creative play, encouraging precisely the self-directed, trial-and-error engagement that CBP itself identified as the hallmark of manipulative play value. *See* HQ H195956. If a science kit that encourages children to create a lemon battery possesses manipulative play value, a motorized pen that invites freehand construction of three-dimensional dragons, bugs, and ornaments plainly does as well.

The Government also ignores that the merchandise at issue is not a bare pen but a set, a boxed product that includes the pen, brightly colored plastic filaments, a power adapter, colorfully illustrated activity guides, step-by-step stencils for making toys, bugs, holiday villages, and three-dimensional sculptures, and in many cases an app with additional creative projects. Bogue Decl. ¶¶40-48, Reiner Decl. ¶¶21-24, Pl. Comp. Ex. A. That integrated set, packaging, activity guides, stencils, and all, is what is imported and sold. Its physical character is unmistakably that of a creative-play toy set. Looked at as a whole, the product is physically indistinguishable from the creative-play toy sets (chemistry/sewing/printing/construction kits) that EN 95.03(D) uses as exemplars of heading 9503. Reiner, drawing on his sixty years' experience of evaluating toys, personally examined the sets and concluded that they "possess the physical characteristics of toys." Reiner Decl. ¶25. The Government offers no examination by any qualified expert to counter that conclusion.

26

Environment of Sale

The Government's environment-of-sale argument rests on two claims: that the accessories accompanying the 3D-Pen Sets reflect an arts-and-crafts identity, and that packaging language emphasizes drawing and creation rather than play.  Def. Br. 20-21.  Neither withstands scrutiny.

On accessories, the Government observes that the sets include power cables, filaments, activity guides, project booklets, stencils, cleaning tools, and silicone mats.  Def. Br. 20.  But those accessories are the defining physical features of the integrated creative-play sets expressly listed as toys in EN 95.03(D). Toy chemistry sets come with reagents, safety equipment, and experiment guides.  Toy printing sets come with inks, paper, and project instructions.  Toy sewing kits come with thread, fabric, and pattern guides. The entire point of EN 95.03(D)'s "collection of articles" language is that a product packaged with accessories in a form clearly indicating its use as a toy is classified as a toy.  EN 95.03(D).  The Government's accessories argument shows only what Plaintiffs have always said: the 3D-Pen Sets are integrated creative-play sets, packaged and presented for play. That is precisely why they belong in heading 9503.

On packaging, the Government selectively lifts phrases such as "handmade crafts," "DIY fixes," and "wearable piece" from the 3Doodler Create+ packaging while ignoring the packaging as a whole. Plaintiffs' record establishes that the packaging is colorful and child-oriented, depicts children and families engaged in creative play, and includes stencils for toy dinosaurs, miniature Eiffel Towers, and holiday ornaments – the whimsical, amusement-driven content of a toy set, not the instructional content of a professional art supply.  Bogue Decl. ¶¶ 40–48, Reiner Decl. ¶¶ 21–24;  Pl. Comp. Ex. A.  The phrase "DIY fixes" appears as one of several listed uses on one product's packaging, but that use is a fringe application that does not define principal use. Bogue Decl. ¶ 36. The phrase "acquire new skills" and "find your style" are the language of creative-play marketing,

27

not professional art instruction.  A child's chemistry set that teaches acids and bases also "acquires new skills"; it is still a toy.

The Government's reliance on the 3Doodler® Pro's "professional grade" label, Def. Br. 21, n.4, is inapposite. The Pro is the highest-end model in the line, aimed at older teens, adult hobbyists, and "prosumers" who straddle the line between enthusiast and casual user, the "kidult" segment that the toy industry expressly recognizes.  Reiner Decl. ¶¶ 23, Attach. 2, 43, Bogue Decl. ¶¶ 13, 50-52.  The existence of a premium/prosumer tier in a product line does not redefine the class or kind of the product line as a whole. LEGO sells Technic and Architecture series to adult hobbyists alongside its standard sets; the entire line remains toys. The relevant question is the principal use of the class or kind, not a marketing adjective on the most expensive model in the range.

On retail placement, the Government concedes that the pens are sold at Walmart's Crafts-Kids Department, Target's Craft-Kits section, Kohl's Educational Toys and Activity Kits, Best Buy's STEM Toys, Barnes & Noble's Toys section, Amazon's Toys & Games, and Camp NYC, a toy store. PSOF ¶ 80.  And their presence at craft sections at Hobby Lobby and Michaels reflects those retailers' merchandising choices, not a tariff-classification determination – EN 95.03(D)'s toy exemplars (sewing sets, toy printing sets, and toy chemistry sets) also appear in craft sections alongside drawing and painting supplies, and the Government cites no authority holding that craft-aisle placement removes a product from heading 9503. The totality of the environment-of-sale evidence – colorful child-oriented packaging, accessory configurations mirroring EN 95.03(D) toy kits, and broad placement across toy and family-oriented channels – confirms that the 3D-Pen Sets are presented and purchased as toys principally used for amusement.

28

The Government shows only that the 3D-Pen Sets are creative play activity products. The question is whether they are creative activity *toys* – and on that, the ENs, accessory configuration, and playful, child-oriented packaging all point to heading 9503.

<u>Consumer Expectations</u>

The Government's consumer-expectations argument is selective and incomplete. The 3Doodler® website passage the Government cites describes a varied user community that includes "artists, makers, designers (fashion and home), educators, engineers, DIY fixers, hobbyists," but the sentence does not end there; it concludes with "and just about *anyone who wants to have some creative fun*." Def.'s Ex. I (emphasis added). The product's own promotional video likewise frames use in expressly playful terms: "a child *drawing just for fun*." *Id.* Those statements go directly to the governing inquiry: the expected use is enjoyment and creative play.

The Government's reliance on the words "create," "design," "decorate," and "craft" in packaging and marketing does not change that conclusion. Children (and adults) buy LEGO sets, chemistry sets, jewelry kits, and Easy-Bake Ovens precisely "to create" something – a model, an experiment, a bracelet, a miniature cake – and yet those products are classified as toys because the creation is undertaken for amusement, not for a utilitarian or commercial end. That is exactly what the Federal Circuit's principal-use standard asks: whether the class or kind is principally used for amusement, diversion, or play, not whether the marketing vocabulary includes verbs like "make," "build," or "create." In context, the 3D-Pen Sets are marketed as a way to "bring life to your ideas" and "have some creative fun," not as a tool to meet a professional art need or perform economically rational DIY repairs.

The consumer review record confirms this reading. Plaintiffs submitted hundreds of reviews from Amazon, Target, and other retailers in which purchasers repeatedly describe the 3D-

29

Pens as toys and fun.  Bogue Decl. ¶ 112, Ex. F, SUMF ¶¶ 87-89.  The Government isolates only a handful of reviews that liken the product to a "3D crayon" or mention using it "to craft" masks or decorate a lamp shade. DSOF ¶ 37. Those examples are not evidence of a non-toy expectation; they are textbook expressions of creative play.  Making a mask, decorating a lampshade, or crafting whimsical figurines are precisely the kinds of imaginative, self-directed projects that CBP and the courts have long recognized as hallmarks of toy use in craft-kit cases.  Again, to the extent any reviewers refer to "DIY fixes," the record is clear that such uses are fringe. Bogue Decl. ¶¶ 36, 66, 106-108, Ex. F, Cowen Dep. 54:4–21.

Viewed as a whole, this factor does not show a class of goods purchased as professional drawing instruments. It shows what the packaging, websites, videos, and reviews all say when quoted in full: consumers of all ages expect and use the 3D-Pen Sets as fun, creative-play devices for making whimsical three-dimensional objects, not as utilitarian drawing tools or plastics-processing machinery.

Economic Practicality

The Government disposes of this factor in a single sentence – the prices of the 3D-Pens "reveal little" – misapprehending the inquiry. Def. Br. 22.  Economic practicality does not ask about price ranges/overlaps in the abstract; it asks whether the merchandise is used in a manner that is economically rational for the purported utilitarian purpose.

Under the Government's own comparison to crayons and drawing tools, the economics make no sense.  No consumer pays  $30–$200 for a motorized device to do what a $2 Crayola crayon accomplishes. The only rational explanation is that consumers are paying for something qualitatively different: a motorized, integrated creative-play experience (the pen, colorful

30

filaments, fun stencils and the amusement of freehand three-dimensional construction), not a utilitarian drawing tool.

Dr. Kazmer's unrebutted empirical analysis shows that producing a simple plastic phone case using a 3D-Pen costs nearly fifty times more per unit than conventional production methods. Kazmer Decl. ¶¶80–83. The record further establishes that any utilitarian use is inefficient and economically impractical. Bogue Decl. ¶¶ 36, 66, 106–108, Cowen Dep. 53:15–20, 54:4–21. The value lies in the experience of using the product, not in the utility of what it produces. The Government offers no competing expert and does not engage this evidence.

A product that is economically impractical for every utilitarian purpose the Government attributes to it, priced far above drawing implements, and purchased for the experience of play, is a toy.

Channels of Trade

The Government concedes that 3D-Pen Sets are sold in toy stores/aisles but seeks to discount that by pointing to their presence in craft stores and calling the overlap insignificant. Def. Br. 22-23.  The relevant question, however, is whether their channels of trade align with utilitarian drawing instruments. They do not. The Sets are sold exclusively through consumer channels alongside toys, hobby kits, and creative-play products; they are not marketed or distributed as precision drawing or drafting tools, nor sold through professional or institutional channels associated with utilitarian drawing instruments. Even within craft stores, they appear among hobby products intended for recreational use, including children's creative kits, not in sections for professional or drafting supplies.  That retail context aligns with toys and consumer play products, not with functional drawing tools.

31

Dual placement does not negate this evidence. *Processed Plastics* does not render channels of trade irrelevant where overlap exists; it requires evaluating what that overlap reflects. 473 F.3d at 1170. Here, the overlap confirms that the products occupy the space of consumer creative-play goods, and the absence of any professional-use distribution channel is itself probative of principal use.

Recognition in Trade

The Government's attempt to minimize toy-trade recognition fails. It is undisputed that the 3D-Pen Sets have been exhibited at major international toy fairs (New York, Nuremberg, London, Hong Kong) and awarded by toy-industry media as "hot" toys. SUMF ¶¶95-99, 100-102. That *Toy Insider* may also cover crayons or art kits simply reflects that it treats these products as part of the same children's creative-play space, not as professional tools. Nor does the presence of some non-toy items at toy fairs undermine this evidence. Toy fairs are the marketplace event at which the toy trade evaluates, buys, and publicizes products for consumer amusement. The relevant question is whether the 3D-Pen Sets are recognized in the toy trade as toys, not whether every product at toy fairs falls within heading 9503. Expert Reiner, who has attended and evaluated products at such fairs for nearly six decades, concluded unequivocally that the 3D-Pen Sets are "widely recognized in the trade as toys" and that their "primary purpose is to provide amusement." Reiner Decl. ¶¶46-51, SUMF ¶¶101-102. The Government offered no competing expert to say otherwise.

The Government's "arts and crafts" theory asks this Court to adopt a legal rule no court has recognized, the statute does not support, the ENs refute, and that would upend decades of Customs and judicial practice classifying craft kits as toys. The fact that a 3D-Pen creates an object is not a reason to deny toy status; it is the mechanism by which it provides amusement. Every *Carborundum* factor aligns with a class or kind of consumer creative-play sets principally used for

32

amusement, diversion, or play. Under controlling law and the full record, the 3D-Pen Sets are properly classified under heading 9503 as "other toys."

## II.    THE GOVERNMENT HAS NOT MET ITS BURDEN TO ESTABLISH THAT HEADING 8477, HTSUS, IS THE CORRECT CLASSIFICATION

Heading 8477 is not a catch-all for anything that heats or shapes plastic; it is a principal-use, plastics-processing industry-tethered provision covering "machinery for working . . . plastics *or* for the manufacture of products from [plastics.]"  As the movant, the Government bears the burden to show, through a proper ARI 1(a) *Carborundum* analysis, that the principal use of the commercially fungible class or kind is as plastics-processing machinery, and that the merchandise belongs to the plastics-processing industry reflected in EN 84.77's industrial exemplars.  *EOS of N. Am., Inc. v. United States*, 911 F. Supp. 2d 1311, 1336 (Ct. Int'l Trade 2013); EN Ch. 84(B)(3); EN 84.77.  It has done neither.

Instead, the Government invents an "arts and crafts" class to sidestep heading 9503, exploits that construct to claim there is "no use provision," concedes that the 3D-Pen Sets are not "machinery for the manufacture of products from plastics" and instead stretches only the first prong, "machinery for working plastics," using a dictionary-level gloss broad enough to sweep in glue guns, caulking guns and Creepy Crawlers®, relies on a factually incomparable ruling and an unauthenticated Amazon screenshot contradicted by the record, offers no expert or industry evidence of its own, and asks this Court to defer to a non-binding WCO opinion that the United States itself argued was wrong.  On this record, the Government has not carried – and cannot carry – its burden to justify classification of the 3D-Pen Sets under heading 8477; its cross-motion on that heading must be denied.

**A. The Government Constructs the Wrong Class or Kind and Then Exploits That Error to Manufacture a "No Use Provision"**

The Government defines the class or kind as merchandise "for drawing or otherwise creating art or crafts, such as crayons and colored pens." Def. Br. 31. As explained in Section I, that construct has no basis in commercial reality, no recognition in the HTSUS or ENs, and is assembled from articles scattered across unrelated chapters that are not commercially fungible with the 3D-Pen Sets. A valid class or kind under ARI 1(a) must reflect how the marketplace actually groups and sells the merchandise. When the class or kind is defined by conception, design, channels of trade, consumer expectations, and trade recognition, as the analysis requires, the result is clear: the 3D-Pen Sets belong to a class of consumer creative-play sets with an unambiguous home in heading 9503.

Having constructed a class that it concedes has "no use provision covering [3D-Pens]," Def. Br. 31, the Government cites *Universal Electronics, Inc. v. United States*, 112 F.3d 488, 492 n.3 (Fed. Cir. 1997) and *Jarvis Clark v. United States*, 733 F.2d 873, 876 (Fed. Cir. 1984) to argue that the Court must find the provision that "best describes" the article "by function." Def. Br. 31. Neither case supports that proposition. *Universal Electronics* says nothing about a functional fallback when a class allegedly lacks a use provision. Nor does *Jarvis Clark* authorize to skip principal-use analysis and classify by function. Heading 9503 *is* a use provision. Properly applied to the correct class, *i.e.*, consumer creative-play sets, it plainly covers the 3D-Pen Sets. The Government's "no use provision" conclusion exists only because the Government defined the class incorrectly. That is circular, not analytical.

**B. Heading 8477 Is a Principal-Use Provision, and the Government Never Performs the Required *Carborundum* Analysis.**

The U.S. Court of International Trade held in *EOS*, that heading 8477 is a use-controlled provision subject to ARI 1(a).  911 F. Supp. 2d at 1336, Pls.' Br. 13, fn. 3. That holding brings the full *Carborundum* framework into play for heading 8477, just as it applies for heading 9503. The Government never engages with that holding. It simply declares that because the pens "function to heat and mold plastic to create free-form objects," they *ipso facto* fall under "machinery for working plastics." Def. Br. 26.  A principal-use provision requires evidence of how the class is actually used, recognized, and marketed. The Government provides none – no industry evidence, no trade recognition, no expert support. Its theory reduces to a mechanical syllogism, not a legal analysis.  A bare physical description dressed as a classification analysis does not satisfy ARI 1(a) or *EOS*.

**C. The Chapter 84 Explanatory Note Confirms Heading 8477 is Industry-Based, not Function-Based, Foreclosing the Government's Theory**

The Government selectively invokes EN Chapter 84 while omitting the controlling principle: headings 84.25-84.78, including 8477, classify machines by the field of industry in which they are used, not merely by function. EN Ch. 84(B)(3). The organizing principle for heading 8477 is *industry*, not function. The relevant inquiry is whether the article belongs to the plastics-processing industry reflected in EN 84.77's exemplars, *i.e.*, injection-molding machines, extruders, blow-molding machines, calenders, and presses, not whether it can be generically described as heating and shaping plastic. On that question, Kazmer's unrebutted expert testimony is dispositive: "machinery for working plastics" and "machinery for the manufacture of products from plastics" of heading 8477 are directed to the plastics industry, and the 3D-Pens are not recognized in the plastics industry, have never appeared at a plastics-industry trade show, and do

35

not perform "working plastics" as that term is understood by plastics engineers.  Kazmer Decl. ¶15, SUMF ¶¶103–111.  The Government offers no competing expert or contrary industry evidence.

The Government attempts to neutralize EN Ch. 84(B)(3) in a footnote by arguing that it is merely "a general arrangement" of the chapter and that "certain exceptions" to the industry-referencing principle mean that heading 8477 should not be read as tied to any particular industry. Def. Br. 29, fn. 9.  That fails on its own terms. The existence of exceptions does not erase the default rule; it merely acknowledges that some headings are organized differently. The Government identifies no exception applicable to heading 8477.  It cannot invoke the Chapter 84 EN to support its functional argument while simultaneously asking the Court to ignore the field-of-industry sentence in the same provision.

Together, *EOS* and EN Ch. 84(B)(3) impose a two-part burden the Government has not met: (1) a *Carborundum* showing that the principal use of the relevant class or kind is as plastics-working machinery; and (2) a showing that the merchandise belongs to the plastics-processing industry in EN 84.77.  It has not done so; its cross-motion must be denied.

### D. The Government Concedes That 3D-Pens Are Not "Machinery for the Manufacture of Products from Plastics"

Heading 8477 is disjunctive: it covers machinery (i) for working plastics, or (ii) for the manufacture of products from plastics.  The Government's brief advances only the first prong.  It affirmatively concedes that the 3D-Pen Sets are not "machinery for the manufacture of products from plastics" within the meaning of heading 8477 and instead rests solely on the first prong "machinery for working plastics." Def. Br. 30. That concession narrows the heading's application and confirms that the Government is stretching the "working plastics" language beyond its statutory meaning in an attempt to cover a consumer handheld pen.

By admitting that the pens do not manufacture plastic products at all, and cannot do so economically at commercial scale, Defendant aligns with Dr. Kazmer's unrebutted testimony that the pens' output consists of low-throughput, imprecise strands suitable only for amusement, not industrial production. What remains is an attempt to read "working plastics" so broadly that any consumer gadget that heats and shapes plastic, including toys and craft tools, would become "machinery" of Chapter 84, contrary to the industrial context of heading 8477, the *Carborundum* factors, and expert testimony.

### E. The Government's Interpretation Ignores the Industrial Context of Heading 8477 And Unrebutted Expert Definitions

The Government's heading 8477 theory rests on the assertion that the 3D-Pen "heat[s] and mold[s] plastic," and that this is, by definition, "working plastics." Def. Br. 31. Under the Government's logic, a glue gun, a hair dryer applied to a plastic pipe, and a child's Creepy-Crawlers® would all "work plastics." This interpretation collapses into a lay description and strips the heading of meaning.

A leading plastics engineer Dr. Kazmer defined "machinery for working rubber or plastics" as the plastics industry uses it – controlled, high-throughput, force-driven processes that transform a lower-valued feedstock into a higher-valued product at commercially meaningful rates. Kazmer Decl. ¶¶1-11, 18 Attach. 1. Dr. Kazmer further explained that typical machinery for working plastics is stationary, sizable, and durable: roughly human-scale or larger, made of steel, mounted on a frame, operating at 2,000 watts or more, and processing 10-1,000 pounds of plastic per hour in continuous industrial service. EN 84.77's exemplars fit that description exactly: they are stationary, high-throughput industrial machines designed for repetitive production in a manufacturing environment. EN 84.77, Pls.' Br. at 29-30. The 3D-Pen Sets share none of those features. SUMF ¶¶40, 47, 49-50, 56, 103-111.

The 3D-Pens are not plastics-working machinery. They weigh 0.2 pounds, operate at 8 watts (versus 2,000+ watts for industrial machinery), process plastic at 0.032 kg/hr (less than one-hundredth of typical machinery), use filament costing ~$80/kg (versus $1–4/kg for industrial resin), produce imprecise freehand output with dimensional variation 43 times greater than an injection-molding machine, and have never appeared at the NPA or any plastics-industry trade show. Kazmer Decl. ¶¶33–34, 43, 68, 80-83, 87-88. Across all seven *Carborundum* factors, Dr. Kazmer concluded the pens are not plastics-working machinery. *Id.* ¶¶92-94.

The Government does not engage with any of this industrial context or with Kazmer's definitions, relegating his detailed expert analysis to a footnote as "non-probative" (fn. 10), without offering any competing expert, industry evidence, or reasoned basis for rejecting his uncontroverted opinions. Instead, it strips the term "machinery for working plastics" of its technical and industry meaning and replaces it with a bare dictionary gloss: anything-that-heats-plastic "works plastics" – that would sweep glue guns, laminators, consumer embossing tools, and toys into heading 8477 with equal logic. That interpretation has no limiting principle and finds no support in the ENs, any CBP ruling, or any judicial decision.

## F. The Government's Evidence Does Not Support Heading 8477

The Government cites no judicial decision that has ever classified a handheld consumer device of this scale, power, throughput, and use under heading 8477. Its principal authorities, CBP Rulings HQ H293445 and N342417, either address industrial-scale machinery or are methodologically unsound for the reasons set forth in Plaintiffs' opening brief and this response. Where the Government turns to the record evidence to fill that gap, it relies chiefly on an unauthenticated Amazon screenshot contradicted by the record and on a marketing label ("3D

*Printing* Pen"), neither of which establishes that the Sets are "machinery for working plastics" within the meaning of heading 8477.

The Government's reliance on CBP Ruling N342417 (Sep. 17, 2024), Def. Br. 29, is particularly misplaced. N342417 classified the "plasticpreneur IMK2," a 67-pound, wall-mounted injection press with a hopper, rack-and-pinion piston drive, precision aluminum molds, and 200–240V operation, retailing for €4,990-€5,390, and manufacturing commercial plastic items, under heading 8477.  Resp. Counsel Decl. ¶6, Ex. Q. The 3D-Pen weighs 0.2 pounds, operates at 8 watts from a USB adapter, and produces freehand doodles.  Invoking a ruling about a 67-pound floor-standing injection press to classify an 8-watt child's pen is not a classification argument; it is a *reductio ad absurdum* of the Government's own theory.

 

Resp. Counsel Decl. ¶6, Ex. Q.                      SUMF ¶3, Comp. Ex. A6

The Government's evidentiary showing further illustrates its failure of proof. The Government's principal record evidence is Exhibit L, an Amazon search screenshot showing the 3Doodler® appearing under an "Industrial & Scientific" node.  DSOF ¶ 40, Def.'s Ex. L. That exhibit is subject to a threshold evidentiary objection. *See* Pls.' Resp. to DSOF ¶40. The Court

39

should disregard it. Even if considered, it is self-refuting: the same Amazon platform lists the 3D-Pens under "Toys & Games."[6]

Finally, the Government refers to the marketing phrase "3D *Printing* Pen" throughout its brief and statement of facts, as if it carries technical or classificatory significance. Tariff classification turns on the merchandise's physical characteristics and principal use, not on a product name. The 3D-Pens are not 3D printers; they do not operate through computer numerical control, automated programming, or layer-by-layer fabrication from a digital model.  SUMF ¶¶46, 90, Bogue Decl. ¶34.  The 3D-Pen does not "print" in any recognized technical sense and is instead a manually guided device used for creative play. The term "printing" was adopted as marketing shorthand during a period when "3D printing" was a widely publicized concept, to help consumers understand a novel product by reference to a familiar term. It was not intended as a technical description of the product's mechanism or use. And they commonly refer to the merchandise as a "3D pen" or "3D doodling pen" in marketing materials. Pls.' Resp. to DSOF ¶5, Def.'s Ex. B, Cowen Dep. 34:8-22.

### G. The WCO Opinion Does Not Carry the Government's Burden

The Government heavily relies on the 2018 WCO HSC classification opinion concerning an earlier 3Doodler® model, urging this Court to defer to it in the name of "international uniformity." Def. Br. 26–27.  This opinion is not legally binding, lacks principal-use analysis, and is undermined by the Government's own documented effort to overturn it.

The Government's Rule 30(b)(6) witness, Mr. Beris, confirmed that decisions taken by the HSC are not legally binding on the member administrations or this Court, and that CBP has the

---

[6] The confidential explanation for the industrial/scientific-node placement is set forth in Plaintiffs' Response to DSOF ¶ 40, filed under seal.

authority to maintain its own classification if it believes it is more appropriate.  Resp. Counsel Decl. ¶2, Ex. M, Beris Dep. 81:8-15, *Cummins, Inc. v. United States*, 454 F.3d 1361, 1366 (Fed. Cir. 2006).

More fundamentally, the HSC opinion cannot substitute for the *de novo* analysis this Court must conduct because: (1) heading 9503 was never considered despite delegates noting the product could be used "as a toy for children" and "for entertainment purposes in the home," Resp. Counsel Decl. ¶3, Ex. N, HSC/61 NC2476E1a, ¶2, Ex. M, Beris Dep. 43:19-44-16, 58:2-59:16, 83:3-8, a classification decision that ignores the correct heading cannot govern a court that must consider it; (2) the U.S. *Carborundum* framework was "absolutely not" applied in WCO decision-making for this product, *Id*. ¶2, Ex. M, Beris Dep. 59:17–60:7, and the HSC reached its outcome by a simple-majority vote on the basis of a photograph without expert testimony or any principal-use analysis, Beris Dep. 44:13–49:6, 50:10–54:13, 53:21–54:13; and (3) no physical samples were examined, Beris Dep. 50:10–52:14, while this Court has before it the actual products, two expert declarations based on physical testing, inventor's declaration, and a full evidentiary record the WCO never had. *Id*. ¶2, Ex. M, Beris Dep. 44:13–49:6, 59:17-60:23, *Id*. ¶3, Ex. N, HSC/61, NC2501E1b.

The Government omits that following the HSC's 61st Session decision classifying the printing pen in heading 84.77, the United States formally requested re-examination and submitted a detailed note arguing that the 3D printing pen is properly classified in HS heading 84.67 (motorized tools working in hand), not 84.77. *Id*. ¶4, Ex. O, HSC/62, NC2521E1a.  The U.S. note expressly argued that because heading 84.77 covers only machinery "not specified or included elsewhere in this Chapter," and because the pen meets the terms of heading 84.67 as a handheld motorized tool, it "cannot be classified in heading 84.77."  *Id*.  The United States requested both that the committee reverse its decision and that it amend EN 84.67 to add "[p]rinting pens and

41

similar apparatus for the construction of three-dimensional objects" as an exemplar of heading 84.67. *Id.*

The HSC declined to revise its decision. *Id*. ¶5, Ex. P, HSC/62, NC2502E1a, NC2570E1b. Mr. Beris confirmed that CBP thereafter classified the product under heading 8477 to "align" its domestic ruling with the HSC outcome, not because CBP independently concluded on the merits that heading 8477 was correct. *Id*. ¶2, Ex. M, Beris Dep. 80:3-8.  That concession undermines the Government's present advocacy: the domestic classification followed the WCO result as a matter of administrative alignment, not as the product of the independent principal-use analysis that U.S. law requires. The Government now asks this Court to defer to the very result the United States told the WCO was wrong.

The Government now invokes the desire for international uniformity as a reason for the Court to credit the WCO opinion. Def. Br. 27.  That argument has limited purchase at the best of times.  *Cummins*, 454 F.3d at 1366.  It has none here. "International uniformity" achieved by bypassing ARI 1(a), the *Carborundum* framework, and the Government's own prior position is not uniformity this Court is obligated to honor.  The WCO opinion may be consulted as background if the Court wishes, but it cannot substitute for the *de novo* principal-use analysis required here, and on the actual summary-judgment record, a record the WCO never had,  the 3D-Pen Sets are toys.

## III.    IN THE ALTERNATIVE, IF THE MERCHANDISE IS NOT CLASSIFIABLE UNDER HEADING 9503, HTSUS IT IS STILL NOT CLASSIFIABLE UNDER HEADING 8477, HTSUS

Even if the Court were to conclude that the 3D-Pens do not fall within heading 9503, the merchandise is still not classifiable under heading 8477. The more appropriate alternatives are heading 8516, HTSUS, as electrothermic appliances of a kind used for domestic purposes, or heading 8467, HTSUS, as tools for working in the hand with a self-contained electric motor. Both

headings better reflect the 3D-Pen Sets' physical characteristics, scale, channels of trade, and manner of use than residual heading 8477.

### A.  Heading 8516 Better Describes the Merchandise Than Heading 8477

CBP's own prior ruling confirms heading 8516's applicability. In NY N248177 (Dec. 18, 2013), CBP classified an earlier 3Doodler® pen under subheading 8516.79.0000 as an "other electrothermic appliance." CBP later revoked that ruling in HQ H293445 (Oct. 7, 2019) to align with the WCO opinion, not because of an independent textual analysis that heading 8477 better described the merchandise. That history remains probative because the United States itself contested the WCO result.  *See* Section II.G, *supra*.

Heading 8516 also fits the article's physical character. The 3D-Pens are small, low-power, consumer electrothermic devices; they are not industrial plastics-working machines. CBP has treated glue guns as *prima facie* classifiable under heading 8516.  HQ 950627 (Mar. 30, 1992). The Government's attempt to distinguish that glue guns on the ground that "adhere" materials while 3D-Pens "create objects" is immaterial because heading 8516 turns on the nature of the appliance, not the downstream object a user may create. Both devices heat thermoplastic material and dispense it through a handheld, electrically powered tool operated in domestic settings. That is the relevant common characteristic under the heading.

The Government's narrow reading of "domestic purposes" is also flawed. The ENs require only that such appliances are *normally* used in the household, not that they perform essential household functions like cooking or cleaning. EN 85.16(E). Many listed exemplars, such as waffle irons, popcorn makers, and coffee machines, are used for convenience or enjoyment, not necessity. A product need not be confined to the home to qualify; it is enough that it is of a kind ordinarily used there. The 3D-Pen Sets meet that standard: they are consumer devices purchased by

43

households and used in homes for recreational activity.  The Government's argument improperly conflates "domestic" with "exclusively household" and contrasts it with "industrial," a dichotomy not found in the statute. A product can be used in schools or studios and still be "of a kind used for domestic purposes."  The relevant inquiry is typical use, not exclusive use.

Nor does the Government's reliance on dictionary definitions advance its position. Those definitions describe household appliances in general terms but do not impose the functional limitation the Government asserts.  Nothing in the text of heading 8516 requires that the appliance perform a core household task; it need only be an electrothermic device of a kind used in the home.

Because heading 8516 more specifically describes a small electrothermic consumer appliance, residual heading 8477 cannot apply. The Government's extra-statutory "arts and crafts" category does not correspond to any tariff provision and cannot displace a heading that fits. If heading 9503 is unavailable, heading 8516 supplies the better alternative.

### B.  Heading 8467 Also Fits Better Than Heading 8477

Heading 8467 covers tools for working in the hand with a self-contained electric motor. The 3D-Pens meet each textual element: they are small handheld devices, contain a DC motor and gearbox, and work preexisting plastic filament by applying heat and motor-driven force through a nozzle while the user controls direction, speed, deposition, and termination by hand.  DSOF ¶¶17-19; PSOF ¶¶40-44; Pls.' Br. 43-44.

The Government's contrary argument depends on a limitation not found in the heading. It asserts that the pens are not "tools for working" because they create new objects rather than alter a preexisting finished workpiece. Def.'s Br. 32-33. But heading 8467 is not limited to tools that modify finished objects.  EN 84.67 includes handheld tools that apply mechanical force to material,

44

including drills, grinders, saws, concrete vibrators, and sand rammers. The common feature is handheld, motor-driven work on material; the 3D-Pens do precisely that to plastic filament.

The Government's attempt to redefine "working" as limited to subtractive or deformative processes (cutting, removing, refining) has no basis in the text or ENs. Nothing in heading 8467 requires that the material preexist in its final form or that "work" consist only of removal or alteration. Extruding, depositing, and shaping material through controlled application of force is still "working" that material. And while the 3D-Pens do not "work plastics" in the industrial, plastics-processing sense contemplated by heading 8477, they plainly perform work on material in the handheld, user-directed sense characteristic of tools covered by heading 8467.

The United States previously advanced that same view before the WCO, urging classification of the 3Doodler® pen in HS heading 84.67 rather than heading 84.77. *See* Section II.G, *supra*. The Court need not adopt the WCO materials as controlling to recognize that they undercut the Government's current position. At minimum, heading 8467 is a more natural Chapter 84 alternative than heading 8477, and because heading 8477 is residual, it cannot prevail over a heading that otherwise describes the merchandise.

## CONCLUSION

The Government has not carried its burden to establish that the 3D-Pen Sets are classifiable under heading 8477, HTSUS. It offers no competing expert testimony and no case law or CBP ruling classifying comparable handheld consumer products under heading 8477. It relies on a fabricated "arts and crafts" class or kind not provided for in any HTSUS heading and drawn from unrelated chapters. It does not identify a recognized class or kind of industrial plastics-working machinery to which the 3D-Pen Sets belong. It effectively concedes that the merchandise is not machinery "for the manufacture of products from plastics" and stretches the remaining "working

45

plastics" prong language beyond its statutory context. And it relies on a nonbinding WCO classification that did not apply the U.S. principal-use analysis required here, and that the United States itself previously argued was wrong.  The undisputed record, evaluated under the properly applied principal-use framework, establishes that the 3D-Pen Sets belong to a class or kind of merchandise principally used by children and adults for amusement, not practicality, and are properly classified under heading 9503, HTSUS, as "other toys."

For the foregoing reasons, and for the reasons set forth in Plaintiffs' opening brief and accompanying evidentiary submissions, Plaintiffs respectfully request that the Court deny Defendant's cross-motion for summary judgment, grant Plaintiffs' motion for summary judgment, hold that the 3D-Pen Sets are properly classified under heading 9503, HTSUS, and order U.S. Customs and Border Protection to reliquidate the subject entries accordingly, and refund the excess duties paid, with interest as provided by law.

**UNITED STATES COURT OF INTERNATIONAL TRADE**

<table>
<tr><td>

QUANTIFIED OPERATIONS LIMITED,
WOBBLEWORKS (HK) LIMITED,

                Consolidated Plaintiffs,

    v.

UNITED STATES,

                Defendant.

</td><td>

Before: Hon. Richard K. Eaton, Judge

Consol. Court No. 22-00178

</td></tr>
</table>

**WORD COUNT CERTIFICATE OF COMPLIANCE**

Pursuant to the Standard Chambers Procedures of the U.S. Court of International Trade, the undersigned certifies that this brief complies with the court limitation requirement. This Memorandum contains 13,823 words, as computed by the word processing system (Microsoft Word). This word count is within the limit of 14,000 words set forth in Standard Chambers Procedure § 2(B)(1).

Respectfully submitted,

/s/ Alena A. Eckhardt
Alena A. Eckhardt

NAKACHI ECKHARDT & JACOBSON, P.C.
50 California Street, Suite 1500
San Francisco, CA 94111
Tel: (415) 498-0070
Email: alena@tradelawcounsel.com
*Counsel for Consolidated Plaintiffs*

Dated: May 5, 2026

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on May 5, 2026, I caused to be served copies of Plaintiffs' Response in Opposition to Defendant's Cross-Motion for Summary Judgment and Reply in Support of Their Motion for Summary Judgment, Response to Defendant's Additional Rule 56.3 Statement, and Plaintiffs' Exhibits, including both the confidential version filed under seal pursuant to the Protective Order and the public version, upon counsel for Defendant United States:

Mathias Rabinovitch
Trial Counsel
U.S. Department of Justice
Commercial Litigation Branch
Int'l Trade Field Office
26 Federal Plaza, Room 346
New York, NY 10278
Mathias.Rabinovitch@usdoj.gov

The public version was served via the U.S. Court of International Trade's CM/ECF system. The confidential version was served via electronic mail pursuant to agreement of the parties and in accordance with the Protective Order.

*/s/ Alena A. Eckhardt*
Alena A. Eckhardt
