UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. RICHARD K. EATON, JUDGE

_____

| | : | |
|---|---|---|
| QUANTIFIED OPERATIONS LTD, *ET AL.*, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Consol. Court No. 22-00178 |
| | : | |
| UNITED STATES, | : | |
| | : | |
| Defendant. | : | |

_____ :

## DEFENDANT'S REPLY MEMORANDUM OF LAW IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

AIMEE LEE
Assistant Director

MATHIAS RABINOVITCH
Trial Attorney
U.S. Department of Justice, Civil Division
Commercial Litigation Branch
26 Federal Plaza, Room 346
New York, New York 10278
(212) 264-0484
*Attorneys for Defendant*

June 26, 2026

**TABLE OF CONTENTS**

INTRODUCTION ....................................................................................................... 1

ARGUMENT ............................................................................................................... 3

   I.    THE 3D PRINTING PENS ARE NOT "OTHER TOYS" OF HEADING 9503 ........... 3

       A.  ARI 1(a) Requires Identification of the Principal Use of the Commercially
           Fungible Class to Which the 3D Printing Pens Belong............................................. 4

       B.  The Exclusions in Explanatory Note to Heading 9503 Support Finding
           that the 3D Printing Pens Belong to a Class or Kind of Arts and Crafts
           Instruments .............................................................................................................. 6

       C.  The "Output-Producing" Exemplars in Explanatory Note 95.03(D) Are
           Reduced-Capacity Role-Play Miniatures ..................................................... 9

       D.  The 3D Printing Pens Are Commercially Fungible with Instruments Used
           to Make Art and Crafts under the *Carborundum* Factors........................................ 10

  II.    THE 3D PRINTING PENS ARE "MACHINERY FOR WORKING PLASTICS"
       OF HEADING 8477.................................................................................................. 14

       A.  The Plain Meaning of Heading 8477 Compels Classification of the
           3D Printing Pens as "Machinery for Working Plastics"........................................ 14

       B.  The WCO Classification Opinion Is Strong Persuasive Authority......................... 18

  III.   THE ALTERNATIVE HEADINGS DO NOT COVER THE 3D PRINTING
       PENS........................................................................................................................ 20

       A.  The 3D Printing Pens Are Not Tools for Working under Heading 8467 ............... 20

       B.  The 3D Printing Pens Serve No Domestic Purpose under Heading 8516 .............. 22

CONCLUSION............................................................................................................ 23

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Aromont USA, Inc. v. United States,*
671 F.3d 1310 (Fed. Cir. 2012)..................................................................................... 4, 12

*Bausch & Lomb, Inc. v. United States,*
148 F.3d 1363 (Fed. Cir. 1998)........................................................................................ 3

*BenQ Am. Corp. v. United States,*
646 F.3d 1371 (Fed. Cir. 2011)........................................................................................ 4

*Childcraft Education Corp. v. United States,*
742 F.2d 1413 (Fed. Cir. 1984)...................................................................................... 13

*Clarendon Marketing, Inc. v. United States,*
144 F.3d 1464 (Fed. Cir. 1998)........................................................................................ 5

*Cummins, Inc. v. United States,*
454 F.3d 1361 (Fed. Cir. 2006)...................................................................................... 18

*The Container Store v. United States,*
864 F.3d 1326 (Fed. Cir. 2017)...................................................................................... 16

*Degussa Corp. v. United States,*
508 F.3d 1044 (Fed. Cir. 2007)...................................................................................... 18

*EOS of North America, Inc. v. United States*,
911 F. Supp. 2d 1311 (Ct. Int'l Trade) ......................................................................... 17

*Gerson Co. v. United States,*
898 F.3d 1232 (Fed. Cir. 2018)...................................................................................... 15

*GRK Canada, Ltd. v. United States*,
180 F. Supp. 3d 1260 (Ct. Int'l Trade 2016), *aff'd*, 885 F.3d 1340 (Fed. Cir. 2018).............. 5, 17

*Kahrs Int'l, Inc. v. United States*,
791 F. Supp. 2d 1228, 1241 (Ct. Int'l Trade 2011) ....................................................... 17

*Minnetonka Brands, Inc. v. United States,*
110 F. Supp. 2d 1020 (Ct. Int'l Trade 2000) ................................................................... 5

*Orlando Food Corp. v. United States,*
140 F.3d 1437 (Fed. Cir. 1998)...................................................................................... 15

*Primal Lite, Inc. v. United States,*
182 F.3d 1362 (Fed. Cir. 1999)...................................................................................... 4, 5

*Processed Plastics Co. v. United States,*
473 F.3d 1164 (Fed. Cir. 2006)............................................................................5, 9, 10, 11

*RKW Klerks Inc. v. United States,*
592 F. Supp. 3d 1349 (Ct. Int'l Trade 2022) ............................................................... 3

*Simon Marketing, Inc. v. United States,*
395 F. Supp. 3d  (Ct. Int'l Trade 2005) ................................................................... 6, 13

*Warner-Lambert Co. v. United States,*
407 F.3d 1207 (Fed. Cir. 2005)................................................................................... 19

**Harmonized Tariff Schedule Of The United States**

Rules of Interpretation

General Rule of Interpretation 1 ................................................................................ 14, 15

General Rule of Interpretation 3(b)............................................................................. 10

Additional Rule of Interpretation 1(a) .................................................................... 4, 5, 11

Chapter 39

Chapter Note 1 .............................................................................................................. 14

Chapter 84

Explanatory Note to Chapter 84 .................................................................................. 15

Heading 8467 .................................................................................................... 1, 18, 19, 20

   Explanatory Note to Heading 8467.......................................................... 19, 20, 21

Heading 8477 ................................................................................................... *passim*

   Subheading 8477.80................................................................................. 16

Chapter 85

Heading 8516 ................................................................................... 1, 18, 19, 20, 22

<u>Chapter 95</u>

Heading 9503 ..........................................................................................................*passim*

    Explanatory Note to Heading 9503.......................................................... 6, 9

**Rules**

USCIT R. 56.3 ...................................................................................................... 3

**Regulations**

80 Fed. Reg. 34,924 ........................................................................................... 18

**Rulings**

CBP Ruling HQ H195956 (Feb. 27, 2012)........................................................... 9

CBP Ruling HQ H123917 (Mar. 28, 2011) .......................................................... 9

**Other Authorities**

The International Convention on the Harmonized Commodity Description and
Coding System, art. 7, 8..................................................................................... 18

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. RICHARD K. EATON, JUDGE

_____

|  |  |  |
|---|---|---|
| QUANTIFIED OPERATIONS LTD, *ET AL.*, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Consol. Court No. 22-00178 |
| | : | |
| UNITED STATES, | : | |
| | : | |
| Defendant. | : | |

_____

### DEFENDANT'S REPLY MEMORANDUM OF LAW IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT

Defendant, the United States (the Government), submits this reply memorandum in opposition to plaintiffs' Quantified Operations Limited (Quantified) and WobbleWorks (HK) (WobbleWorks) (collectively Plaintiffs) motion for summary judgment and in further support of our cross-motion for summary judgment.

### INTRODUCTION

As more fully set forth in our cross-motion for summary judgment, this action concerns U.S. Customs and Border Protection (CBP)'s classification of 3D Printing Pens used to create three-dimensional objects. At issue is whether the 3D Printing Pens are classified as "other toys" of heading 9503 of the Harmonized Tariff Schedule of the United States (HTSUS), duty free, and, if not, whether they are classified as "machinery for working . . . plastics" of heading 8477, HTSUS, as classified by CBP and the World Customs Organization, or under heading 8467, HTSUS, as "tools for working in the hand" or heading 8516, HTSUS, as "other electrothermic appliances of a kind used for domestic purposes."

As we explained in our cross-motion, the 3D Printing Pens are instruments used to create art and crafts. Users of the 3D Printing Pens build and create dragons, bugs, miniature Eiffel Towers, ornaments, wearables, masks, lampshade decorations, and perform household repairs. Plaintiffs concede that the 3D Printing Pens deposit molten thermoplastic that cools into a freestanding three-dimensional structure. And they describe the merchandise as a motorized applicator that processes separate plastic feedstock through a heated dispensing system to create these three-dimensional structures. That is not a description of a plaything. It is a description of a device that creates a plastic object and, at the same time, of a machine that heats and extrudes plastic to do so. The 3D Printing Pens are covered by heading 8477, not heading 9503.

The items excluded from heading 9503 show that the 3D Printing Pens are not toys. The heading 9503 exclusions specifically covering paints, crayons, pastels, drawing books and modeling paste share a unifying characteristic: they are all instruments or media used to create art and crafts. Like the 3D Printing Pens at issue, this class of goods are not principally used for amusement, diversion, or play. Moreover, there is no "industrial" limitation in the text of heading 8477. CBP appropriately classified the merchandise, which is consistent with the World Customs Organization's persuasive, and emphatic, decision to classify identical 3D printing pens under heading 8477.

The undisputed facts, measured against the actual text of the headings, compel a single conclusion: the 3D Printing Pens are machinery for working plastics of heading 8477, not toys of heading 9503. Accordingly, Plaintiffs' motion should be denied and the Government's cross-motion should be granted.

2

## <u>ARGUMENT</u>

**I.    THE 3D PRINTING PENS ARE NOT "OTHER TOYS" OF HEADING 9503**

As discussed in our cross-motion and further below, the 3D Printing Pens are not "other toys" of heading 9503, HTSUS.  As a preliminary matter, Plaintiffs contend that the Government "admitted" a comprehensive record and thus "cannot overcome" toy classification.  *See* Plaintiffs' Response in Opposition to Defendant's Cross-Motion for Summary Judgment and Reply in Support of Plaintiffs' Motion for Summary Judgment (Pls. Reply) at 2–3, 5–7, ECF No. 62 (June 5, 2026).  Plaintiffs confuse fact with legal consequence.[1]  The Government does not dispute that the 3D Printing Pens are small, handheld, and, for limited models, colorfully packaged; that they are sold in both craft and toy channels; that some consumers call them "fun"; or that they have appeared in *holiday* gift guides.  *See* Pls. Reply at 6–7.  Those are descriptions of the merchandise and its commercial setting.  But it does not answer the controlling legal question of whether the principal use of the class or kind of merchandise to which the 3D Printing Pens belong are for "amusement, diversion, or play."  Under the two-step classification inquiry, where the nature of the merchandise is not in dispute, such as here, the remaining issue is the meaning of the relevant tariff provisions, which is a question of law.  *See Bausch & Lomb, Inc. v. United States*, 148 F.3d 1363, 1365 (Fed. Cir. 1998); *RKW Klerks Inc. v. United States*, 592 F. Supp. 3d 1349, 1354 (Ct. Int'l Trade 2022) ("When no factual dispute exists regarding the merchandise, resolution of the classification turns solely on the [the meaning of the relevant

---

[1] The Government's objections that "toy," "play," and "amusement" are legal conclusions are well-founded and not limited to "word-choice quarrels."  Pls. Reply at 2, 5–6. Whether merchandise is a "toy" of heading 9503 is the legal question presented. The Government properly responded under USCIT Rule 56.3, leaving the Court free to draw the governing legal inference from facts that, properly understood, compel classification outside heading 9503.

tariff provisions].").  Plaintiffs simply characterize the Government's refusal to contest facts relating to the subject merchandise as a concession of the ultimate legal question, which the Government squarely disputes.  *See* Defendant's Cross-Motion for Summary Judgment and Response in Opposition to Plaintiffs' Motion for Summary Judgment (Gov't Brief), ECF No. 58 (March 12, 2026).

### A.  ARI 1(a) Requires Identification of the Principal Use of the Commercially Fungible Class to Which the 3D Printing Pens Belong

Plaintiffs argue that the Government invents a class or kind of article covering instruments used to create art and crafts—while fashioning a "creative-play toy set" class themselves—and that such category of merchandise does exist in any heading of the HTSUS, rendering the Government's analysis improper and contrary to ARI 1(a).  *See* Pls. Reply at 3–4, 5, 8–9.

Plaintiffs' argument misstates the analysis under ARI 1(a) and misunderstands the purpose of the principle-use framework.  Classification under a use provision "is to be determined in accordance with the use in the United States at, or immediately prior to, the date of importation, of goods of that class or kind to which the *imported goods* belong, and the controlling use is the principal use."  ARI 1(a), HTSUS (emphasis added).  In other words, to determine whether merchandise is classified under a use provision, the court must look to "those goods that are commercially fungible with the imported goods" to determine the "class or kind" of goods to which the *imported goods* belong.  *Primal Lite, Inc. v. United States*, 182 F.3d 1362, 1364 (Fed. Cir. 1999).  In determining which goods are "commercially fungible" with the imported goods, and thus in determining the class or kind of goods to which the imported goods belong, the Court may consider the *Carborundum* factors.  *Aromont USA, Inc. v. United States*, 671 F.3d 1310, 1312–13 (Fed. Cir. 2012) (citing *BenQ Am. Corp. v. United States*, 646 F.3d

4

1371, 1377 (Fed. Cir. 2011)); *Processed Plastics Co. v. United States*, 473 F.3d 1164, 1170 (Fed. Cir. 2006) (stating that the "factors are simply areas of inquiry that may prove useful in determining what is the principal use of merchandise alleged to be a 'toy'").

After determining the "class or kind" of the imported goods, the Court determines whether the "principal use" of this class or kind is the use described by the HTSUS provision. *See* ARI 1(a) ("[T]he controlling use is the principal use"); *see also Minnetonka Brands, Inc. v. United States*, 110 F. Supp. 2d 1020, 1028 (Ct. Int'l Trade 2000) (finding that, because the evidence showed that "the subject merchandise belongs to the class or kind of merchandise whose principal use is amusement, diversion or play," the merchandise is properly classified as "toys" of heading 9503). The purpose of the principal use framework is "to classify particular merchandise according to the ordinary use of such merchandise, even though particular imported goods may be put to some atypical use." *Primal Lite*, 182 F.3d at 1363; *GRK Canada, Ltd. v. United States*, 180 F. Supp. 3d 1260, 1267 (Ct. Int'l Trade 2016), *aff'd*, 885 F.3d 1340 (Fed. Cir. 2018); *see also Clarendon Mktg., Inc. v. United States,* 144 F.3d 1464, 1467 (Fed. Cir. 1998) (stating that such use provisions "may function as a controlling legal label, in the sense that even if a particular import is proven to be actually used inconsistently with its principal use, the import is nevertheless classified according to its principal use").[2]

ARI 1(a) thus does not require that the class or kind correspond to a single tariff heading, or to any tariff heading at all. Rather, "the statute [] call[s] for a determination as to the group of goods that are commercially fungible with the imported goods." *Primal Lite*, 182 F.3d at 1365. As we indicated in our cross-motion, a review of the *Carborundum* factors indicate that the

---

[2] An example from *Primal Lite* elucidates this purpose: "a classification covering vehicles principally used for automobile racing would cover a race car, even if the particular imported car was actually used solely in an advertising display." *Primal Lite*, 182 F.3d at 1363

imported 3D Printing Pens belong to a class of instruments principally used to create art, crafts, decorations, and like objects.  The relevant headings for articles defining the Government's proposed class—handheld instruments used to create art, crafts, etc.—are scattered across the tariff schedule.  That is a feature of the tariff schedule, not a flaw in the Government's "class or kind" analysis.[3]

### B. The Exclusions in Explanatory Note to Heading 9503 Support Finding that the 3D Printing Pens Belong to a Class or Kind of Arts and Crafts Instruments

Plaintiffs then characterize the exclusion in Explanatory Note 9503 as a random "list" of "anti-duplication rules" with no organizing principle.  Pls. Reply at 12–13.  Nothing in the text of the Explanatory Notes supports Plaintiffs' narrow reading.  The Explanatory Note excludes from heading 9503 paints put up for children's use, modeling pastes put up for children's amusement, children's drawing and coloring books, and crayons and pastels for children's use.  The drafters recognized that certain articles geared towards children's use or amusement are excluded from classification as toys under the HTSUS.  The noted examples are merely consistent with classification principles surrounding toys, such that not "every eye-catching, child-friendly article [is] a toy, simply because it enhances a child's imagination[.]"  *Simon Marketing, Inc. v. United States*, 395 F. Supp. 3d 1280, 1291 (Ct. Int'l Trade 2005).  Markers and crayons "enhance a child's imagination" too, yet those products are not classified as toys.  The unifying characteristic of such products is that each are an instrument or medium used to create art, crafts, or just a doodle.  The drafters understood that toys are those in which the amusement is intrinsic

---

[3]  As the Government discusses in the following section, the result of this dispersion of the class results in the classification of the 3D Printing Pens under heading 8477.

and complete in the object itself (*e.g.* a toy vehicle) and articles that are used for creative expression are classified elsewhere.

Plaintiffs also insist the crayon analogy "breaks down" because a crayon is itself the deposited material while the 3D Printing Pen is a motorized applicator acting on separate feedstock. *See* Pls. Reply at 10, 24. The distinction is accurate but legally irrelevant. Classification of the 3D Printing Pens turns on how the article is used, not on the engineering by which it works. A fountain pen, a marker, an airbrush, and a mechanical pencil all deposit a separate medium through different mechanisms. But they are all used to write, draw, paint, etc. That the 3D Printing Pen uses a motor, a gear assembly, and a heater to deposit its medium does not transform an instrument of creation into a plaything.[4]

Plaintiffs further seek to confine the excluded articles to creating "two-dimensional" media. Pls. Reply at 10, 12–13. But that also has no support in the Explanatory Notes, as they specifically identify modeling paste, a medium for forming three-dimensional shapes, as excluded from classification under heading 9503. Just as with Plaintiffs' 3D Printing Pens, a user of modeling paste would create a freestanding three-dimensional object, but the modeling paste is not classified as a toy. Thus, Plaintiffs' distinction between media used to make a two-dimensional versus three-dimensional creation, *see* Pls. Reply at 10, cannot be correct. Rather, the relevant commonality between the noted exemplars is not the dimensionality of the output but the fact that these are all instruments for creation. Here, the 3D Printing Pen is a medium-and-applicator used to bring an external object into being. *See* Pls. Reply at 10, 24. The fact that it builds outward in three dimensions rather than flat on a page places it nearer to modeling paste.

---

[4] If anything, the motorized, heated, extruding mechanism confirms the Government's proposed classification as a *machine*, and a machine for working plastic belongs in heading 8477.

That is precisely why Plaintiffs referred to its product as a magical crayon—not because it is exactly like a crayon—but because its use is the same, other than the fact that it can "draw" in three dimensions.

Plaintiffs additionally argue that its 3D Printing Pens are not "drawing instruments." Pls. Reply at 10–13. Plaintiffs' argument is belied by the record. At every turn, Plaintiffs describe their products as used to "draw." DSOF ¶¶ 24–36. Nor can Plaintiffs neutralize their own marketing as "colloquial." Pls. Reply at 11, 20, 40. The official websites, catalogs, sell sheets, user guides, and packaging uniformly describe the pens as devices to "draw" in 3D, "make art," "design wearables," "decorate," and "fix things." DSOF ¶¶ 24–36. Plaintiffs' marketing also aligns with the article's physical operation and actual use, which is to draw shapes in three dimensions. Plaintiffs' attempt to recharacterize "draw in 3D" as mere launch-era branding, *see* Pls. Reply at 11, cannot survive the consistency of their own materials, which describe creation, design, and fixing as the 3D Printing Pens' purpose across every model and every channel. Plaintiffs further note that "drawing instruments" of Chapter 90 do not appear by name on the exclusion list. *See* Pls. Reply at 9, 13. Plaintiffs' observation proves nothing. The Explanatory Note excludes media and instruments of creation by example, not exhaustively, and it directs each to the heading that most specifically describes it. The 3D Printing Pen is not a Chapter 90 drawing or drafting instrument, and the Government has not argued that it is. An instrument principally used for creating a permanent and tangible item is not, for that reason, a toy, regardless of whether the particular article happens to be enumerated in the Explanatory Note exclusions. The Explanatory Notes serve to confirm that the 3D Printing Pens do not belong to a class or kind of merchandise principally used for amusement.

8

### C. The "Output-Producing" Exemplars in Explanatory Note 95.03(D) Are Reduced-Capacity Role-Play Miniatures

The other exclusions identified in the Explanatory Note to heading 9503 do not support Plaintiffs' position. Plaintiffs lean heavily on the Explanatory Notes' inclusion of toy chemistry, printing, sewing, and knitting sets, arguing that those produce "tangible outputs" yet remain toys. Pls. Reply at 14. Plaintiff fundamentally misunderstands the Government argument and ignores what the Explanatory Note says. The Explanatory Note explains that such toys, described as "educational toys," "may be capable of a limited 'use,'" but are "generally distinguishable by their size and limited capacity from real" articles. Essentially, these toys are miniature, reduced-capacity representations of adult items. And these articles' play value, or use as playthings, lie in mimicking an adult activity. *See Processed Plastics*, 473 F.3d 1164 (using the term "play value" in classifying merchandise under heading 9503). In these instances, a child pretends to be a chemist, a printer operator, or a seamstress. The output is a byproduct of role-play, not the reason the article exists. As we indicated in our cross-motion, CBP has explained that, in such educational sets, "any actual learning of principles . . . is incidental to the entertainment value of the role-playing." *See* CBP Ruling HQ H195956 (Feb. 27, 2012); *cf.* CBP Ruling HQ H123917 (Mar. 28, 2011) (finding that a "Light N Sound Phonics" electronic learning device was not an "educational toy" as identified by the ENs).

Here, the 3D Printing Pens are not reduced-capacity, miniature versions of some "real" 3D Printing Pen used by adults, but the "real" article itself. *See* EN 95.03(D). Indeed, Plaintiffs market the 3D Printing Pens to "artists, makers, designers (fashion and home), educators, engineers, DIY fixers, [and] hobbyists," DSOF ¶ 36, and tout the professional-grade model as suitable for architects. A device that performs the very function professionals use it for, at the very capacity they use it at, is not a toy "distinguishable . . . by . . . size and limited capacity from

9

real" articles.  It is the thing itself.  The 3D Printing Pens thus belong with the excluded instruments of creation, not with the role-play miniatures.

Moreover, Plaintiffs seek to reduce the Government's argument to the fact that the 3D Printing Pens are "output-producing" articles.  In doing so, Plaintiffs marshal a series of CBP rulings classifying craft kits—cross-stitch kits, jewelry kits, bath-bomb kits—as toys.  Pls. Reply at 16.  Those rulings, not binding on this court, do not help them.  Unlike craft kits, the 3D Printing Pens are not consumable kits to make one predetermined craft.  Instead, the 3D Printing Pens are durable, reusable instruments that a user employs again and again to create whatever the user wishes: art, decorations, wearables, replacement parts, and repairs.  The proper analogue is therefore the crayon, paint, and modeling paste, the instruments and media themselves, not consumable kits.  And to the extent the pens are sold bundled with filament and stencils, the set takes its essential character from the pen, around which the package is built.  *Cf.* Pls. Reply at 26–27; GRI 3(b).[5]

### D. The 3D Printing Pens Are Commercially Fungible with Instruments Used to Make Art and Crafts under the *Carborundum* Factors

Plaintiffs contend that the 3D Printing Pens belong to a class of "creative-play toy sets" based on a review of the *Carborundum* factors.  Pls. Reply at 17–32.  But as we explained in our cross-motion, the *Carborundum* factors, properly applied,[6] indicate that the 3D Printing Pens

---

[5] Plaintiffs confuse the term "set" from a classification perspective and the "sets' or "kits" identified in HQ Rulings.  The imported merchandise are sets from a classification perspective because they contain more than one product, such as plastic filaments and a charging cable.  *See* GRI 3(b).  But that does not render them akin to the "kits" identified by Plaintiffs.

[6] Plaintiffs attempt to fault the Government for "select[ing] a few factors," Pls. Reply at 19, but the Government addressed every *Carborundum* factor, while noting that courts have given different weight to each factor depending on the context.  *See Processed Plastics*, 473 F.3d at 1170.

belong to a class of instruments whose principal use is the creation of art and crafts, not amusement. Plaintiffs' response to the Government's *Carborundum* analysis underscores the mistake in their analysis under ARI 1(a). Plaintiffs claim, for example, that "a *Carborundum* analysis conducted against [the Government's proposed class] answers the wrong question," Pls. Reply at 18, and that Government applies the factors to a litigation-constructed class. Pls. Reply at 17. But the *Carborundum* factors are used to *determine* the class of goods that is commercially fungible with the imported merchandise, not the other way around.

Plaintiffs' effort to turn *Processed Plastics* into a decision that compels toy classification, Pls.' Reply at 17–18, misreads the case. First, *Processed Plastics* stands for a proposition that the *Carborundum* factors "are simply areas of inquiry that may prove useful" and do not carry "weight equal to principal use in defining 'toys.'" *Processed Plastics*, 473 F.3d at 1170. There, the court found that the significance of certain factors, such as channels of trade, is reduced because the beach bags were sold in sets with toys. Here, as we explained in our cross-motion, the significance of the economic practicality, channel of trade, and recognition in the trade factors has reduced weight where such factors could at most equally apply to toys and non-toys, such as board games, musical instruments, video games, and other products that are generally marketed to children. *See* Gov't Br. at 22–24. Second, Plaintiffs' contention that the backpacks and beach bags in *Processed Plastics* had an evident utilitarian function of carrying things, while the 3D Printing Pens have "no evident primary utilitarian function" is incorrect on the undisputed record. The 3D Printing Pens' function is evident, and it is the very thing Plaintiffs market, which is the creation of three-dimensional objects from plastic.

As we indicated in our cross-motion, the actual use, physical characteristics, environment of sale, and expectations of the ultimate customers most strongly indicate that the 3D Printing

11

Pens are of a class or kind of merchandise used to create art or crafts, whether driven by artistic creation, the need for a repair, or to design and decorate. *See* Gov't Br. at 16–22. As to actual use, "one of the more important of the *Carborundum* factors," *Aromont*, 671 F.3d at 1313, Plaintiffs accuse the Government of "conflat[ing] mechanism with use," Pls. Reply at 19, but the 3D Printing Pens' mechanics are that it heats and then extrudes the plastic. The user then *uses* this mechanism to *draw* and create objects. And that the user enjoys creating does not change the use; the amusement is derived entirely from using the 3D Printing Pen to create. As to physical characteristics, the 3D Printing Pens are shaped and sized like markers, are held by hand, and consume a separate medium during use, which makes them comparable to colored pens, crayons, and modeling pastes, and not to playthings. The physical characteristics highlighted by Plaintiffs merely add "playful" and "colorful" to those characteristics that are common to other art and crafts instruments. Pls. Reply at 25. As to the environment of sale, official websites, catalogs, sell sheets, and user guides describe the pens as devices used to "draw" in 3D, "make art," "design wearables," "decorate," and "fix things." Gov't Br. at 16–17; DSOF ¶¶ 24–36. Plaintiffs direct to the Court to the packaging as a whole, describing it as "colorful" and "child-oriented,"[7] but that is belied by the actual packaging, which focuses on the use of the instrument to make art and crafts. Further, the accessories Plaintiffs tout—filaments, stencils, project booklets, and silicone mats—are the equipment of creation, not indicia of play.

---

[7] The packaging curiously states that the device is for "Adult use only" and to "Keep out of reach of children." It also indicates it is intended for persons 14 or older, which appears to remove the product from mandatory safety standards and regulations for toys under 15 U.S.C. § 2056b and 16 C.F.R. Part 1250. *See also* https://www.cpsc.gov/Business--Manufacturing/Business-Education/Toy-Safety (last visited June 26, 2026) (defining "toys" as "any object designed, manufactured, or marketed as a plaything for children under 14 years of age"). Plaintiffs' claim that the colorful, whimsical, or child-like aspects of its marketing carries any weight is incompatible with Plaintiffs' choice to design, manufacture, and market the 3D Printing Pens as a product intended for teenagers.

Finally, as to the expectations of the ultimate purchasers, Plaintiffs' materials identify the buyers as "artists, makers, designers . . . , educators, engineers, DIY fixers, [and] hobbyists," Pls. Reply at 29, while reviews describe the product as "a 3D crayon," a "magical crayon," and a tool purchased "to craft," Gov't Br. at 23. That certain reviews describe children as "playing" with the 3D Printing Pens is merely a description that the child used the device to make three-dimensional shapes.[8] Plaintiffs' further insistence that the same words "create," "design," "decorate," "fix" really means amusement, simply restates their flawed premise that any enjoyable act of creation is "creative play." Pls. Reply at 29–30. It is not. Paints and crayons "enhance a child's imagination" too, *Simon*, 395 F. Supp. 3d at 1291, and they are not toys all the same.

\* \* \*

Critically, Plaintiffs have not presented what, if anything, provides amusement for the merchandise as a toy other than the 3D Printing Pens are used to draw in 3D. Pls. Reply at 17 (stating that the "value lies in the creative amusement of doodling in 3D"). The novelty that Plaintiffs' devices can draw in 3D, rather than 2D, cannot be the sole basis for classification as a toy and render them indistinguishable from other handheld instruments that use a medium to create a permanent tangible item, even those designed for children's use. The "play value" Plaintiffs document is derived entirely from using the pen to create, which is precisely the incidental amusement that does not establish toy classification. *Childcraft Education Corp. v. United States*, 742 F.2d 1413, 1420 (Fed. Cir. 1984); *Simon*, 395 F. Supp. 3d at 1291. The *Carborundum* factors place the 3D Printing Pens commercially fungible with the excluded

---

[8] Take the phrase "the child played with the pen." A reasonable English speaker would not understand that to mean the child *wrote* or *drew* with the pen. The natural reading is that the child spun or fidgeted with it.

13

instruments of creation.  And the volume of Plaintiffs' evidence does not change the result, because evidence that consumers enjoy a creation instrument no more transforms it into a toy than a child's enjoyment of crayons, paints, or modeling paste removes those excluded media from their proper headings.  Accordingly, the 3D Printing Pens are not toys of heading 9503.

## II.    THE 3D PRINTING PENS ARE "MACHINERY FOR WORKING PLASTICS" OF HEADING 8477

The 3D Printing Pens are machinery for working plastics under heading 8477 because they heat and extrude thermoplastic feedstock to shape it, meeting the plain meaning of the heading's terms.  Plaintiffs read an unwritten "industrial" limitation into the heading, by recasting "working plastics" as a plastics-industry term of art.  None of Plaintiffs arguments square with the text of the heading.  Moreover, Plaintiffs' challenge to the WCO's classification of the 3Doodler under heading 8477 is merely limited to a claim that it has no persuasive value, and its resort to the opinion's history only confirms that the merchandise belongs in Chapter 84 rather than Chapter 95.

### A.    The Plain Meaning of Heading 8477 Compels Classification of the 3D Printing Pens as "Machinery for Working Plastics"

Under GRI 1 and the plain language of heading 8477, the 3D Printing Pens are "[m]achinery for working . . . plastics . . . not specified or included elsewhere in this chapter." The 3D Printing Pens satisfy each of the terms in the heading.  They are "machinery" because they are mechanically and electrically operated devices that, by use of a motor and a gearbox, drive plastic filament through a heated nozzle.  DSOF ¶¶ 8, 16–22.  And they "work" plastics because they apply heat and force to soften thermoplastic feedstock and extrude it into shapes retained on cooling.  In other words, they extrude plastics of Chapter 39.  *See* Note 1, Ch. 39, HTSUS (describing "plastics" as materials "capable . . . of being formed under external influence

14

(usually heat and pressure . . . ) by molding, casting, extruding, rolling or other processes"). Standard dictionary and other lexicographic sources confirm that "to work" a material means to shape, form, or fashion it, and that "machinery" is a mechanically or electrically operated device for performing a task. *See* Gov't Br. at 24–26. The 3D Printing Pens thus comfortably fit within the plain meaning of the terms of heading 8477.

Plaintiffs only answer to the Government's GRI 1 argument is to read into heading 8477 a litany of limitations—industrial scale, durable steel construction, thousands of watts, throughput in pounds per hour—where none appears in the text of heading 8477. Pls. Reply at 37–38. That is not statutory interpretation. It is a wholesale amendment of the tariff provision. The heading covers "machinery for working . . . plastics," and not "industrial machinery with a high-throughput in continuous industrial service" as suggested by Plaintiffs. A benchtop extruder is no less an extruder for being small, and a low-output machine that works plastics, just as a 3D Printing Pen, is no less "machinery for working . . . plastics" for being slow. Although exemplars in the Explanatory Notes or *eo nomine* provisions in subheadings provide guidance, they cannot be used to narrow the scope of a heading. *Orlando Food Corp. v. United States*, 140 F.3d 1437, 1440 (Fed. Cir. 1998). Classification proceeds "top-down," beginning with the language of the heading. *Gerson Co. v. United States*, 898 F.3d 1232, 1240 (Fed. Cir. 2018). Plaintiffs' analysis inverts that rule, starting from the industrial exemplars in the Explanatory Note and the subheading structure and working backward to graft an "industrial" limitation onto the heading text. Pls. Reply at 35–38. Moreover, it provides no room for any new article of working plastics to be classified under heading 8477, merely because of current structure of the heading.

15

Plaintiffs' "industry-based" argument rests entirely on a single sentence in the general-arrangement portion of the Chapter 84 Explanatory Note, which states that certain headings cover machines "by reference to the field of industry in which they are used."  Pls. Reply at 35–36.  But that same Note applies "with certain exceptions," and the Note elsewhere states that Chapter 84 covers "all machinery" not otherwise excluded.  EN to Ch. 84(A)–(B). More fundamentally, an Explanatory Note cannot narrow the scope of a heading whose text plainly covers a subject good.  *The Container Store v. United States*, 864 F.3d 1326, 1331–32 (Fed. Cir. 2017) ("Explanatory Notes may not be deployed to contravene the plain meaning of a tariff provision").  Heading 8477 makes no mention of industrial machinery, and the general-arrangement note cannot supply the limitation that Plaintiffs seek.

What's more, Plaintiffs' argument as to the proper interpretation of the Explanatory Notes is undercut by the decision of the Harmonized System Committee (HSC) of the WCO, the very body that drafts the Explanatory Notes, to classify the 3Doodler model under subheading 8477.80.  As we indicated in our cross-motion, the WCO Classification Opinion describes a printing pen that extrudes heated ABS and PLA (*i.e.* plastic) to create free-hand three-dimensional objects, and the accompanying illustration is Plaintiffs' own product.  If the Explanatory Note's "field of industry" language provide the limitation Plaintiffs suggest, Pls. Reply at 35–36, the body that drafted that language would not have placed these very same goods under heading 8477.  Plaintiffs cannot wield the Explanatory Notes against the considered judgment of the institution that wrote them.

The opinion of Plaintiffs' plastics industry expert, Dr. Kazmer, similarly creates a plastics industry limitation within heading 8477 where none exists.  Dr. Kazmer's definition of "working plastics" is confined to "controlled, high-throughput, force-driven" industrial transformation.

16

Pls. Reply at 37–38.  But Dr. Kazmer provides an industry interpretation that contradicts both the unqualified statutory text and the WCO's classification of the identical article.  Expert testimony "is only advisory and has no binding effect on the court," and because the court "may further obtain knowledge of the common meaning of a term from dictionary, lexicons [or] written authorities" the expert testimony cannot be "contradicted[] by reliable textual sources."  *Kahrs Int'l, Inc. v. United States*, 791 F. Supp. 2d 1228, 1241 (Ct. Int'l Trade 2011) (citations omitted); *GRK Canada*, 180 F. Supp. 3d at 1279 ("While opinions of witnesses as to common meanings of terms may properly be considered as advisory, the usual rule is to consult standard lexicographers to determine the common meaning of statutory words") (citing *United States v. Crosse & Blackwell, Inc.*, 22 C.C.P.A. 214, 217–218 (1934)).  The Court should decline the invitation to rewrite heading 8477 to exclude any machine that is small, inexpensive, or slow based on the fact that a plastics engineer defines "working plastics" within an industry context.

Finally, Plaintiffs make much of the Government's reliance on the "working plastics" prong rather than the "manufacture of products from plastics" prong of heading 8477.  Pls. Reply at 36–37.  But this is irrelevant.  Heading 8477 is disjunctive, providing for machinery for working plastics *or* for the manufacture of products from plastics, and a product satisfying either prong is classified in heading 8477.  That the 3D Printing Pens "work" plastics by heating and extruding thermoplastic feedstock is sufficient on its own to classify the merchandise under heading 8477.  Plaintiffs' reliance on *EOS of North America, Inc. v. United States*, 911 F. Supp. 2d 1311 (Ct. Int'l Trade) is similarly misplaced, as it concerned a laser-sintering machine claimed to be classified under the "manufacture of products" prong, and has no bearing on whether the pens "work" plastics under the first prong.  *See EOS*, 911 F. Supp. at 1336.

17

### B. The WCO Classification Opinion Is Strong Persuasive Authority

Plaintiffs' challenge the WCO classification opinion as non-binding, lacking a principal-use analysis, and previously opposed by the United States. Pls. Reply at 40–42. None of these points defeats its persuasive force. First, the Government does not contend that the HSC opinion binds this Court. *see* Pls. Reply at 40–41; *Cummins, Inc. v. United States*, 454 F.3d 1361, 1366 (Fed. Cir. 2006). It is, however, strong persuasive authority on the classification of the same merchandise—the 3Doodler—and crediting it advances the uniformity in international classification that the United States, as a contracting party to the Harmonized System Convention, has committed to pursue. 80 Fed. Reg. 34,924 (June 18, 2015); HS Convention, art. 7, 8. Rather than conflict with this Court's *de novo* review, the Court, as part of that very review, may consider the WCO Opinion for its persuasive effect. *See Degussa Corp. v. United States*, 508 F.3d 1044, 1047 (Fed. Cir. 2007). Thus, this Court's *de novo* review does not render the considered, on-point judgment of the international committee irrelevant, but rather informs this Court as to the correct interpretation of heading 8477.

Moreover, as the exhibits provided by plaintiff reveal, the WCO's decision reflected the considered judgment of the international committee. *See* Pls. Reply at Exhibit N. Plaintiffs quip that the HSC did not consider heading 9503 nor have physical samples. Pls. Reply at 41. But the HSC was provided with a detailed description of the product, including user manuals. *See* Exhibit N. Indeed, the merchandise was described as have a broad scope: being used "in fine arts," for "the creation of the usage of decorative elements," as a "toy for children," or "for the use in the repair of things." But the Secretariat found that only heading 8477 and 8516 merit consideration, and none of the other delegates suggested a heading other than heading 8477 or 8516, with the United States as the only delegated that suggested, and voted for, heading 8467.

18

This only reinforces that the subject merchandise is classified under Chapter 84, or if not, under Chapter 85—but not under heading 9503.  Given the above, the WCO's on-point opinion supplies the best indication of the proper interpretation of heading 8477.  *Warner-Lambert Co. v. United States*, 407 F.3d 1207, 1209 (Fed. Cir. 2005).

Second, the HSC's declination to disturb its classification over the United States reconsideration request only furthers the persuasive effect of the WCO opinion, given that the delegates considered the classification of the product twice and nevertheless classified it under heading 8477.  Moreover, the history of the classification of 3D printing pens at the WCO confirms that the Government never regarded these articles as toys.  *See* Pls. Reply at Exhibits O, P.  In seeking reconsideration of the classification opinion, the United States argued that the pens belong in heading 8467, as motorized "tools for working in the hand" and proposed amending the Explanatory Note to heading 84.67 to add printing pens as an exemplar.  In other words, the position Plaintiffs hold up as the Government's "true" view was that these articles are Chapter 84 machinery or tools, not Chapter 95 toys.  The Government's position that the 3D Printing Pens were not classified as toys has thus been consistent.

Plaintiffs merely seek to rely on a history in which no participant, at any point, treated 3D printing pens as toys of heading 9503.  That history undermines Plaintiffs' claim far more than it undermines the Government's.  Finally, the Government's decision to classify the 3D Printing Pens under heading 8477 is not, as Plaintiffs suggest, a thoughtless act of "alignment," *see* Pls. Reply at 42, but reflects the considered judgment that identical merchandise belongs in heading 8477 and the institutional interest in uniform classification.

## III.    THE ALTERNATIVE HEADINGS DO NOT COVER THE 3D PRINTING PENS

Plaintiffs alternatively argue that the subject 3D Printing Pens, if not classified under heading 9503, are classified as "other electrothermic appliances of a kind used for domestic purposes" of heading 8516, HTSUS, and if not under heading 8516, then under heading 8467 as "tools for working in the hand . . . with [a] self-contained electric . . . motor" of heading 8467. *See* Pls Br. at 42–45.  As we explained in our cross-motion, neither provision covers the 3D Printing Pens.[9]  *See* Gov't Br. at 32–36.

### A.  The 3D Printing Pens Are Not Tools for Working under Heading 8467

As we indicated in our cross-motion, the 3D Printing Pens are not covered by heading 8467.  The 3D Printing Pens are not a tool for "working" in the hand because the 3D Printing Pens do not alter or manipulate a separate, preexisting material, so that, while the tool is in use, "work is in progress" on another material.  *See* EN 84.67 (Heading 8467 covers "tools designed to be held in the hand during use, and also heavier tools . . . which are portable, . . . in particular *while work is in progress*, and which are also designed to be controlled and direct[ed] by hand during operation.").  Contrary to Plaintiffs' argument, this view follows from the text of heading 8467.  The phrase "tools for working in the hand" in the tariff provisions means that work is being performed by use of the tool.  The exemplars in Explanatory Note to heading 8467 confirms that the scope of tools covered by that heading are limited to those that perform work, and specifically on a separate material: drilling, tapping, and reaming machines; boring machines and rock drills; wrenches, screwdrivers, and nut setters; planning, gauging, and surfacing appliances; filling machines, grinders, sanders, and polishers; circular and chain saws; hammers

---

[9]  Should the Court find that heading 8477 does not cover the subject article, then the Government contends that heading 8467 is more suitable than heading 8516.

of various types; and electric hand scissors.  *Id.*  Each of these tools share a characteristic of manipulating material, by, for example, making a hole, driving a screw, removing a layer, or cutting a piece into two.

First, Plaintiffs' contrary view proves too much.  Plaintiffs essentially argue that the 3D Printing Pens "work" the plastic filaments, by use of heat and force through the nozzle of the pen.  Pls. Reply at 44.  But the filament is not a workpiece the tool acts upon.  It is the deposited medium that *becomes* the created object.  Under Plaintiffs' logic, a glue gun "works" its glue stick and a mechanical pencil "works" its graphite, and every applicator that consumes a medium becomes a "tool for working."  The exemplars Plaintiffs themselves invoke (grinders, concrete vibrators, sand rammers), *see* Pls. Reply at 44–45, only underscore the distinction.  Each example acts upon a separate, preexisting material (a surface, wet concrete, loose sand) to alter or compact it.  But, unlike articles of heading 8477, none creates an object out of a consumed feedstock.

Second, Plaintiffs' argument essentially proves that classification under heading 8477, as machinery for "working plastics" is correct.  But as we explained in our cross-motion, the term "work" in each provision carry different senses.  In heading 8477, the term "working" describes the effect a machine has on the plastic itself, such as by heating it and extruding it through the nozzle of the 3D Printing Pen.  Here, however, as indicated by the Explanatory Notes, the term "working" refers to making progress on a particular task, *i.e.*, where "work is in progress."  *See* EN 84.67.  Applied here, the 3D Printing Pens do not perform work on a separate workpiece.

21

They do not drill, cut, grind, fasten, or refine anything already in existence. Rather, they extrude filament to create a new object in the first instance.

### B. The 3D Printing Pens Serve No Domestic Purpose under Heading 8516

Plaintiffs argument as to classification under heading 8516 fails because the 3D Printing Pens perform no household function. The exemplars in EN 85.16, such as coffee makers, hair dryers, smoothing irons, bottle heaters, towel rails, are united by their use in performing recognized domestic tasks of the kitchen, bathroom, or bedroom. Rather than explain how the 3D Printing Pens perform *any* household—let alone a "core" household task, which the Government did not advocate—Plaintiffs merely claims that any device "used in the home" is covered by heading 8516. Pls. Reply at 44. But that is belied by the plain terms of the heading, which covers those "used for domestic purposes." *See* heading 8516, HTSUS. As we explained in our cross-motion, an "appliance" used for "domestic purposes" covers those designed to perform a household function. *See* Gov't Br. at 35. The 3D Printing Pens perform none and Plaintiffs have not demonstrated otherwise.

Moreover, Plaintiffs' reliance on CBP's classification of glue guns does not further support their argument. *See* Pls. Reply at 43. A glue gun is used to perform the household tasks of adhering material together, whereas the pens are used to create art and objects. Plaintiffs argue that this distinction is "immaterial" because heading 8516 turns on the nature of the

appliance rather than the downstream object.  But the distinction is not the downstream object, but whether the appliance performs a household function at all.

## CONCLUSION

For the reasons above, and those set forth in our cross-motion for summary judgment, we respectfully request that this Court grant our cross-motion for summary judgment and dismiss this action.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

AIMEE LEE
Assistant Director

/s/ Mathias Rabinovitch
MATHIAS RABINOVITCH
Trial Attorney
U.S. Department of Justice, Civil Division
Commercial Litigation Branch
26 Federal Plaza, Room 346
New York, New York 10278
(212) 264-0484

June 26, 2026                    *Attorneys for Defendant*

23

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. RICHARD K. EATON, JUDGE

_____

|  | : |
| QUANTIFIED OPERATIONS LTD, *ET AL.*, | : |
|  | : |
| Plaintiff, | : |
|  | : |
| v. | : | Consol. Court No. 22-00178 |
|  | : |
| UNITED STATES, | : |
|  | : |
| Defendant. | : |
_____ | : |

## CERTIFICATE OF COMPLIANCE

I, MATHIAS RABINOVITCH, a trial attorney in the Office of the Assistant Attorney

General, Civil Division, Commercial Litigation Branch, International Trade Field Office, who is

responsible for the foregoing brief in support of defendant's cross-motion for summary judgment

and response in opposition to plaintiff's motion for summary judgment, relying upon the word

count feature of the word processing program used to prepare the brief, certify that this brief

complies with type-volume limitation under USCIT Standard Chamber Procedure 2(B) and

contains 6,984 words.


/s/ Mathias Rabinovitch
MATHIAS RABINOVITCH